ACCEPTED
15-25-00096-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
7/16/2025 4:08 PM
CHRISTOPHER A. PRINE
CLERK

NO. 15-25-00096-CV

IN THE FIFTEENTH COURT OF APPEALS
AT AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
7/16/2025 4:08:45 PM
CHRISTOPHER A. PRINE
Clerk

**CITY OF COLLEGE STATION,**
*Appellant*,

v.

**PUBLIC UTILITY COMMISSION OF TEXAS,**
*Appellee.*

On Appeal from the 200th Judicial Court,
Travis County, Texas
Cause No. D-1-GN-24-005680

## BRIEF FOR APPELLANT

THOMAS L. BROCATO
State Bar No. 03039030
ROSLYN M. WARNER
State Bar No. 24117520
**LLOYD GOSSELINK**
**ROCHELLE & TOWNSEND, P.C.**
816 Congress Ave., Suite 1900
Austin, Texas 78701
(512) 322-5800
(512) 472-0532 (fax)
tbrocato@lglawfirm.com
rwarner@lglawfirm.com

ADAM C. FALCO
State Bar No. 24055464
**College Station**
**City Attorney's Office**
P.O. Box 9960
College Station, Texas 77842
(979) 764-3746
(979) 764-3481 (fax)
afalco@cstx.gov

**ATTORNEYS FOR APPELLANT, CITY OF COLLEGE STATION**
**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| **Appellant:** | **Attorneys for Appellant:** |
| City of College Station | Thomas L. Brocato<br>Roslyn M. Warner<br>Lloyd Gosselink<br>Rochelle & Townsend, P.C.<br>816 Congress Avenue, Suite 1900<br>Austin, Texas 78701<br>(512) 322-5800<br>(512) 472-0532 (fax)<br>tbrocato@lglawfirm.com<br>rwarner@lglawfirm.com |
| | Adam C. Falco<br>College Station<br>City Attorney's Office<br>P.O. Box 9960<br>College Station, Texas 77842<br>(979) 764-3746<br>(979) 764-3481 (fax)<br>afalco@cstx.gov |
| **Appellee:** | **Attorneys for Appellee:** |
| Public Utility Commission of Texas | Jordan Pratt<br>John R. Hulme<br>Office of the Attorney<br>General of Texas –<br>Environmental<br>Protection Division<br>P.O. Box 12548 (MC-066)<br>Austin, Texas 78711-2548<br>(512) 463-2012<br>(512) 320-0911 (fax)<br>jordan.pratt@oag.texas.gov<br>john.hulme@oag.texas.gov |

**Intervenor:**

Office of Public Utility Counsel

**Attorneys for Intervenor:**

Benjamin Barkley
Justin Swearingen
Chris Ekoh
Office of Public Utility Counsel
P.O. Box 12397
Austin, Texas 78711-2397
(512) 936-7500
(512) 936-7525 (fax)
justin.swearingen@opuc.texas.gov
chris.ekoh@opuc.texas.gov

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL ............................................ 2

TABLE OF CONTENTS ........................................................................ 4

INDEX OF AUTHORITIES ................................................................... 6

GLOSSARY OF TERMS ........................................................................ 8

STATEMENT OF THE CASE ................................................................ 10

STATEMENT REGARDING CITATION FORM ................................... 11

STATEMENT REGARDING ORAL ARGUMENT ............................... 11

ISSUE PRESENTED FOR REVIEW ...................................................... 12

STANDARD OF REVIEW ...................................................................... 14

STATEMENT OF FACTS ....................................................................... 17

      A.    College Station is a Transmission Service Provider. ........................................................... 17

      B.    General Fund Transfers are a Common MOU Expense Routinely Approved in TCOS Rates. ..................... 19

      C.    College Station Began Including a GFT in Transmission Rates After Approval of its 2007 Interim TCOS Application. ................................. 19

      D.    College Station Appeals the Commission's Decision in PUC Docket No. 52728 ..................................... 23

SUMMARY OF THE ARGUMENT ....................................................... 27

ARGUMENT & AUTHORITIES ............................................................ 30

      A.    The Commission's decision to order a refund for College Station's historical inclusion of a GFT is reversible error under the Administrative Procedure Act. ............................................... 30

            1.    The Final Order is arbitrary and capricious and constitutes an abuse of discretion. ..................... 30

a. The Final Order arbitrarily develops a new standard and retroactively imposes it on College Station.............................. 32

   i. There is no requirement that a GFT must first be included in a comprehensive TCOS filing to be subsequently included in an interim TCOS filing. ................................... 32

   ii. The Commission's made-up standard constitutes invalid ad hoc rulemaking. .......................................... 36

b. The Commission provides no explanation for rejecting the unequivocal circumstances supporting good cause. ........................................... 41

2. The Final Order is not reasonably supported by substantial evidence.................................................. 44

a. The evidence shows the Commission's established practice is to approve inclusion of GFTs as "other associated taxes" under the TCOS Rule............................... 45

b. The evidence shows the Commission approved College Station's GFT inclusion in three previous orders. ..................... 48

c. The reliable witness testimony does not support the Commission's decision...................... 50

d. Despite the developed record, the Final Order unreasonably contradicts itself and fails to ground the Commission's decision in the evidence. .................................... 53

CONCLUSION AND PRAYER ............................................................. 58

CERTIFICATE OF COMPLIANCE ...................................................... 60

INDEX OF APPENDICES .................................................................... 61

# INDEX OF AUTHORITIES

**Cases**                                                                           **Page**

*CenterPoint Energy Entex v. R.R. Comm'n*, 213 S.W.3d 364 (Tex. App.—Austin 2006, no pet.) .............................................................. 37, 56, 57

*Cities of Port Arthur v. R.R. Comm'n*, 886 S.W.2d 266 (Tex. App.—Austin 1994, no writ) ...................................................................51, 57

*City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179 (Tex. 1994) ....... 30

*Dutchmen Mfg. v. Tex. DOT*, 383 S.W.3d 217 (Tex. App.—Austin 2012, no pet.) ...............................................................................................54

*Gulf States Utils. Co. v. Pub. Util. Comm'n*, 841 S.W.2d 459 (Tex. App.—Austin 1992, writ denied).........................................................16

*Heritage on the San Gabriel Homeowners Ass'n v. Tex. Comm'n on Envtl. Quality*, 393 S.W.3d 417 (Tex. App.—Austin 2012, pet. denied) ...........................................................................................................15

*McClelland v. Tex. HHS Comm'n*, 635 S.W.3d 410 (Tex. App.—Houston [1st Dist.] 2021, no pet.) .................................................................30

*N.E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243 (Tex. 2020)...................14

*Oncor Elec. Delivery Co. LLC v. PUC of Tex.*, 406 S.W.3d 253 (Tex. App.—Austin 2013, no pet.) .............................................................47

*Pub. Util. Com. v. Gulf States Utils. Co.*, 809 S.W.2d 201 (Tex. 1991) ..15

*Starr Cty. v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.).......................................................31, 53

*Tex. Dep't of Pub. Safety v. Valdez*, 956 S.W.2d 767 (Tex. App.—San Antonio 1997, no pet.) .........................................................................16

*Tex. DOT v. Sunset Transp., Inc.*, 357 S.W.3d 691 (Tex. App.—Austin 2011, no pet.) .......................................................................................37

*Tex. Health Facilities Com. v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446 (Tex. 1984) ............................................................... 15

*Tex. State Bd. of Pharmacy v. Witcher*, 447 S.W.3d 520 (Tex. App.—Austin 2014, pet. denied) ........................................................ 37, 38

*Westlake Ethylene Pipeline Corp. v. R.R. Comm'n of Tex.*, 506 S.W.3d 676 (Tex. App.—Austin 2016, pet. denied) ........................................ 16

## Statutes

Tex. Gov't Code § 1502.059 ...................................................... 12, 19, 40

Tex. Gov't Code § 2001.058 ......................................................... 28, 56

Tex. Gov't Code § 2001.174 ..................................................... 14, 30, 44

Tex. Util. Code § 15.001 .................................................................. 14

Tex. Util. Code § 35.004 .................................................................. 18

Tex. Util. Code § 40.004 .................................................................. 18

## Rules and Regulations

16 Tex. Admin. Code § 25.247 ............................................................ 43

16 Tex. Admin. Code § 25.192 ...................................................... *passim*

# GLOSSARY OF TERMS

| | |
|---|---|
| **ALJs** | Administrative Law Judges Cassandra Quinn and Daniel Wiseman |
| **APA** | Administrative Procedure Act |
| **AR** | Administrative Record |
| **College Station** | City of College Station, a Municipally-Owned Utility |
| **Commission or PUC** | Public Utility Commission of Texas |
| **COL** | Conclusion of Law |
| **CR** | Clerk's Record |
| **DSP** | Distribution Service Provider |
| **ERCOT** | Electric Reliability Council of Texas |
| **Final Order** | Order on Rehearing issued July 11, 2024 |
| **FOF** | Finding of Fact |
| **GFT** | General Fund Transfer |
| **MOU** | Municipally-Owned Utility |
| **OPUC** | Office of Public Utility Counsel |
| **PFD** | Proposal for Decision |
| **PILOT** | Payment in Lieu of Taxes |
| **ROI** | Return on Investment |
| **RR** | Reporter's Record |
| **TIEC** | Texas Industrial Energy Consumers |

| | |
|---|---|
| **TCOS** | Transmission Cost of Service |
| **TCOS Rule** | 16 Texas Administrative Code § 25.192 |
| **TSP** | Transmission Service Provider |

## STATEMENT OF THE CASE

*Nature of the Case:*      Appellant City of College Station ("College Station"), in its capacity as a Municipally-Owned Utility ("MOU"), seeks review of the Final Judgment of the District Court for the 200th Judicial District, Travis County, Texas issued pursuant to the presiding court's review of the Public Utility Commission of Texas' ("Commission" or "PUC") July 11, 2024 Order on Rehearing ("Final Order") in College Station's 2021 Transmission Cost of Service ("TCOS") application. Specifically, College Station appeals the District Court's failure to reverse and remand the Commission's decision ordering College Station to issue a full refund for its historic inclusion of a General Fund Transfer ("GFT") in its transmission rates.

*Trial Court:*      District Court for the 200th Judicial District, Travis County, Texas.

*Course of Proceedings:*      On September 3, 2024, Appellant timely sought judicial review of the Commission's Final Order (CR at 4-60) after exhausting all administrative remedies before the Commission as required by Chapter 2001, Subchapter G of the Texas Government Code. After briefing, the 261st District Court, Travis County, Texas, held a hearing on the merits on April 30, 2025.

*Disposition in Trial Court:*      On May 1, 2025, the District Court entered its judgment affirming the Commission's actions. (CR at 604.)

10

## STATEMENT REGARDING CITATION FORM

Citations to the Clerk's Record are stated in the following form: CR at [page number].  The Administrative Record is part of the Reporter's Record and, accordingly, citations to the Administrative Record are stated in the following form: RR, AR [item number] at [page number].  All citations to CR, RR, and AR will cite to Bates number pages when Bates number pages are available.  Otherwise, citations refer to the document's original page numbers.

## STATEMENT REGARDING ORAL ARGUMENT

This case concerns rate recovery of a General Fund Transfer, or GFT, which is a critical and longstanding expense for Municipally-Owned Utilities across the state.  The dispute also poses important questions regarding the PUC's authority over transmission rates and, more broadly, the extent of agency discretion.  College Station respectfully requests oral argument and proffers that it would help facilitate the Court's understanding of the extensive background in the case and the ratemaking nuances at play.

## ISSUE PRESENTED FOR REVIEW

***Did the Commission err in ordering College Station to issue a refund for the inclusion of a General Fund Transfer in its transmission rates beginning in 2007?***

City-owned utilities often make a transfer of revenues from the utility to the city's general fund. While the transfer may be referred to using various names based on the city action authorizing it, this type of transfer is commonly known as a General Fund Transfer and is statutorily authorized under Texas law. Tex. Gov't Code § 1502.059.

College Station owns and operates an electric utility. The utility is required by the City's financial policy to make a transfer of revenues to the City. In 2007, after receiving approval from the Commission to do so, College Station began including this General Fund Transfer in its transmission rates. Consistent with Commission rule and precedent, the General Fund Transfers were authorized within the category "other associated taxes" under 16 Texas Administrative Code § 25.192 (the "TCOS Rule").

From 2007 through 2017, the Commission issued three orders approving College Station's inclusion of a General Fund Transfer in its transmission rates. Based on the Commission's rules, instruction from PUC

Staff, and the Commission's repeated approvals, College Station again included a General Fund Transfer in its 2021 comprehensive Transmission Cost of Service application under PUC Docket No. 52728—the subject of this appeal. In PUC Docket No. 52728, the Commission disclaimed its prior orders and longstanding precedent to order College Station to refund over $40 million including interest for inclusion of a General Fund Transfer in its rates. The Commission's sole basis for its decision is that College Station did not first include a General Fund Transfer in its initial comprehensive TCOS application in 1996.

The Final Order unlawfully and retroactively invalidates College Station's historically approved inclusion of a General Fund Transfer in its transmission rates. The Commission's decision to order College Station to issue a refund is arbitrary and capricious, constitutes an abuse of discretion, and is not reasonably supported by substantial evidence.

# STANDARD OF REVIEW

This appeal challenges a decision issued by the Public Utility Commission of Texas. Per the Public Utility Regulatory Act, the Court reviews this decision under the substantial evidence rule. Tex. Util. Code § 15.001. The substantial evidence rule under the Administrative Procedure Act ("APA") requires the Court to:

> reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
> 
> (A) in violation of a constitutional or statutory provision;
> (B) in excess of the agency's statutory authority;
> (C) made through unlawful procedure;
> (D) affected by other error of law;
> (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
> (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174.

The test under the substantial evidence rule is "not whether the agency's decision is correct, but whether the record demonstrates a reasonable basis for it." *N.E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 251 (Tex. 2020). "[T]he agency's action will be sustained if the evidence is such that reasonable minds could have reached the conclusion that the agency

14

must have reached in order to justify its action." *Tex. Health Facilities Com. v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 453 (Tex. 1984).

There may be instances where an agency's action is supported by substantial evidence but is nonetheless arbitrary and capricious. *Id.* at 454. "An agency acts arbitrarily if it makes a decision without regard for the facts, if it relies on fact findings that are not supported by any evidence, or if there does not appear to be a rational connection between the facts and the decision." *Heritage on the San Gabriel Homeowners Ass'n v. Tex. Comm'n on Envtl. Quality*, 393 S.W.3d 417, 423 (Tex. App.—Austin 2012, pet. denied). Moreover, administrative decisions must be found arbitrary and capricious if an agency fails to follow the clear, unambiguous language of its own regulation. *Pub. Util. Com. v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991).

Texas courts have additionally found agency orders to be arbitrary and capricious under the following circumstances: the agency improperly based its decision on non-statutory criteria; the agency based its decision on legally irrelevant factors or did not consider legally relevant factors; or the agency considered only relevant statutory factors but reached a completely unreasonable result. *Westlake Ethylene Pipeline Corp. v. R.R. Comm'n of*

*Tex.*, 506 S.W.3d 676, 687 (Tex. App.—Austin 2016, pet. denied). In determining whether an agency acted arbitrarily and capriciously, courts look to whether the order considered all relevant factors. *Gulf States Utils. Co. v. Pub. Util. Comm'n*, 841 S.W.2d 459, 474 (Tex. App.—Austin 1992, writ denied).

The district court issued a ruling on College Station's appeal of the Final Order in accordance with its jurisdiction under the APA. The district court's decisions under the APA are reviewed de novo. *See Tex. Dep't of Pub. Safety v. Valdez*, 956 S.W.2d 767, 769 (Tex. App.—San Antonio 1997, no pet.) (explaining that the court of appeals reviews trial court decisions involving questions of law de novo; each ground under the APA's substantial evidence rule presents a question of law.).

## STATEMENT OF FACTS

### A. College Station is a Transmission Service Provider.

College Station is a MOU that provides electric, water, and wastewater services to residents and businesses in the City of College Station. College Station's provision of electric service encompasses both transmission and distribution service.

College Station is a Transmission Service Provider ("TSP") connected to the Electric Reliability Council of Texas ("ERCOT") transmission network. Transmission lines are akin to highways and transport high voltage electricity across large distances. In its capacity as a TSP, College Station contributes the use of its infrastructure for the transmission of electricity to Distribution Service Providers ("DSPs") throughout the ERCOT region.

Distribution lines are akin to local roads and deliver electricity to end-users. The rates associated with distribution service are often referred to as "retail rates." However, the only type of electricity rate at issue in this appeal is College Station's rate for the transmission service it provides to DSPs within ERCOT.

While the City of College Station maintains jurisdiction over the retail rates the MOU charges its citizens, the Commission has exclusive

jurisdiction over the transmission rates that College Station charges DSPs. Tex. Util. Code § 35.004; Tex. Util. Code § 40.004. To update its transmission rate, College Station must file an application with the Commission to modify its TCOS. Under the Commission's rules, a MOU may file either a "comprehensive" TCOS application or an "interim" TCOS application. 16 Tex. Admin. Code § 25.192(g)–(h). Both types of TCOS applications entail witness testimony, review by PUC Staff and intervenors, discovery, and ultimate approval from the Commission.

The TCOS set by the Commission is also referred to as the annual "revenue requirement." The revenue requirement approved in a rate proceeding is the amount a utility needs to cover its expenses and receive a reasonable return on its investment. To determine the ultimate transmission rate charged, the TSP's approved revenue requirement is used in conjunction with an ERCOT demand average to calculate the transmission rate charged to DSPs.

In November 2021, College Station filed a comprehensive TCOS application in PUC Docket No. 52728 seeking to update its transmission rate. College Station is now challenging one aspect of the Commission's decision in that docket.

**B.  General Fund Transfers are a Common MOU Expense Routinely Approved in TCOS Rates.**

Under Texas law, a city with a MOU may receive a transfer of revenues from the utility system for general or special purposes.  Tex. Gov't. Code § 1502.059.  This statutorily authorized transfer is most commonly referred to as a GFT.  However, as established in the administrative record, many other titles are used interchangeably to refer to a GFT.  These include Payment in Lieu of Taxes ("PILOT"), Return on Investment ("ROI"), Payment in Lieu of Franchise Fee, and Other Associated Taxes.  (RR, AR 188 at 10:14–12:25.); (RR, AR 200 at 6:20–7:10.); (RR, AR 173 at 39:13–40:23.)

For decades, the Commission has routinely approved inclusion of a GFT within MOU TCOS rates.  Most commonly, the Commission approves GFTs as an expense within the "other associated taxes" category provided in the TCOS Rule.  (RR, AR 173 at 40:10–23.)

**C.  College Station Began Including a GFT in Transmission Rates After Approval of its 2007 Interim TCOS Application.**

In 1995, the Legislature passed Senate Bill 373, authorizing a new system of transmission cost allocation and rate setting.  (RR, AR 188 at 20:1-11.)  Under the new law, every transmission provider was required to make an initial tariff filing within 60 days of adoption of the

19

Commission rules implementing the bill. TSPs like College Station were navigating an unfamiliar framework with a time constraint. On May 2, 1996, College Station filed its first comprehensive TCOS application in PUC Docket No. 15762. College Station inadvertently failed to request inclusion of a GFT in PUC Docket No. 15762, but it is undisputed that College Station could have requested inclusion of a GFT in that application. (RR, AR 134 at 26.) As a result of this oversight, College Station missed the opportunity to recover its GFT expense in transmission rates from 1996 until its next TCOS filing in 2007.

On May 1, 2007, College Station filed its first interim TCOS application in PUC Docket No. 34230. In advance of the 2007 interim filing, College Station representative Timothy Crabb contacted a seasoned PUC Staff expert, Glenda Spence, to ensure the utility was preparing all the necessary information for the application. (RR, AR 184 at 16–27.) PUC Staff's witness in this proceeding, Ruth Stark, confirmed that, at the time, Ms. Spence had been at the Commission for sixteen years. (RR, AR 173 at 48:2–23.) Ms. Spence specifically advised College Station to include a GFT even though it was not included in College Station's original comprehensive TCOS application. (RR, AR 184 at 16,

22.) Ms. Spence stated that "they would make the call as to whether it would be allowed." (RR, AR 184 at 16, 22.) Based on PUC Staff's instructions, College Station included a GFT in its 2007 interim TCOS application along with supporting testimony discussing the inclusion and specifically stating that "Docket No. 15762 did not include a payment in lieu of taxes amount." (RR, AR 184 at 47.) Four separate PUC Staff analysts recommended approval of the application as filed. The Commission then issued an order approving the inclusion of a GFT in College Station's transmission rate. (RR, AR 184 at 53–57.)

A little over a year later, on July 1, 2008, College Station filed its second interim TCOS application in PUC Docket No. 35837. Before filing the 2008 interim application, Mr. Crabb again contacted Ms. Spence to ensure College Station was using the correct numbers for the GFT inclusion—the same item that PUC Staff instructed College Station to include and that the Commission approved less than a year prior. (RR, AR 184 at 63.) In email correspondence to PUC Staff, College Station specifically stated that no GFT (referred to as PILOT) was included in College Station's original comprehensive TCOS application. (RR, AR 184 at 63.) This time, the PUC's Director of Rate Regulation, Darryl Tietjen,

21

instructed College Station to proceed with the proposed numbers and explain the issue in testimony. (RR, AR 184 at 58–61.) Ms. Spence said Mr. Tietjen would have the "definitive word" on the question. Mr. Tietjen directed Mr. Crabb to use current numbers and to "fully explain the issue in any testimony you include with your filing." (RR, AR 184 at 58.) Mr. Crabb followed these instructions and, once again, explained the GFT inclusion in testimony. (RR, AR 184 at 64.) Mr. Crabb and Ms. Spence's correspondence continued even after College Station filed the 2008 interim TCOS application. The application was filed on July 1, 2008. On July 11, 2008, Ms. Spence called Mr. Crabb to discuss proof for the GFT, illustrating that PUC Staff specifically reviewed the GFT inclusion and had every opportunity to flag or disallow anything it found to be impermissible. (RR, AR 184 at 65.) PUC Staff issued three memos recommending approval of the 2008 application. (RR, AR 184 at 78–81.) As it did in the 2007 interim TCOS proceeding, the Commission issued an order approving a transmission rate with a GFT inclusion. (RR, AR 184 at 68–72.)

On February 10, 2017, College Station filed its third interim TCOS application in PUC Docket No. 46847. After previously receiving explicit

instruction from PUC Staff and two Commission orders adopting the inclusion of a GFT in its TCOS, College Station included a GFT in the 2017 interim TCOS application. Again, PUC Staff recommended approval of the application. For the third time, the Commission issued an order approving College Station's inclusion of a GFT. (RR, AR 184 at 74–77.)

**D.     College Station Appeals the Commission's Decision in PUC Docket No. 52728.**

On November 3, 2021, College Station filed its second comprehensive TCOS application in PUC Docket No. 52728. College Station requested an annual TCOS of $6,006,601 and, for the fourth time since 2007, requested inclusion of a GFT. From the date the application was filed through May 2022, PUC Staff served six sets of discovery on College Station. The inclusion of a GFT in College Station's interim TCOS applications was never raised in discovery.

In June 2022, PUC Staff filed its direct testimony and, for the first time, objected to College Station's historical inclusion of a GFT. PUC Staff witness Ms. Stark testified that because College Station did not include a GFT in its initial comprehensive TCOS application, College Station "should not" have included a GFT in its three subsequent interim TCOS

applications. (RR, AR 200 at 10:4–16:20.) Ms. Stark posited that College Station had been improperly collecting a GFT in its TCOS for fifteen years and recommended that College Station refund $31.5 million plus additional interest. (RR, AR 200 at 20:12–21:17.) In that original direct testimony, Ms. Stark included an alternative recommendation for a $6.6 million refund. (RR, AR 200 at 21:18–23:4.) Significantly, Ms. Stark supported prospective inclusion of a GFT.

In response to PUC Staff's testimony, College Station filed rebuttal testimony providing documentation of College Station's correspondence with members of the PUC Staff leading up to the 2007 and 2008 interim TCOS filings. (*See* RR, AR 184.) Based on that documentation, it is undisputed that College Station only began including a GFT in its interim TCOS applications at the specific instruction of PUC Staff. The Final Order itself establishes this key fact in Finding of Fact ("FOF") No. 50: "College Station began including a general fund transfer in its interim TCOS filings at the direction of Commission Staff with their knowledge that it was not included in College Station's last comprehensive TCOS filing." (RR, AR 167 at 11.) After reviewing the facts presented in College Station's rebuttal testimony, Ms. Stark filed supplemental direct

24

testimony retracting her $31.5 million recommendation and instead recommending the $6.6 million alternative. (RR, AR 201 at 4:1—5:13.)

In August 2022, after PUC Staff modified its original recommendation, three parties to the administrative proceeding—College Station, PUC Staff, and intervenor the Office of Public Utility Counsel ("OPUC")—reached an uncontested settlement. Intervenor Texas Industrial Energy Consumers ("TIEC") was unopposed to the settlement. Among other terms, the uncontested settlement would have required College Station to refund $3.9 million for its past GFT inclusions. (RR, AR 52 at 2.)

The Commission eventually rejected the uncontested settlement on January 26, 2023. The Commission issued a remand order that pre-determined key substantive components without any hearing and provided unclear instructions to the Administrative Law Judges ("ALJs"). (RR, AR 68.) Based on the Commission's directives, the ALJs convened a hearing on remand on May 2, 2023, and issued their first Proposal for Decision ("PFD") on July 27, 2023. (RR, AR 102.) The first PFD's conclusion was that the Commission had pre-determined the disputed issues and that the ALJs' hands were tied. When it considered

the first PFD, the Commission rescinded its previous Remand Order and remanded the case a second time for the ALJs to "address all issues." (RR, AR 113.) On second remand, the parties again briefed the refund issue for the ALJs' consideration.

On December 21, 2023, the ALJs reviewed the evidence and issued a second PFD recommending that College Station be ordered to refund $900,000. (RR, AR 134.) During its open meeting on February 15, 2024, the Commission rejected the refund recommendation from the second PFD and instead ordered College Station to issue a full refund, with interest, for its inclusion of a GFT in its interim TCOS applications. In rendering its decision, the Commission gave no explanation for ignoring the mitigating factors addressed in the second PFD.

## SUMMARY OF THE ARGUMENT

The Final Order requires College Station to refund $26.2 million and more than $15 million in interest for including a GFT in its transmission rates. However, GFTs are a routine MOU expense authorized by statute and inclusion of a GFT in transmission rates is consistent with the Commission's longstanding application of its own rules.

The Final Order articulates only one basis for imposing a refund— that College Station should have first requested a GFT in its initial comprehensive TCOS filing (PUC Docket No. 15762) and that, because it did not, it earned a greater "effective rate of return" than was approved in the comprehensive filing. The Commission determined that College Station's failure to meet this arbitrary standard was a violation of the TCOS Rule. But the TCOS Rule contains no such standard. The Commission imposed a "standard" on College Station that has no legal or evidentiary basis and constitutes invalid ad hoc rulemaking.

The evidentiary record, including witness testimony and documentation from College Station's prior interim TCOS filings, demonstrated that College Station complied with the Commission's own

historic application of the TCOS Rule and began making a GFT inclusion at the specific instruction of PUC Staff. The Commission has the authority to review and reconcile the rates set in an interim TCOS proceeding, but the Commission does not have the authority to unexpectedly and retroactively disallow an entire permitted expense category.

Not only did the Commission ignore the reliable and probative evidence before it, but in the Final Order, the Commission makes several compelling findings illustrating that a refund is unlawful, inappropriate, and inequitable. It then inexplicably proceeds to reach a baseless and punitive conclusion. Providing explanations for decisions is a critical component of regulatory certainty. *See* Tex. Gov't Code § 2001.058(e). Here, the Commission provided no explanation for its departure from the evidence and similarly did not address why it rejected the body of evidence demonstrating unique circumstances and good cause weighing against any refund.

In sum, the Commission arrived at an unjust conclusion by abandoning the record evidence and abusing its discretion to impose an invalid standard. The Commission's actions prejudiced College Station's

substantial rights by ordering a refund that is more than *six* times College Station's annual transmission revenue requirement. Accordingly, the Final Order should be reversed and remanded for further proceedings.

<u>**ARGUMENT & AUTHORITIES**</u>

**A.     The Commission's decision to order a refund for College Station's historical inclusion of a GFT is reversible error under the Administrative Procedure Act.**

**1.     *The Final Order is arbitrary and capricious and constitutes an abuse of discretion.***

Under the APA, the Court is required to reverse or remand an agency decision if an appellant's substantial rights have been prejudiced by findings, inferences, conclusions, or decisions that are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.  Tex. Gov't Code § 2001.174(1)(F).  Texas courts have interpreted this to mean that, irrespective of whether there is substantial evidence in the record to support an agency's decision, the decision may still be reversed as arbitrary and capricious if it constitutes a clear abuse of discretion.  *McClelland v. Tex. HHS Comm'n*, 635 S.W.3d 410, 417 (Tex. App.—Houston [1st Dist.] 2021, no pet.).  Further, an agency abuses its discretion if it considers an irrelevant factor or considers only relevant factors but reaches a completely unreasonable result.  *City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994).  "The major factor that runs throughout arbitrary-capricious review cases is that parties must be able to know what is expected of

them in the administrative process." *Starr Cty. v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 356 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.).

Here, the Commission found that "[b]ecause College Station's inclusion of the general transfer funds [*sic*] was not first approved in a comprehensive rate case, College Station violated the Commission's TCOS rule when it included general transfer funds [*sic*] as an expense item in its three interim TCOS cases." (RR, AR 167 at 3.) This is the only basis the Commission provides for ordering a full refund. But the Commission has never established or applied this standard in any TCOS proceeding prior to this case.

The Commission abused its discretion by improperly creating this new standard and retroactively imposing it on only College Station to the extreme financial detriment of the utility. The Commission contradicted the relevant precedent, rules, and evidence to impose this new standard. The Commission additionally rejected the relevant factors demonstrating good cause and provided no explanation for doing so. These actions by the Commission resulted in an unreasonable decision that unjustly penalizes College Station when it did nothing wrong or impermissible.

### a. The Final Order arbitrarily develops a new standard and retroactively imposes it on College Station.

#### i. There is no requirement that a GFT must first be included in a comprehensive TCOS filing to be subsequently included in an interim TCOS filing.

In the Final Order, the Commission asserts that College Station violated 16 Tex. Admin. Code § 25.192(h) because College Station's inclusion of a GFT was not first approved in a comprehensive rate case. (RR, AR 167 at 3, 18.) The Commission refers to this artificial standard as a "reasonable method" for evaluating GFT inclusions. (RR, AR 167 at 12, FOF 53.) "Reasonable methods" are not law. The Commission does not, and *cannot*, identify any language in the TCOS Rule or in any other authority that imposes this standard, nor is such a standard supported by the record.

In discovery, PUC Staff admitted that "[t]here is no rule, statute, precedent, or other authority that specifically requires that a municipal utility must include PILOT in its initial comprehensive rate case in order to include it in subsequent interim filings." (RR, AR 183 at 9.) PUC Staff expert Ms. Stark confirmed this lack of authority a second time on the witness stand. When asked during cross-examination where in the

32

Commission's rules or filing instructions or elsewhere there is a requirement that a utility must first include a GFT in its initial full TCOS case in order to update GFT in an interim filing, Ms. Stark acknowledged that there is nowhere that specifically addresses the issue. (RR, AR 173 at 72:15–23.) The idea that College Station somehow violated nonexistent language in the TCOS Rule is the *only stated rationale* for the Commission's decision, and it is stated without explanation and without grounding in the evidence or in existing legal principles.

As part of its arbitrary standard, the Commission states that MOUs should maintain the "effective rate" for the GFT expense item from their last comprehensive TCOS filing. (RR, AR 167 at 12, FOF 53.) By the Commission's rationale, because College Station included $0 of GFT in the transmission function in PUC Docket No. 15762, College Station was prohibited from including anything above a 0% "effective rate" in its subsequent interim TCOS filings. (RR, AR 167 at 12, FOF 55.) However, as discussed in greater detail below, a GFT is an expense routinely approved by the Commission in interim TCOS filings within an express category under the TCOS Rule. The Commission's unfounded standard

33

erases decades of its own application of the TCOS Rule. The Commission's "effective rate" premise is not established in the TCOS Rule nor was it discussed in any of the orders from College Station's prior TCOS cases or in *any* TCOS case. The standard additionally ignores a municipality's statutory right to receive a GFT from its MOU. The Final Order provides no explanation of how this standard is logical or appropriate. Rather, it is a made-up standard designed to justify an unreasonable outcome.

If the requirement that a MOU must first request a GFT in a comprehensive TCOS application is a legitimate Commission standard, it begs the question why it was never enforced during College Station's interim applications. PUC Staff did not mention this standard when it specifically instructed College Station to begin including a GFT and the Commission never imposed this standard when it approved College Station's interim requests as filed. Furthermore, there is simply no reasonable explanation for why the Commission did not previously object to an increased "effective rate"—adding *anything* to the $0 from PUC Docket No. 15762 is an increase. College Station was consistently transparent about including a GFT in its interim TCOS filings. The

inclusion was easily observable in its interim applications—the "Taxes Other Than Income Taxes" schedule in each interim application included a single line-item for the GFT, and College Station specifically identified the inclusion in its testimony in all three applications, stating explicitly that no GFT was included in the original comprehensive TCOS filing. (*E.g.*, RR, AR 184 at 73.)

The Commission contends that by varying the "effective rate" from the 0% GFT included in PUC Docket No. 15762, College Station earned a greater "effective rate of return" in its interim TCOS proceedings than was authorized in its initial comprehensive TCOS proceeding. (RR, AR 167 at 13, FOF 66.) But this "effective rate of return" premise is likewise not found in the TCOS Rule or any other applicable authority.

As the Final Order acknowledges, College Station's GFT is an expense permitted by statute and based on a valid business purpose. (RR, AR 167 at 13, FOF 64.) College Station included a GFT in its interim filings as an allowable expense and not within its return calculation. (RR, AR 185 at 9:5-13.) This means that it was a separate line-item and did not affect College Station's Commission-approved rate of return. Accordingly, the PUC Staff experts reviewing College Station's interim

applications specifically stated that the appropriate 6.71% return was applied to rate base and that this was indicated on the schedules provided in the filing. (*E.g.*, RR, AR 184 at 79.) Also, for nearly thirty years, the Commission has had numerous opportunities to review College Station's earnings. Since 2000, College Station has filed its required annual Earnings Monitoring Reports. At no time did the Commission express to College Station any concerns of an increased "effective rate of return" based on its GFT inclusion. (RR, AR 184 at 14:15-18.)

Although the Commission has never established a standard that a GFT must first be included in a comprehensive TCOS filing, it did so in this case and somehow found that College Station violated the new standard three times beginning more than seventeen years ago. The Commission's false conclusion that College Station's failure to meet this new standard is a violation of the TCOS Rule has no grounding in the actual language of the rule and is an unlawful basis for the decision.

### ii. The Commission's made-up standard constitutes invalid ad hoc rulemaking.

The requirement that College Station had to first request a GFT in a comprehensive TCOS application constitutes impermissible ad hoc rulemaking. "If the decision made during a ratemaking proceeding

36

reflects a policy choice that has not been committed to a formal rule, it can be considered an ad hoc rulemaking." *CenterPoint Energy Entex v. R.R. Comm'n*, 213 S.W.3d 364, 369 (Tex. App.—Austin 2006, no pet.). An ad hoc rule is an agency statement of general applicability that interprets, implements, or prescribes agency law or policy outside formal rulemaking procedures provided by the APA. *Id.* Further, an agency statement interpreting law may constitute an ad hoc rule if it "bind[s] the agency or otherwise represent[s] [the agency's] authoritative position in matters that impact personal rights." *See Tex. State Bd. of Pharmacy v. Witcher*, 447 S.W.3d 520, 528 (Tex. App.—Austin 2014, pet. denied) (quoting *Tex. DOT v. Sunset Transp., Inc.*, 357 S.W.3d 691, 703 (Tex. App.—Austin 2011, no pet.)).

An ad hoc rule is valid only if the agency "is confronted with (1) an issue of first impression, (2) a new or amended statutory scheme or administrative rules, or (3) an issue that cannot be adequately captured within the bounds of a general rule because the problem is so specialized and varying in nature." *Witcher*, 447 S.W.3d at 535. Ad hoc rules are otherwise invalid and, importantly, agency decisions based on such rules

"must be reversed and remanded to the agency if substantial rights of the appellant have been prejudiced." *Id.* at 527.

In *Witcher*, pursuant to an unwritten policy, the Texas State Board of Pharmacy suspended a pharmacist's license solely because the pharmacist was actively suspended in a separate jurisdiction. *Id.* at 523–25. The court found the action to be an invalid ad hoc rulemaking because it elevated a factor in an existing rule "to case-dispositive status," which "constitute[d] a modification of that rule or [an] establishment of a new rule." *Id.* at 533. As such, it was a rule of general applicability promulgated outside the confines of the APA and, therefore, invalid. *Id.* at 535.

Here, the Commission determined that, solely because College Station allocated no GFT to transmission in its comprehensive TCOS application in 1996, including any GFT in subsequent interim TCOS applications was inappropriate. However, the TCOS Rule expressly authorizes an MOU to include "other associated taxes" in its interim TCOS filings. The Commission consistently recognizes a GFT as "other associated taxes" and, accordingly, authorizes GFT recovery in MOU interim TCOS proceedings.

The Final Order arbitrarily distinguishes between MOUs that requested, and MOUs that did not request, GFT recovery in their initial comprehensive TCOS proceedings. Therefore, similar to the invalid action in *Witcher*, the Commission necessarily modified its rules to impose this distinction. The *Witcher* facts involved improper elevation of an existing factor; the Commission's rationale here is more egregious—the standards it is imposing are not components found in any governing rule or law and are certainly not established rules or laws themselves. Moreover, the Final Order devises a new interpretation of the TCOS Rule by suddenly, retroactively, and without notice, deciding that it precludes recovery of a GFT in interim TCOS filings if the MOU did not first include a GFT in a comprehensive TCOS filing. Therefore, the Final Order establishes rules of general applicability that impact an applicant's rights in a TCOS proceeding.

The standard imposed in the Final Order additionally does not fall within one of the three exceptions to invalid ad hoc rulemaking set out in *Witcher*. The Commission is faced with TCOS issues on a regular basis. MOUs are entitled to file an interim TCOS up to two times per year. 16 Tex. Admin. Code § 25.192(h)(1). MOUs do so frequently, and the

39

Commission regularly reviews and processes these filings. The facts at issue in this proceeding are based on common filings available to all TSPs in Texas. Even if the nature of College Station's GFT inclusion is considered unique, the case of first impression was the 2007 interim filing where College Station began including a GFT at the specific instruction of PUC Staff and the Commission approved the inclusion.

Furthermore, none of the laws implicated by a TCOS application are new. The TCOS Rule has been in place since the 1990s. There has similarly been no recent change to the sole statute authorizing cities to require a GFT from MOUs for any purpose. Tex. Gov't Code § 1502.059. This case relies on well-established law. The Final Order is an attempt to establish unlawful standards that were not in place at the time this case was filed.

Finally, there is nothing specialized or unique about including a GFT in TCOS rates. The Commission's new requirements imposed in the Final Order *must* be captured in a general rule so that the many regulated entities impacted by TCOS filings are aware of the requirements. Without providing a legal or evidentiary basis for doing so, the Commission used College Station's application to impermissibly

create and implement a standard that invalidates the Commission's historical interpretation and application of the TCOS Rule.

### b. The Commission provides no explanation for rejecting the unequivocal circumstances supporting good cause.

In addition to enforcing an unlawful standard, the Commission rejected the overwhelming circumstances demonstrating good cause. And, crucially, the Commission did so without explanation or justification. The Commission provides a single conclusory statement in response to the good cause circumstances of this case: "The Commission rejects the PFD's recommendation that Commission Staff's communications or College Station's good faith are circumstances that constitute good cause to grant an exception to the full refund required by the rule." (RR, AR 167 at 4.)

Even if the Court finds the Commission's reasoning sound or its newly developed standard valid, the record shows good cause existed and weighed heavily against ordering any refund. Multiple witnesses, an uncontested settlement agreement (RR, AR 52), and a recommendation from the ALJs (RR, AR 134) all endorsed a finding of good cause. The ALJs relied on the evidence to recommend a refund amount of $900,000.

(RR, AR 134 at 2.) The ALJs appropriately considered mitigating factors such as College Station's good faith actions, the statutory authority for GFTs, and the fact that "recovery of a GFT in general is not unreasonable, nor was it unreasonable for College Station to believe it could be included in an interim TCOS filing." (RR, AR 134 at 43.) PUC Staff's key witness similarly found good cause to mitigate the refund amount. (RR, AR 201 at 4:13-5:2.) The Commission *inexplicably* ignored all of this.

The Final Order makes the finding that College Station began including a GFT at the direction of PUC Staff and that it was clear no GFT was allocated to transmission in PUC Docket No. 15762. (RR, AR 167 at 11, FOF 50.) College Station does not dispute that PUC Staff is not the ultimate decision maker in its TCOS proceedings. But that principle only makes the Final Order more erroneous because the Commission *is* the ultimate decision maker and had the final say in College Station's interim filings. At the time PUC Staff directed College Station to begin including a GFT, the Commission could have taken simple steps to indicate that the inclusion was improper.

For instance, the Commission could have disallowed the expense when it was first included in 2007. Or the Commission could have ordered College Station to file a comprehensive TCOS application as it has the power to "initiate a rate proceeding at any time . . . on the basis of other criteria that the Commission determines are in the public interest . . . ." 16 Tex. Admin. Code § 25.247(d)(2). Instead, on three separate occasions over a decade, the Commission reviewed the application, including transparent testimony from College Station explaining the requested GFT (RR, AR 184 at 46–47) and memoranda from multiple PUC Staff experts (RR, AR 184 at 78–81), and approved a TCOS rate that included a GFT. The Commission consciously permitted College Station's GFT inclusion three times before this case. Even assuming arguendo that the "effective rate" standard is valid, the Commission knowingly exempted College Station on three occasions because it knew that anything greater than $0 would not meet the standard. The Commission's own prior actions contributed to the circumstances at issue and should have been one of the many grounds for good cause to validate College Station's GFT inclusions and forego any refund.

The Commission also blatantly ignored the profound financial impact its decision has on College Station. In rebuttal testimony, College Station established that the full refund, as contemplated in 2022,[1] was 63 percent of the requested annual revenue requirement and 214 percent of the revenue requirement approved in College Station's first interim case. (RR, AR 188 at 19:7-16.) After modifying its recommendation in light of the circumstances supporting good cause, PUC Staff explained that ordering College Station to refund the full amount is over 500% of the utility's annual transmission revenue requirement while the annual impact on the total ERCOT revenue requirement in 2022 was three one-hundredths of one percent. (RR, AR 87 at 20-21.) The Commission's decision ignores the immense financial harm to College Station. The Commission's denial of good cause and, particularly, its refusal to provide *any* explanation for such denial, is a textbook abuse of discretion.

2.    ***The Final Order is not reasonably supported by substantial evidence.***

The Commission additionally violated Tex. Gov't Code § 2001.174(1)(F) by neglecting the reliable and probative evidence in the

---

[1] This was based on PUC Staff's original recommended refund calculated through June 30, 2022. The refund the Commission ultimately imposed was calculated through February 14, 2024, and was therefore an even greater impact.

record to reach conclusions entirely incongruent with its own factual findings. The evidentiary record and the Commission's own findings demonstrate that College Station's GFT inclusions were permissible, consistent with the Commission's longstanding application of the TCOS Rule, and consciously approved by the Commission three times. The witness testimony in the record as a whole did not support ordering a full refund. The Commission's decision ordering College Station to issue a $26 million refund plus additional interest ignores the evidentiary record *without explanation*.

> ### a. The evidence shows the Commission's established practice is to approve inclusion of GFTs as "other associated taxes" under the TCOS Rule.

MOU TSPs filing an interim update of transmission rates are required to reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and *other associated taxes*. 16 Tex. Admin. Code § 25.192(h)(1) (emphasis added.). The Commission has a well-established practice of approving GFTs within the "other associated taxes" category under the TCOS Rule. This practice is confirmed throughout the administrative record. (RR, AR 173 at 39:17–40:2, 62:10–23.); (RR, AR 188 at 23:3–8.). The Final Order

45

likewise confirms this settled practice in its findings. (*See* RR, AR 167 at 11, FOF 47, stating that a GFT most often appears in TCOS applications as an "other taxes" line item.).

Per the Commission's established interpretation of the TCOS Rule, College Station included a GFT within the "other associated taxes" category in its 2007, 2008, and 2017 interim TCOS filings. College Station began making this inclusion after receiving specific instruction from PUC Staff to do so and College Station clearly stated the inclusion in the schedules it provided in each interim TCOS application. Each time, College Station specifically requested an amount within "associated taxes" and identified the requested inclusion in testimony. (RR, AR 184 at 46-47, 64, 73.) But the evidentiary support for a GFT inclusion within "other associated taxes" is not confined to College Station's filings. During the administrative hearing in this case, PUC Staff's expert witness provided that GFTs are commonly categorized within "other associated taxes." (RR, AR 200 at 7:20–21, wherein Ms. Stark testified that "a general fund transfer is not a tax but nevertheless may be categorized as such in setting the municipal utility's rates.")

The Commission's practice of approving GFTs as "other associated taxes" under the TCOS Rule is further proven by the Commission's and PUC Staff's repeated assent to College Station's inclusion of a GFT in its three interim TCOS filings. For example, the PUC Staff memo filed in College Station's 2008 interim application stated that the "associated tax effects have been appropriately represented." (RR, AR 184 at 78.) The orders issued by the Commission in all three interim proceedings made no mention of reviewing "other associated tax" expenses and only required subsequent review of plant additions. (e.g., RR, AR 184 at 76.) With these endorsements, College Station had no reason to expect the Commission would later disclaim its accepted practice of approving a GFT within "other associated taxes."

An agency must explain its reasoning for departing from its prior norms and show adequate support in the record for its findings and conclusions. *Oncor Elec. Delivery Co. LLC v. PUC of Tex.*, 406 S.W.3d 253, 267-269 (Tex. App.—Austin 2013, no pet.). Although College Station's GFT inclusions were consistent with the Commission's well-known application of the TCOS Rule, the Final Order in this case erroneously concluded that College Station was not authorized to include

GFTs in its updated transmission rates under the TCOS Rule. (RR, AR 167 at 18, COL 10B.) By clawing back College Station's GFT inclusions, the Commission suddenly, and without notice, reversed its own longstanding interpretation of the TCOS Rule and consequently disallowed an entire expense category expressly permitted under the rule. The Commission has the authority to review the *rates* approved in interim TCOS proceedings, but the Commission does not have the authority to revoke an *entire category of costs* expressly permitted under the TCOS Rule and historically approved by the Commission in all other TCOS cases.

### b. The evidence shows the Commission approved College Station's GFT inclusion in three previous orders.

The record shows that in each of College Station's interim TCOS filings, the Commission issued an order approving an updated rate that included a GFT as an expense. (RR, AR 184 at 53-57, 68-72, 74-77.) The Final Order arbitrarily disclaims these past decisions and relies on the incorrect premise that the Commission conducts no review before signing an order. By issuing orders of approval in College Station's interim filings, the Commission allowed the inclusion of a GFT as an expense

with the knowledge that no GFT was included in College Station's last comprehensive TCOS application. College Station reasonably relied on the Commission's repeated approval of a GFT and is now being penalized for following the Commission's own historic application of the TCOS Rule.

In the interim proceedings, PUC Staff's recommendations were temporary only as to the "appropriateness of the new transmission facilities and the resulting wholesale transmission rate," but there was no language to indicate that the expense PUC Staff directed College Station to include would later be disallowed. (RR, AR 184 at 80, providing that "whether *the costs of transmission plant* are reasonable and necessary is left for the next complete review . . . .") Per the language of the orders, the Commission was only required to review "costs of transmission plant additions" in a subsequent comprehensive filing. (*E.g.*, RR, AR 184 at 76.) College Station could not have possibly predicted that an entire category historically adopted and approved in its interim applications would later be subject to refund.

With eyes wide open and all of the facts before it, the Commission decided to allow inclusion of a GFT in College Station's TCOS rates. The

Commission' orders were an acknowledgement that College Station indisputably could have included a GFT in its original comprehensive TCOS filing, did not do so, and was harmed by that exclusion. College Station was unable to collect a GFT from the time PUC Docket No. 15762 rates went into effect until College Station's first interim TCOS filing in 2007. The Commission now finds that College Station should be punished for not doing something the utility *could have done* that cost only the utility money. The interim orders signify that the Commission realized this. The Final Order states that inclusion of College Station's GFT amounts in the interim filings was "inconsistent with the Commission's precedent," but the Commission itself approved these inclusions and made no findings that such inclusions were in violation of its own precedent. Moreover, as established above, inclusion of a GFT in College Station's TCOS was consistent with the Commission's longstanding application of the TCOS Rule.

### c. The reliable witness testimony does not support the Commission's decision.

Pre-filed testimony and oral testimony elicited at a hearing on the merits are the primary evidentiary mechanisms in rate filings before the PUC. College Station and PUC Staff were the only parties to file

testimony and offer witnesses in this proceeding. None of the witnesses ultimately recommended the full refund the Commission ordered. An agency is not required to accept any specific piece of evidence, but it must state a basis, reason, or explanation for rejecting evidence that is uncontradicted, unimpeached, and not inherently improbable. *Cities of Port Arthur v. R.R. Comm'n*, 886 S.W.2d 266, 270-72 (Tex. App.—Austin 1994, no writ).

Ignoring all other evidence, the Commission based its decision entirely on PUC Staff testimony that was later replaced by the witness. The only evidence that supported imposing a full refund was PUC Staff's original direct testimony, which was subsequently replaced with a supplemental recommendation. (RR, AR 200.); (RR, AR 201.) PUC Staff witness Ms. Stark originally recommended imposing a full refund. However, after reviewing the incontrovertible evidence introduced in College Station's rebuttal testimony, PUC Staff modified its recommendation.

College Station's rebuttal testimony demonstrated that *but for* the specific direction of PUC Staff, College Station would not have included a GFT in its first interim TCOS application. (RR, AR 184 at 14:8–14,

providing that "[i]f Staff had given any indication or feedback that College Station should not include PILOT in its interim filings, [College Station] would have re-evaluated the situation and either excluded it . . . or . . . proceeded with a full TCOS case.") PUC Staff specifically instructed College Station to begin making the GFT inclusion even if it was not included in PUC Docket No. 15762. (RR, AR 184 at 8.) The evidence also showed that College Station transparently explained the GFT in testimony in all three interim filings and that PUC Staff reviewed and addressed draft annotated schedules using current numbers. (RR, AR 184 at 8-9.)

College Station's expert explained that the inclusion of a GFT as an expense in the interim filings was reflection of a cost and not accounted for in College Station's return. (RR, AR 185 at 9:14-17.) The record also established that adopting the logic in Ms. Stark's original testimony would mean "*any* increase in transfers to the general fund would be tantamount to additional return above the allowed return." (RR, AR 185 at 10:4-6.) College Station witness Mark Dreyfus provided testimony on the financial significance of ordering a full refund and explained that

there is no established authority for reviewing interim expenses like a GFT in a subsequent comprehensive filing.  (RR, AR 188 at 19, 30.)

During the hearing on the merits, PUC Staff expert Ms. Stark agreed that the citizens of College Station should not have to pay for the Commission's changed position when College Station had no notice or knowledge of it.  (RR, AR 173 at 64:18–24.)  A lesser refund was also reflected in an unopposed settlement agreement that the Commission rejected by issuing an erroneous remand order that unlawfully predetermined the merits of the key issue and had to be subsequently rescinded.  (RR, AR 52; RR, AR 68.)  The Final Order's punitive conclusion is not reasonably supported by the evidence as a whole but is instead derived solely from stale testimony no longer endorsed by the witness.

> ### d. Despite the developed record, the Final Order unreasonably contradicts itself and fails to ground the Commission's decision in the evidence.

In evaluating an agency decision on appeal, "[t]here must appear a rational connection between the facts and the decision of the agency." *Starr Cty.*, 584 S.W.2d at 356.  Furthermore, a court must remand an agency decision if it concludes that the agency has not "genuinely

engaged in reasoned decision-making." *Dutchmen Mfg. v. Tex. DOT*, 383 S.W.3d 217, 221 (Tex. App.—Austin 2012, no pet.). Rather than relying on the evidentiary record to inform a reasonable decision, the Final Order makes a series of supported findings and then reaches a conclusion that directly contradicts those findings. As an example, the Commission expressly affirms in the Final Order its "other associated taxes" precedent discussed above and supported by the record. FOF No. 47 provides that a GFT most often appears in TCOS applications as an "other taxes" line item. (RR, AR 167 at 11.) The Commission even concedes that College Station followed this practice by including its GFT as an expense item under "other taxes" in all three interim TCOS cases. (*Id.* at FOF 49.) According to the very findings in the Final Order, College Station included an item within the appropriate, routinely approved category explicitly permitted under the TCOS Rule. Nevertheless, the Commission is now invalidating that inclusion in violation of its own historic interpretation of the TCOS Rule.

FOF No. 46A in the Final Order states: "The Commission's TCOS rule, 16 Tex. Admin. Code § 25.192, does not specify whether or how a [MOU] can include transfers to the municipality's general fund in its

54

[TCOS]." (RR, AR 167 at 11.) It is not reasoned decision-making for the Commission to make this finding in one breath and then penalize College Station for "violating the TCOS Rule" in the next. College Station did not violate the TCOS Rule, or any other Commission authority, with its inclusion of a GFT. To find otherwise is contrary to the language of the rule—language that the Final Order recognizes.

The Commission's decision also ignores its own findings related to the key facts and circumstances of the case. FOF No. 50 states, "College Station began including a general fund transfer in its interim TCOS filings at the direction of Commission Staff with their knowledge that it was not included in College Station's last comprehensive TCOS filing." (RR, AR 167 at 11.) The Commission goes on to find that in each interim case, College Station filed testimony explaining that it was requesting a GFT. (RR, AR 167 at 11, FOF 51.) Accordingly, both PUC Staff and the Commission indisputably had knowledge that no GFT was included in the 1996 TCOS application and yet, the Commission approved the interim applications without finding that College Station violated the TCOS Rule.

The Commission even acknowledges that "[m]aking a refund of the total over-recovered amount would have a significant impact on College Station," (RR, AR 167 at 13) and that College Station acted in good faith and did not willfully or intentionally violate the Commission's rules or policies. (RR, AR 167 at 13.) Then, without explaining why none of these findings should carry *any* weight, the Commission ordered the maximum refund. The Commission's findings clearly preponderate against a full refund, but the Commission nonetheless irrationally ordered College Station to refund $26 million and additional interest.

Under the APA, an agency must state the specific reason and legal basis for changing the recommendations of an administrative law judge. Tex. Gov't Code § 2001.058(e). Moreover, courts have established that an administrative decision that fails to provide a concise and explicit statement of the underlying facts and adopts a conclusion contrary to the findings is reversible under Texas law. *CenterPoint*, 213 S.W.3d 364. In the *CenterPoint* decision, the court provided that an agency can reject uncontradicted evidence but it must explain the reasonableness of its rejection. *Id.* at 373. If an agency does not explain why it rejected uncontradicted evidence, a court cannot ignore that evidence in its review

of the sufficiency of the evidence. *Id.* at 373, citing *Cities of Port Arthur*. In short, an agency must provide explanations for its decisions. The Commission failed to do so here and its failure severely prejudiced College Station's substantial rights.

## CONCLUSION AND PRAYER

The Commission's Final Order must be reversed under the APA. College Station respectfully asks this Court to reverse the Commission's erroneous decision as it is an unsupported and arbitrary abuse of discretion that prejudices College Station's substantial rights in excess of $40 million. College Station additionally requests any other relief to which it is entitled.

Respectfully submitted,

**LLOYD GOSSELINK**
**ROCHELLE & TOWNSEND, P.C.**
816 Congress Avenue, Suite 1900
Austin, Texas 78701
(512) 322-5800 Phone
(512) 472-0532 Facsimile

By: _____
      THOMAS L. BROCATO
      State Bar No. 03039030
      tbrocato@lglawfirm.com
      ROSLYN M. WARNER
      State Bar No. 24117520
      rwarner@lglawfirm.com

and

      ADAM C. FALCO
      State Bar No. 24055464
      afalco@cstx.gov
      City Attorney
      College Station City Attorney's
      Office
      P.O. Box 9960
      College Station, Texas 77842
      (979) 764-3746 Phone
      (979) 764-3481 Facsimile

**ATTORNEYS FOR APPELLANT**

## CERTIFICATE OF COMPLIANCE

I, Thomas Brocato, attorney for Appellant, certify that this document was generated by a computer using Microsoft Word, which indicates that the word count of this document is 8,602 per Tex. R. App. P. 9.4(i).

_____
THOMAS L. BROCATO

## INDEX OF APPENDICES

**Appendix A**    Final Judgment and Order (CR at 604)

**Appendix B**    Order on Rehearing, July 11, 2024 (Final Order) (RR, AR 167)

**Appendix C**    College Station's Third Motion for Rehearing, July 26, 2024 (RR, AR 170)

**Appendix D**    Proposal for Decision on Second Remand, December 21, 2023 (RR, AR 134)

**Appendix E**    Final Order, PUC Docket No. 15762, July 8, 1997 (RR, AR 184 at 33-34)

**Appendix F**    Final Order, PUC Docket No. 34230, July 23, 2007 (RR, AR 184 at 53-57)

**Appendix G**    Final Order, PUC Docket No. 35837, September 12, 2008 (RR, AR 184 at 68-72)

**Appendix H**    Texas Government Code § 1502.059

**Appendix I**    Texas Government Code § 2001.058

**Appendix J**    Texas Government Code § 2001.174

**Appendix K**    Texas Utilities Code § 35.004

**Appendix L**    Texas Utilities Code § 40.004

**Appendix M**    16 Texas Administrative Code § 25.192 (the TCOS Rule)

# APPENDIX A

05/01/2025 08:42:53 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-005680

CAUSE NO. D-1-GN-24-005680

| | | |
|---|---|---|
| THE CITY OF COLLEGE STATION, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| PUBLIC UTILITY COMMISSION | § | |
| OF TEXAS, | § | |
| *Defendant.* | § | 200th JUDICIAL DISTRICT |

## FINAL ORDER

On April 30, 2025, the above-captioned case came for final hearing to the Court. All parties appeared through counsel. The Court, having reviewed the pleadings, all papers on file with the Court, and the briefs and argument of counsel, finds that the agency order under review in this case should be in all things affirmed.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the final order of the Public Utility Commission of Texas dated July 11, 2024, in its Docket No. 52728 is AFFIRMED.

IT IS FURTHER ORDERED that the Plaintiff take nothing by its cause of action and that costs are assessed against the Plaintiff.

All relief not expressly granted herein is DENIED. This is a final judgment disposing of all claims and parties and is appealable.

SIGNED on April 30, 2025.

_____
DANIELLA DESETA LYTTLE
Judge Presiding, 261st District Court

# APPENDIX B



Control Number: 52728



Item Number: 211



PUC DOCKET NO. 52728
SOAH DOCKET NO. 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

| | | |
|---|---|---|
| APPLICATION OF THE CITY OF | § | PUBLIC UTILITY COMMISSION |
| COLLEGE STATION TO CHANGE | § | |
| RATES FOR WHOLESALE | § | OF TEXAS |
| TRANSMISSION SERVICE | § | |

**ORDER ON REHEARING**

This Order addresses the application of the City of College Station to change its transmission cost of service (TCOS) and wholesale transmission service rates. On August 16, 2022, the parties filed an unopposed agreement requesting approval of College Station's proposed annual TCOS, wholesale transmission rates, and authorization for College Station to collect rate-case expenses. The agreement included a term requiring College Station to refund $3.9 million related to the inclusion of general fund transfers in College Station's interim TCOS. On January 26, 2023, the Commission declined to accept the parties' unopposed agreement and proposed order and remanded this proceeding to the State Office of Administrative Hearings (SOAH) for further processing.

On July 27, 2023, the SOAH administrative law judges (ALJs) filed a proposal for decision (PFD) addressing the contested issues in this proceeding. The Commission rejected the PFD because the ALJs failed to provide their own findings of fact and conclusions of law on all contested issues that the Commission remanded to SOAH. The Commission then rescinded its January 26, 2023 remand order and issued a new remand order. The Commission remanded the proceeding to SOAH to address all issues, including whether or not it was permissible for College Station to include general fund transfer payments in the interim TCOS filings, and if not, how to address any over or under-recovered amounts. Also, because the Commission declined to accept the entirety of the parties' unopposed agreement filed on August 16, 2022 and the proposed order based on the agreement, the Commission ordered that all issues in the Commission's preliminary order, in addition to the general transfer issue, must be addressed.

211

On December 21, 2023, the SOAH administrative law judges filed a PFD recommending that the Commission approve College Station's application, as modified to: (1) require a partial refund of approximately $900,000 over a 24-month period for the over-recovery of general fund transfers in College Station's interim TCOS proceedings; (2) incorporate the terms of the parties' agreement as to the remainder of the application; and (3) authorize College Station to recover rate-case expenses incurred through November 30, 2023, through a 24-month surcharge. Through exceptions and replies, the ALJs also adopted the parties' recommendations that rate-case expenses incurred after November 30, 2023 be addressed in a compliance docket for this proceeding.

The Commission adopts the proposal for decision in part and rejects it in part, including findings of fact and conclusions of law, for the reasons discussed in this Order.

## I. Discussion

The Commission disagrees with the SOAH ALJs' recommendation that College Station should only be required to refund $900,000 for the over-recovery of general fund transfers in College Station's interim TCOS proceedings and that rate-case expenses incurred after November 30, 2023 should be addressed in a compliance docket for this proceeding.

### A. Rule Violation

College Station's most recent comprehensive TCOS review before the Commission was approved on July 8, 1997 in Docket No. 15762.[1] This was College Station's first and only comprehensive TCOS before the present application. As the SOAH ALJs found, College Station did not include general fund transfers in its initial TCOS, either by using the cash flow method or by including the amounts as payment in lieu of taxes. The Commission's order in that proceeding provided for $0 in tax expense allocated to the transmission function. Thus, no general fund transfer was included in the rates approved by the Commission.

Nevertheless, as the SOAH ALJs also found, College Station included general fund transfers in its interim TCOS filings in 2007, 2008, and 2017 in Docket Nos. 34230,[2] 35837,[3] and

---

[1] *City of College Station Filing in Compliance with Subst. R. 23.67*, Docket No. 15762, Order (July 8, 1997).

[2] *Application of City of College Station for Interim Update for Wholesale Transmission Rates*, Docket No. 34230, Order (Jul. 23, 2007).

[3] *Application of the City of College Station for Interim Update of its Wholesale Transmission Rate Pursuant to P.U.C. Subst. R. §25.192(g)(1)*, Docket No. 35837, Order (Sep. 12, 2008).

46847,[4] respectively, as an expense item under *other taxes*. By including the general fund transferred payments as an expense item in its interim review requirements, College Station has been increasing its effective rate of return above what the Commission approved in College Station's last comprehensive transmission rate case, Docket No. 15762.

The Commission disagrees with the SOAH ALJs' characterization of the Commission's orders in those interim proceedings. The Commission did not issue orders approving inclusion of a general fund transfer in College Station's interim TCOS filings in Docket Nos. 34230, 35837, and 46847. Instead, in those proceedings, the Commission issued orders approving College Station's request to make interim adjustments to its transmission revenue requirement and wholesale transmission rate in advance of a comprehensive TCOS. Further, those orders stated that the updated rates would be subject to reconciliation at the next complete review of College Station's TCOS.

Because College Station's inclusion of the general transfer funds was not first approved in a comprehensive rate case, College Station violated the Commission's TCOS rule[5] when it included general transfer funds as an expense item in its three interim TCOS cases. The rule permits interim updates to transmission rates set in a prior comprehensive TCOS proceeding. The prior Commission order in Docket No. 15762 did not authorize College Station to recover the amounts in rates. Nor are general transfer payments items expressly authorized for inclusion in interim TCOS updates under the Commission's rule.

### B.  Refund

Interim updates of transmission rates are subject to reconciliation at the next complete review of the transmission service provider's TCOS, at which time the Commission must review the costs of the interim transmission plant additions to determine if they were reasonable and necessary. Any amounts resulting from an interim TCOS update that are found to have been unreasonable or unnecessary, plus the corresponding return and taxes, must be refunded with carrying costs in accordance with 16 TAC § 25.192(h)(2).

---

[4] *Application of the City of College Station for Interim Update of Wholesale Transmission Rates,* Docket No. 46847, Notice of Approval (Mar. 17, 2017).

[5] 16 TAC § 25.192.

After conducting an evidentiary hearing, the SOAH ALJs found that College Station began including a general fund transfer in its interim TCOS filings at the direction of Commission Staff, with their knowledge that it was not included in College Station's last comprehensive TCOS filing. The SOAH ALJs also found that College Station acted in good faith and did not willfully or intentionally violate the Commission's rules or policies.

The Commission rejects the PFD's recommendation that Commission Staff's communications or College Station's good faith are circumstances that constitute good cause to grant an exception to the full refund required by the rule. College Station must refund the total overcollection amount which resulted from the inclusion of the general fund transfers in its interim TCOS rates through February 14, 2024. The Commission does agree with the PFD's recommendation that the total overcollection amount should be reduced by the amount of depreciation expense that was under-recovered by College Station during that same period.

The Commission rejects the PFD's recommendation that carrying charges should not be applied. However, the Commission does grant a good-cause exception to the requirements in the TCOS rule that would require College Station to use the rate of return approved in its last comprehensive transmission cost of service to calculate carrying charges. This provision of the rule was not in effect when College Station filed its first interim TCOS proceedings. Instead, the Commission will apply carrying charges on the net amount using the Commission's interest rates for under and overbillings applicable for each year from which the first interim TCOS docket, Docket No. 34230, went into effect on January 20, 2007, until the third interim TCOS Docket No. 46847 went into effect on March 17, 2017. For the period thereafter, carrying charges should be applied using College Station's rate of return of 6.71% approved in its last comprehensive TCOS proceeding.

The Commission rejects the recommendation that the refund be made over 24 months. Because the Commission is ordering a larger refund, a longer repayment period is appropriate. College Station's over-recovery period has extended for more than 15 years. Thus, an appropriate refund period is 15 years. The 15-year repayment period is the maximum amount of time College Station has to repay the refund balance. But College Station is not precluded from paying the refund balance in less than 15 years and thereby incurring less carrying charges without incurring fees or penalties.

Contrary to the recommendation adopted through exceptions and replies, College Station should establish a regulatory asset to record any rate-case expenses incurred for this case after November 30, 2023 for recovery in a future rate-case proceeding.

The Commission adopts the PFD's recommendation to approve the parties' agreement on all other issues, except the general fund transfer issue.

### C. Changes

In accordance with the above discussion, the Commission makes the changes to the PFD that are described below. Finding of fact 46A is added for completeness. Finding of fact 47 is modified for accuracy. Finding of fact 52 is modified because it incorrectly describes the Commission's orders in those proceedings. Finding of fact 52A is added for completeness. Consistent with Commission Staff's number run, finding of fact 58 is changed to reflect the updated amount College Station recovered as of February 14, 2024. Finding of fact 59 is deleted because it is no longer relevant in light of the Commission's decision to require a full refund. Finding of fact 60 is modified for accuracy. Finding of fact 62 is deleted because it is an unverifiable statement and not a proper finding of fact supported by the evidentiary record; it requires the Commission to speculate about a hypothetical event. Finding of fact 63 is modified because it contains a vague generalization about conduct outside the scope of this proceeding. Finding of fact 63 is also modified because the Commission finds that the reasonableness of College Station's inclusion of general fund transfers in its interim TCOS filings must be considered in light of the Commission's order in Docket No. 15762 and the Commission's TCOS rule.

Finding of fact 65 is modified in light of the updated over-recovered amount. Finding of fact 68 is modified because the Commission does not find that good cause exists. Finding of fact 69 is deleted because of the Commission's decision to require a full refund. Finding of fact 69A is added to reflect the SOAH ALJs' decision in the exceptions letter to add a finding of fact regarding the under-recovered depreciation expense, but updated to reflect the more current amount resulting from Commission Staff's number run. Finding of fact 70 is amended to reflect the Commission's decision to require a full refund. Finding of fact 70A is added to include the new total refund amount, not including carrying charges. Finding of fact 71 is modified to reflect the Commission's decision to require carrying charges. Findings of fact 71A, 71B, and 71C are added to reflect the Commission's decisions about what carrying charge rates to apply and to

include the calculated amount. Findings of fact 72 and 73 are amended to include the new total refund amount, including carrying charges. Finding of fact 74 is modified to reflect the Commission's decision that the maximum refund period is 15 years. Findings of fact 74A and 74C are added to reflect the Commission's decisions regarding the refund mechanism. Finding of fact 74B is added to reflect the Commission's decision to apply carrying charges during the refund period.

Conclusions of law 6A and 6B are added for completeness. Conclusion of law 7 is modified for accuracy and completeness. Conclusion of law 8A is added for completeness. Conclusion of law 9 is modified for accuracy. Conclusion of law 10A and 10B are added for completeness. Conclusion of law 10C is added due to the Commission's determination that College Station violated the TCOS rule. Conclusion of law 12 and 13 are deleted as inapplicable because the Commission is not exercising discretion to order a mitigated refund and carrying charges. Conclusions of law 14 and 15 are amended to reflect the Commission's decisions regarding the refund due.

Finally, the Commission makes non-substantive changes for such matters as capitalization, spelling, grammar, punctuation, style, correction of numbering, readability, and conformity with the Commission's order-writing format.

## II. Findings of Fact

The Commission adopts the following findings of fact.

### *Applicant*

1. The City of College Station is a municipally owned utility providing electric transmission service within the Electric Reliability Council of Texas (ERCOT) region under certificate of convenience and necessity number 30035.

### *Application*

2. On November 3, 2021, College Station filed an application with the Commission to change its transmission cost of service (TCOS) and wholesale transmission service rates.

3. In its application, College Station requested the Commission approve an annual wholesale transmission rate of $84.67 per megawatt (MW) based on an annual TCOS of $6,006,601 using a test year ending September 30, 2020, the end of College Station's fiscal year.

4. College Station also requested recovery of its reasonable and necessary rate-case expenses through a six-month surcharge.

5. In Order No. 3 filed on November 30, 2021, the Commission administrative law judge (ALJ) found College Station's application administratively complete.

6. College Station's last comprehensive TCOS review was approved on July 8, 1997 in Docket No. 15762.

*Notice*

7. On November 12, 2021, College Station filed the affidavit of Thomas L. Brocato, attorney for College Station, attesting that notice of the application was mailed on November 3, 2021, to: (a) all transmission and distribution providers listed on the Commission's transmission charge matrix; (b) Commission Staff; (c) the parties still operating in Texas that participated in Docket No. 15762;[6] and (d) the Office of Public Utility Counsel (OPUC).

8. On November 23, 2021, Commission Staff recommended College Station be required to provide notice by publication for two consecutive weeks in newspapers of general circulation in the areas served by College Station. Commission Staff asserted notice by publication should be required because College Station's last comprehensive TCOS proceeding concluded in 1997 and because College Station requested a more-than-50% increase to its wholesale transmission rates.

9. On December 17, 2021, College Station filed proof of notice of publication, providing that notice of the application was published in a newspaper of general circulation for two consecutive weeks on December 3, 2021, and December 10, 2021, and in an online publication of general circulation from December 3, 2021, to December 16, 2021.

10. In Order No. 4 filed on January 12, 2022, the Commission ALJ found notice sufficient.

*Intervenors*

11. In Order No. 2 filed on November 17, 2021, the Commission ALJ granted OPUC's motion to intervene.

---

[6] *City of College Station Filing Pursuant to Subst. R. 23.67*, Docket No. 15762, Final Order (Jul 8, 1997).

PUC Docket No. 52728        **Order on Rehearing**        **Page 8 of 22**
SOAH Docket No. 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

12.       In Order No. 4 filed on July 22, 2022, the State Office of Administrative Hearings (SOAH) ALJs granted Texas Industrial Energy Consumers' (TIEC) motion to intervene.

### *Initial Referral to SOAH*

13.       On February 22, 2022, OPUC filed a request for hearing.

14.       On April 19, 2022, the Commission referred this case to SOAH for assignment of an ALJ to conduct a hearing.

15.       On April 21, 2022, the Commission issued its preliminary order identifying the issues to be addressed in this proceeding.

16.       On May 13, 2022, the SOAH ALJs convened a prehearing conference via videoconference.

17.       In SOAH Order No. 2 filed on May 16, 2022, the SOAH ALJs adopted a procedural schedule.

### *Uncontested Stipulation and Agreement*

18.       On August 16, 2022, College Station, OPUC, and Commission Staff filed a joint motion to admit evidence and an uncontested stipulation and settlement agreement (agreement). TIEC was unopposed to the agreement.

19.       On August 16, 2022, College Station filed the testimony of Mark K. Dreyfus in support of the agreement.

20.       On August 17, 2022, Commission Staff filed the testimony of Ruth Stark in support of the agreement.

21.       On August 17, 2022, College Station filed a supplement to the joint motion to admit evidence.

22.       In SOAH Order No. 7 filed on August 18, 2022, the SOAH ALJs admitted 34 joint exhibits into evidence, remanded the case to the Commission, and dismissed the case from SOAH's docket.

23.       On September 8, 2022, College Station filed a second supplement to the joint motion to admit evidence.

24.       On November 9, 2022, Commission Counsel issued a memo requesting clarification regarding the agreement.

25. On November 15, 2022, College Station filed the supplemental testimony of Grant Rabon in response to the Commission Counsel's memo.

26. In SOAH Order No. 5 filed on November 15, 2022, the Commission ALJ admitted two joint exhibits into evidence.

27. During the public meeting on January 26, 2023, the Commission discussed the agreement.

28. On January 26, 2023, the Commission issued an order remanding the proceeding, declining to accept the agreement and remanding the case to SOAH for further processing in accordance with its order.

29. The first order remanding the proceeding addressed whether College Station was permitted to include a general fund transfer in its interim TCOS filings.

### *First Remand*

30. On March 21, 2023, the SOAH ALJs convened a prehearing conference via videoconference.

31. On May 2, 2023, the SOAH ALJs convened a hearing on remand via videoconference. The hearing concluded the same day.

32. The following parties appeared through legal counsel and participated in the hearing on remand: College Station, Commission Staff, OPUC, and TIEC.

33. The scope of the hearing on remand was limited to the issue of whether College Station was permitted to include a general fund transfer in its interim TCOS proceedings. No other terms of the agreement were contested.

34. On May 16, 2023, the parties filed initial briefs.

35. On May 31, 2023, the parties filed reply briefs and proposed findings of fact, conclusions of law, and ordering paragraphs.

36. The record closed on May 31, 2023, except that College Station was authorized to, and did, file a supplemental update concerning its requested rate-case expenses through June 30, 2023.

37. At the hearing, the SOAH ALJs admitted into evidence three joint exhibits, 17 exhibits offered by College Station, one exhibit offered by OPUC, and 11 exhibits offered by Commission Staff.

38. On July 27, 2023, the SOAH ALJs issued a proposal for decision.

39. In the initial proposal for decision, the SOAH ALJs admitted three additional exhibits regarding rate-case expenses.

### *Second Remand*

40. On September 14, 2023, the Commission rejected the initial proposal for decision, rescinded its first order remanding the proceeding, and issued a new order remanding the proceeding (second remand order) remanding the proceeding to SOAH a second time and instructing the SOAH ALJs to issue findings of fact and conclusions of law on all contested issues.

41. On October 16, 2023, the SOAH ALJs convened a prehearing conference via videoconference, and the parties agreed that an additional evidentiary hearing was unnecessary; the sole remaining contested issue to be decided related to the recoverability of the general fund transfers; and the agreement should be resubmitted to the Commission, but with the proposal for decision making specific findings regarding its reasonableness.

42. On October 30, 2023, parties filed additional initial briefs.

43. On November 6, 2023, parties filed additional reply briefs and proposed findings of fact, conclusions of law, and ordering paragraphs.

44. The record closed on November 6, 2023, except that College Station was authorized to, and did, file a supplemental update concerning its requested rate-case expenses through November 30, 2023.

45. In SOAH Order No. 14, filed on December 4, 2023, the SOAH ALJs admitted two additional exhibits regarding rate-case expenses.

46. In the proposal for decision on second remand, the SOAH ALJs admitted two additional exhibits regarding rate-case expenses.

*College Station's General Fund Transfers in Interim TCOS Filings*

46A.  The Commission's TCOS rule, 16 TAC § 25.192, does not specify whether or how a municipally owned utility can include transfers to the municipality's general fund in its transmission cost of service.

47.  General fund transfers have been reflected in the revenue requirement as a component of a municipally owned utility's cash needs when using the cash flow method to determine the return component of rates or included in the revenue requirement as a separate expense item, most often appearing in the "other taxes" line item.

48.  College Station's first comprehensive TCOS application in Docket No. 15762 was resolved by an agreement that provided for $0 in tax expense allocated to the transmission function and did not use the cash flow method to determine return. Thus, no general fund transfer was included in the approved rates.

49.  College Station included a general fund transfer in its interim TCOS filings in 2007, 2008, and 2017 in Docket Nos. 34230,[7] 35837,[8] and 46847,[9] respectively, as an expense item under "other taxes."

50.  College Station began including a general fund transfer in its interim TCOS filings at the direction of Commission Staff with their knowledge that it was not included in College Station's last comprehensive TCOS filing.

51.  In each of the interim TCOS cases, College Station filed testimony explaining that it was requesting a general fund transfer, and its filings were reviewed by Commission Staff.

52.  The Commission issued orders adjusting College Station's transmission revenue requirement and wholesale transmission rates, on an interim basis, in Docket Nos. 34230, 35837, and 46847.

---

[7] *Application of City of College Station for Interim Update for Wholesale Transmission Rates*, Docket No. 34230, Order (Jul. 23, 2007).

[8] *Application of the City of College Station for Interim Update of its Wholesale Transmission Rate Pursuant to P.U.C. Subst. R. §25.192(g)(1)*, Docket No. 35837, Order (Sep. 12, 2008).

[9] *Application of the City of College Station for Interim Update of Wholesale Transmission Rates*, Docket No. 46847, Notice of Approval (Mar. 17, 2017).

52A. In Docket Nos. 34230, 35837, and 46847, the Commission ordered that the updated wholesale transmission rates would be subject to reconciliation at the next complete review of College Station's TCOS.

53. Using the effective rate for the separate expense item general fund transfer from a municipally owned utility's last comprehensive rate case to update the municipally owned utility's general fund transfer in a later interim TCOS filing is a reasonable method of determining the appropriate amount of the general fund transfer associated with interim transmission plant additions and retirements.

54. The effective rate for the general fund transfer from a municipally owned utility's last comprehensive rate case has been consistently used to update the municipally owned utility's general fund transfers in later interim TCOS proceedings.

55. The effective rate of College Station's general fund transfer for its transmission function in Docket No. 15762 was 0%.

56. Despite having a general fund transfer effective rate of 0%, $833,330 was included in College Station's interim TCOS rates resulting from Docket No. 34230; $1,228,955 was included in its interim TCOS rates resulting from Docket No. 35837; and $1,476,306 was included in the interim TCOS rates resulting from Docket No. 46847.

57. Inclusion of these amounts in College Station's interim TCOS rates is inconsistent with the Commission's precedent of using a municipally owned utility's effective rate for the general fund transfer from its last comprehensive rate case to update the municipally owned utility's later interim TCOS proceedings.

58. The amount College Station recovered in its interim TCOS cases associated with the general fund transfers is $21,624,653 as of February 14, 2024, not including carrying charges.

59. DELETED.

60. The current proceeding is the first complete review of College Station's TCOS after Docket No. 15762 and the first opportunity for the Commission to review and reconcile College Station's interim TCOS rates.

61. In including the general fund transfers in its interim TCOS filings, College Station acted in good faith and did not willfully or intentionally violate the Commission's rules or policies.

62. DELETED.

63. College Station's inclusion of a general fund transfer in its interim TCOS filings was unreasonable in light of the Commission's order in Docket No. 15762 and the Commission's TCOS rule.

64. College Station has statutory authority to adopt a general fund transfer and has identified a valid business purpose for it.

65. Making a refund of the total over-recovered amount would have a significant impact on College Station.

66. College Station's effective rate of return was higher in each of the interim updates because it recovered both its authorized rate of return on rate base, plus the general fund transfers as an expense item.

67. The over-recovered amounts were discovered in this proceeding, not through a customer complaint.

68. A refund of the over-recovered amounts is appropriate.

69. DELETED.

69A. In each of its interim TCOS filings, College Station understated its depreciation expense due to an incorrect formula provided in a Commission template, which resulted in $3,485,333 of under-recovery as of February 14, 2024, not including carrying charges.

70. College Station's under-collection of depreciation expense should be netted against the $21,624,653.

70A. College Station's net over-recovery as of February 14, 2024 is $18,139,320, not including carrying charges.

71. College Station is required to apply carrying costs to the refund amount.

71A.　The provision of 16 TAC § 25.192(h)(2) that requires College Station to use the rate of return approved in its last comprehensive transmission cost of service to calculate carrying charge was not in effect when College Station filed its first two interim TCOS proceedings.

71B.　Carrying charges on the net amount should be applied using the Commission's interest rates rate for under and overbillings applicable for each year from which the first interim TCOS docket, Docket No. 34230, went into effect on January 20, 2007, until the third interim TCOS Docket No. 46847 went into effect on March 17, 2017. For the period after March 17, 2017 until the beginning of the refund period, carrying charges should be applied using the 6.71% rate of return approved in College Station's last comprehensive TCOS proceeding.

71C.　As of February 14, 2024, total carrying charges on the net over-recovered amount is $8,114,773.

72.　As of February 14, 2024, the total refund amount, including carrying charges, is $26,254,093.

73.　A refund amount of $26,254,093 is reasonable.

74.　It is reasonable for College Station to make the refund over a maximum of 15 years.

74A.　Monthly refunds based on the annually approved coincident peak demand for the months of June, July, August and September (4CP) will address the effects of load growth or load reduction.

74B.　Starting February 15, 2024, carrying charges should continue to be applied to the total refund amount using the 6.71% rate of return approved in College Station's last comprehensive TCOS proceeding. During the refund period, carrying charges should continue to apply to College Station's outstanding refund balance until the outstanding balance is paid in full, including the principal and any carrying charges accrued as of the payoff date.

74C.　It is reasonable for College Station to refund the amount due via a monthly credit based on the annually approved 4CP.

### *Adoption of Agreement*

75.    The terms of the agreement should be adopted, except for the term requiring College Station to refund $3.9 million related to the general fund transfers in its interim TCOS proceedings. The rate-case expense term should be adopted with modification to account for recovery of rate-case expenses incurred beyond August 31, 2022.

76.    The adopted terms of the agreement are reasonable, in the public interest, supported by evidence, and provide an equitable and fair resolution of the issues presented in this case.

77.    The adopted terms of the agreement represent a reasonable compromise that reflects adjustments from diverse parties.

### *Rate Base, Return, and Depreciation*

78.    Under the agreement, College Station's transmission rate base is $26,864,373, and the return on transmission rate base is $2,874,067, as shown in schedule B of exhibit 1 attached to the agreement.

79.    The parties agreed to a rate of return of 10.00%. In his testimony filed on November 15, 2022, Mr. Rabon testified that the parties agreed to use a 10.70% rate of return for purposes of determining the return on transmission rate base in this proceeding, as shown in exhibit 1 attached to the agreement. Mr. Rabon further testified that the parties agreed to use a 10.00% rate of return for purposes of future interim TCOS applications and annual earnings monitoring reports.

80.    The agreed rate of return will allow College Station to recover its reasonable and necessary expenses while providing sufficient incentive for continued transmission investment.

81.    College Station will use the depreciation rates as originally filed in the application and as shown in the rebuttal testimony of College Station witness Rabon at table 3 in the far-right column labeled "Docket No. 52728".

82.    College Station will include a depreciation study, prepared in accordance with schedule E1: depreciation expenses of the commission's transmission cost of service rate filing package for non-investor-owned transmission service providers in the Electric Reliability Council of Texas, in its next application for a complete review of its transmission cost of service.

83.    College Station's transmission-related invested capital is used and useful.

### *Financial Policy*

84. College Station agrees to update its financial policies to minimize confusion about the authorization of transfers to the city's general fund.

### *TCOS and Wholesale Transmission Rate*

85. Under the agreement, College Station's TCOS revenue requirement is $5,875,259, and its annual wholesale transmission rate is $82.82 per MW.

### *Rate-Case Expenses*

86. The wholesale transmission rate approved in this Order does not include rate-case expenses.

87. In the agreement, the parties agreed to extend recovery of rate-case expenses as necessary due to the Commission's processing of the case.

88. College Station will continue to incur rate-case expenses through the conclusion of the proceeding.

89. College Station's rate-case expenses for this proceeding incurred through November 30, 2023, in the amount of $487,904.95 are reasonable and necessary. This amount should be recovered through a 24-month surcharge. College Station should establish a regulatory asset to record any additional rate-case expenses incurred for this case for recovery in a future proceeding.

### III. Conclusions of Law

The Commission adopts the following conclusions of law.

1. The Commission has authority over this proceeding under PURA[10] §§ 35.004 and 40.004(1).

2. College Station is a municipally owned utility as defined in PURA § 11.003(11) and an electric utility as defined in PURA § 35.001 for the purpose of wholesale transmission service.

---

[10] Public Utility Regulatory Act, Tex. Util. Code §§ 11.001–66.016 (PURA).

3. College Station is a transmission service provider as defined in 16 Texas Administrative Code (TAC) § 25.5(141) that provides transmission service as defined in PURA § 31.002(20).

4. The Commission processed the application in accordance with the requirements of PURA, the Administrative Procedure Act,[11] and Commission rules.

5. College Station provided notice of the application that complies with 16 TAC § 22.55.

6. College Station's application complies with the requirements of 16 TAC § 25.192.

6A. A transmission service provider's wholesale transmission rates are based on the Commission-approved transmission cost of service under 16 TAC § 25.192(b).

6B. In a comprehensive TCOS proceeding, the Commission approves a transmission service provider's transmission cost of service based on expenses functionalized to transmission, as well as depreciation, federal income tax, other associated taxes, and the Commission approved rate of return under 16 TAC § 25.192(c).

7. A transmission service provider in the ERCOT region may seek authority to revise its transmission rates to reflect the cost of providing such services under 16 TAC § 25.192(g).

8. A transmission service provider may apply to update its transmission rates on an interim basis to reflect changes in its invested capital under 16 TAC § 25.192(h)(1).

8A. If a transmission service provider elects to update its transmission rates, 16 TAC § 25.192(h)(1) provides that the new rates shall reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the Commission-authorized rate of return on such facilities as well as changes in loads.

9. Approved interim updates of transmission rates are subject to reconciliation at the next complete review of the transmission service provider's TCOS, at which time the Commission reviews the costs of the interim transmission plant additions to determine if they were reasonable and necessary under 16 TAC § 25.192(h)(2).

---

[11] Tex. Gov't Code §§ 2001.001–.903.

10.      Any amounts resulting from an interim TCOS update that are found to have been unreasonable or unnecessary, plus the corresponding return and taxes, must be refunded with carrying costs in accordance with 16 TAC § 25.192(h)(2).

10A.     The Commission did not approve College Station's general fund transfers for inclusion in its transmission cost of service and wholesale transmission rates in a comprehensive TCOS proceeding under 16 TAC § 25.192(c).

10B.     College Station was not authorized to include general fund transfers in its updated transmission rates under 16 TAC § 25.192(h)(1).

10C.     College Station violated 16 TAC § 25.192(h) when it included general fund transfers as an expense item in its three interim TCOS cases, because College Station's inclusion of the general fund transfers was not first approved in a comprehensive rate case.

11.      The Commission may grant exceptions to any requirement in its rules for good cause under 16 TAC § 22.5(b).

12.      DELETED.

13.      DELETED.

14.      College Station must issue a refund for its inclusion of a general fund transfer in Docket Nos. 34230, 35837, and 46847.

15.      Good cause exists for an exception to the provision of 16 TAC § 25.192(h)(2) that requires College Station to use the rate of return approved in its last comprehensive transmission cost of service to calculate carrying charges.

16.      College Station's annual TCOS revenue requirement in the amount of $5,875,259 is reasonable and necessary and calculated in accordance with 16 TAC § 25.192(c).

17.      College Station's annual wholesale transmission rate of $82.82 per MW is properly calculated under 16 TAC § 25.192.

18.      College Station's transmission-related investment is reasonable and necessary, is used and useful, and in compliance with 16 TAC § 25.192.

19.  The wholesale transmission rate base additions since College Station's last comprehensive TCOS proceeding that were included in the application have been reconciled in accordance with 16 TAC § 25.192 and were prudently incurred.

20.  It is appropriate for College Station to recover its reasonable and necessary rate-case expenses incurred through November 30, 2023, in this proceeding in accordance with 16 TAC § 25.245.

21.  College Station should recover any trailing rate-case expenses through a regulatory asset for review and recovery in a separate docket.

## IV.  Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders.

1.  The Commission adopts the proposal for decision in part and rejects it in part, including findings of fact and conclusions of law, to the extent provided in this Order.

2.  The Commission approves College Station's TCOS and wholesale transmission rates to the extent provided by this Order.

3.  The Commission establishes College Station's annual TCOS revenue requirement as $5,875,259, effective the date of this Order.

4.  The Commission establishes College Station's annual wholesale transmission rate as $82.82 per MW, effective the date of this Order.

5.  College Station must refund $26,254,093, plus carrying charges incurred starting February 15, 2024, via a monthly credit over a maximum period of 15 years.  The monthly credit must continue until the outstanding balance, which includes the principal plus carrying charges incurred from February 15, 2024 until the payoff date, is fully refunded.

6.  College Station may recover its reasonable and necessary rate-case expenses incurred in this proceeding through November 30, 2023, in the amount of $487,904.95.

7.  College Station must recover its rate-case expenses through a separate 24-month surcharge, and such surcharge must be calculated based on 70,938 MW (ERCOT's 4 Coincident Peak for calendar year 2020).

8.      The refund and rate-case expense surcharge authorized by this Order must be implemented in Docket No. 54329, *Compliance Filing for Docket No. 52728 (Application of the City of College Station to Change Rates for Wholesale Transmission Service)*. College Station must file a report annually in Docket No. 54329 documenting the calculation and collection of the monthly rate-case expense surcharge from customers and the calculation and distribution of the monthly credit to customers in compliance with this Order.

9.      College Station must record any additional rate-case expenses incurred in this docket in a regulatory asset. College Station may seek recovery of those additional amounts in a future rate proceeding.

10.     College Station may prepay all or any part of the outstanding refund balance at any time without penalty.

11.     If College Station intends to pay the outstanding refund balance in full at any time prior to the maximum period of 15 years, it must file notice in Docket No. 54329 at least 60 days in advance of the anticipated payoff date to facilitate calculation of the final refund payment due.

12.     If College Station intends to pay the outstanding refund balance in full at any time prior to the maximum period of 15 years, it must file a report in Docket No. 54329 documenting the calculation and distribution of the monthly credit to customers at least 60 days in advance of the payoff date to facilitate calculation of the final refund payment due.

13.     The Commission approves the depreciation rates described in finding of fact number 81.

14.     College Station must include a depreciation study, prepared in accordance with schedule E-1: depreciation expense of the commission's transmission cost of service rate filing package for non-investor-owned transmission service providers in the Electric Reliability Council of Texas, in its next application for a complete review of its transmission cost of service as referenced in 16 TAC § 25.192(h)(2).

15.     Until its next comprehensive TCOS, College Station must use a 10.00% rate of return for purposes of future interim TCOS applications and its annual earnings monitoring reports.

16. Within ten days of the date of this Order, College Station must file with the Commission a clean copy of the approved wholesale transmission service tariff to be stamped *Approved* and retained by Central Records.

17. The Commission denies all other motions and any other requests for general or specific relief, if not expressly granted.

Signed at Austin, Texas the ___11th___ day of ___July___ 2024.

PUBLIC UTILITY COMMISSION OF TEXAS

_____
LORI COBOS, COMMISSIONER

_____
JIMMY GLOTFELTY, COMMISSIONER

_____
KATHLEEN JACKSON, COMMISSIONER

q:\cadm\orders\final\52000\52728 orh 2.docx

# APPENDIX C



## Filing Receipt

**Filing Date - 2024-07-26 04:04:04 PM**

**Control Number - 52728**

**Item Number - 214**

**PUC DOCKET NO. 52728**
**SOAH DOCKET NO. 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**

| | | |
|---|---|---|
| **APPLICATION OF THE CITY OF** | § | **BEFORE THE** |
| **COLLEGE STATION TO CHANGE** | § | |
| **RATES FOR WHOLESALE** | § | **PUBLIC UTILITY COMMISSION** |
| **TRANSMISSION SERVICE** | § | **OF TEXAS** |

**THE CITY OF COLLEGE STATION'S**
**THIRD MOTION FOR REHEARING**

**JULY 26, 2024**

PUC DOCKET NO. 52728
SOAH DOCKET NO. 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

APPLICATION OF THE CITY OF    §          **BEFORE THE**
COLLEGE STATION TO CHANGE    §
RATES FOR WHOLESALE         §    **PUBLIC UTILITY COMMISSION**
TRANSMISSION SERVICE        §            **OF TEXAS**

# THE CITY OF COLLEGE STATION'S
# THIRD MOTION FOR REHEARING

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION & EXECUTIVE SUMMARY ............................................................. 1

II. POINTS OF ERROR ...................................................................................................... 3

  A. The Commission's decision to order a $26.3 million refund has no legal basis in a Commission rule or order and no factual basis considering the evidence presented. [FOFs 53, 54, 63, 68, 71, 73, COLs 10B, 10C, 14] ............................................. 3

    1. The TCOS rule does not require that a GFT must first be included in a comprehensive TCOS filing to be subsequently included in an interim TCOS filing. ........................................................................................................... 3

    2. The order in Docket No. 15762 did not prohibit inclusion of a GFT in subsequent interim TCOS filings. ....................................................................... 4

    3. This proceeding is the first time the Commission has implemented a policy requiring a MOU to maintain the GFT effective rate from the last comprehensive TCOS filing. ................................................................................ 5

    4. The Commission's punitive decision to order a refund is contrary to the facts in evidence. ............................................................................................................ 7

  B. The Order on Rehearing ignores longstanding precedent of approving GFTs within "other associated taxes" under the TCOS rule and instead retroactively disallows an entire expense category permitted under the rule. [FOF 52A, COL 9] ....................... 8

  C. The Order on Rehearing arbitrarily disclaims three of the Commission's own prior orders. [FOFs 52, 57] ................................................................................................. 11

III. CONCLUSION ............................................................................................................ 12

**TO THE HONORABLE PUBLIC UTILITY COMMISSION OF TEXAS:**

The City of College Station (College Station) files this Third Motion for Rehearing (Third Motion) based on the Order on Rehearing issued by the Public Utility Commission of Texas (Commission) on July 11, 2024. Pursuant to Tex. Gov't Code §§ 2001.145 and 2001.146, and 16 Tex. Admin. Code (TAC) § 22.264, this Third Motion is timely filed. In support of this Third Motion, College Station respectfully shows as follows:

## I. INTRODUCTION & EXECUTIVE SUMMARY

On July 11, 2024, the Commission issued an Order on Rehearing[1] requiring College Station to refund over $26 million and more than $15 million in additional carrying charges. College Station's annual transmission revenue requirement is slightly more than $6 million. The Order on Rehearing disregards the evidence and misapplies the law. Therefore, College Station respectfully requests reconsideration of the points of error identified in the sections that follow.

In each of its three interim Transmission Cost of Service (TCOS) filings, College Station acted in good faith and had every reason to believe its actions complied with the Commission's rules. Despite this, the Commission is now looking back nearly three decades to find that College Station violated the Commission's rules and a Commission order, but the Order on Rehearing does not, and cannot, identify any specific language or requirements in the rules or a past order that College Station has violated. In addition, the Order on Rehearing adopts a "reasonable method" of relying on the proportional allocation from the utility's last comprehensive filing and finds that College Station violated this newly created method. The Commission's decision is a quintessential "regulatory gotcha."

The evidence shows that College Station began including a General Fund Transfer (GFT) in its TCOS at the specific direction of Commission Staff.[2] The evidence also shows that the Commission issued orders approving rates that included a GFT on three separate occasions over a decade.[3] The orders directed the Commission to review "whether the cost of the *transmission plant additions* included in College Station's application are reasonable and necessary at the next

---

[1] Order on Rehearing (Jul. 11, 2024).

[2] Rebuttal Testimony of Timothy R. Crabb, Ex. CS-10 at 16.

[3] *Id.* at 53-57, 68-72, 74-77.

1

complete review of College Station's TCOS."[4] The applicable rule similarly limits subsequent review of interim TCOS filings to plant additions.[5] The orders contained no indication that the Commission could retroactively prohibit inclusion of an entire expense category it has historically permitted. It is undisputed that College Station could have asked for a GFT in its first comprehensive TCOS filing in Docket No. 15762. Accordingly, in 2007, when College Station filed an interim TCOS application, Commission Staff, *sua sponte*, instructed College Station to include a GFT. Commission Staff told College Station to include GFT *even if it was not in the original filing.*[6] As a result, College Station requested a reasonable GFT and presented testimony documenting the addition of the GFT and stating that it was not included in the initial comprehensive filing. The Commission knowingly approved inclusion of a GFT *three* times. The Administrative Law Judges' (ALJs) Proposal for Decision (PFD) appropriately considered the evidence and the incontrovertible mitigating factors present in this proceeding. In contrast, the Commission's decision disregards all such context.

College Station offers the following executive summary of its Third Motion:

- The Commission's decision has no basis in a Commission rule or order. The Commission's only articulated legal basis for its decision is that College Station violated 16 TAC § 25.192 (the TCOS rule) "because College Station's inclusion of the general transfer funds [sic] was not first approved in a comprehensive rate case." The TCOS rule has no such requirement. Therefore, the Commission's decision is an error of law.

- The order in Docket No. 15762, College Station's last comprehensive TCOS filing, contains no prohibition against inclusion of a GFT in subsequent interim TCOS filings.

- The Order on Rehearing establishes a "reasonable method" that did not exist in any prior Commission rule or order. Given that the method is derived only from commonalities between schedules in municipally owned utility (MOU) TCOS filings and is not grounded in any known legal requirement, College Station could not have reasonably been on notice that the Commission would adopt and enforce this method to retroactively penalize College Station.

- Commission precedent is to approve inclusion of a GFT in TCOS rates as "other associated taxes" under the TCOS rule. The Commission followed this precedent

---

[4] *Id.* at 56, 71, 76-77 (emphasis added).

[5] 16 Tex. Admin. Code (TAC) § 25.192(h)(2).

[6] Ex. CS-10 at 16.

by approving inclusion of College Station's GFT as "other associated taxes" in three orders. The Commission's decision arbitrarily disclaims its own prior orders.

The Order on Rehearing is arbitrary and capricious because it lacks any established legal basis and disregards the facts in evidence and the mitigating factors that are inextricably tied to those facts. As such, College Station respectfully urges reconsideration of the Commission's decision.

## II.   POINTS OF ERROR

**A. The Commission's decision to order a \$26.3 million refund has no legal basis in a Commission rule or order and no factual basis considering the evidence presented. [FOFs 53, 54, 63, 68, 71, 73, COLs 10B, 10C, 14]**

1. **The TCOS rule does not require that a GFT must first be included in a comprehensive TCOS filing to be subsequently included in an interim TCOS filing.**

In Conclusion of Law No. 10C, the Commission asserts that College Station violated 16 TAC § 25.192(h) because College Station's inclusion of a GFT was not first approved in a comprehensive rate case.[7] The Commission cannot identify *any* specific or even general language in the TCOS rule that College Station has violated. This is because there is no rule, law, or other legal authority requiring that a GFT must first be approved in a comprehensive rate case. This was repeatedly confirmed in the record of this proceeding. For example, Commission Staff admitted in discovery and during the hearing that no such authority exists.[8] When asked during cross-examination where in the Commission's rules or filing package instruction or elsewhere there is a requirement that a utility must include a GFT in its initial full TCOS case to update GFT in an interim filing, Commission Staff witness Stark responded that there is nowhere that specifically addresses the issue.[9] Even so, the Order on Rehearing goes as far as to include a section titled "Rule Violation."[10] The Commission's decision is not grounded in any existing law and instead infuses language and meaning into the TCOS rule that is simply not there. The Commission is essentially creating new rules without the protections of the Administrative Procedure Act.

---

[7]   Order on Rehearing at Conclusion of Law (COL) No. 10C.

[8]   Commission Staff's Response to College Station's First Request for Information, Ex. CS-9 at 9; Tr. at 43:10-20 (Stark Cross).

[9]   Tr. at 43:10-20.

[10]   Order on Rehearing at 2.

3

Moreover, there is no practical reason for making recovery of a GFT in interim TCOS filings contingent on whether it was requested in a preceding comprehensive TCOS filing. The Commission has never had such a policy, and the Commission routinely approves inclusion of a GFT in TCOS rates; in fact, the Commission has never denied a request for a GFT in TCOS rates. Transmission customers benefitted from College Station not asking for a GFT in Docket No. 15762—an ask that would have been routine and approved. The Order on Rehearing fails to identify with any degree of particularity which portion(s) of the TCOS rule College Station has violated and instead relies on a prohibition that does not exist in the rule. There is no basis for the claim that College Station had to first request a GFT in a comprehensive TCOS filing. As such, the Commission's decision to penalize College Station with an exorbitant refund is erroneously based on an artificial requirement that does not exist under the applicable law.

2. **The order in Docket No. 15762 did not prohibit inclusion of a GFT in subsequent interim TCOS filings.**

The Order on Rehearing continues to erroneously rely on the order from Docket No. 15762 as a basis for invalidating College Station's GFT inclusions. Finding of Fact No. 63 states that College Station's GFT inclusion was "unreasonable in light of the Commission's order in Docket No. 15762 and the Commission's TCOS rule."[11] Significantly, the finding is not that College Station *violated* the order in Docket No. 15762 because there is no language from the order in Docket No. 15762 that prohibited College Station's subsequent GFT inclusions. Absent a substantiated claim of how College Station's actions were *unlawful*, this cannot reasonably be the basis for the Commission's decision. The order from Docket No. 15762 includes no mention of a GFT or whether a GFT may be included in College Station's future TCOS rates.[12] Nor does the order place any limitation on College Station's ability to increase its tax expense allocation in subsequent interim TCOS filings, as discussed in more detail below. In the instant case, the Commission's Finding of Fact No. 63 is an error of law and an abuse of discretion because it provides no legal explanation for ordering College Station to refund over $41 million.

---

[11] *Id.* at Finding of Fact (FOF) No. 63.

[12] *City of College Station Filing Pursuant to Subst. R. 23.67*, Docket No. 15762, Final Order (Jun. 8, 1997).

4

**3. This proceeding is the first time the Commission has implemented a policy requiring a MOU to maintain the GFT effective rate from the last comprehensive TCOS filing.**

In the Order on Rehearing, the Commission finds that the effective rate approved in MOU comprehensive TCOS cases has been used to update a GFT in subsequent interim proceedings.[13] For the first time, the Commission memorializes this as a "reasonable method of determining the appropriate amount of the general fund transfer associated with interim transmission plant additions and retirements."[14] The Commission's rationale for its new principle is that because $0 in tax expense was allocated to the transmission function in Docket No. 15762, College Station's subsequent inclusions of a GFT as an expense item increased College Station's effective rate of return above what was approved in Docket No. 15762.[15] The Commission has not established this principle in any previous rule or order but now finds that College Station has violated it three times beginning seventeen years ago. According to the Commission, College Station has violated a "reasonable approach" that could not have been known as Commission policy until the issuance of an order in this case. By the Commission's rationale, MOUs filing a TCOS application should comb through the schedules of all previous MOU TCOS proceedings over the last three decades to ascertain which aspects of the schedules show the same pattern. MOUs should then deduce from these patterns which policies need to be followed in an interim TCOS proceeding. This cannot reasonably be the expectation placed upon regulated entities. Prior to the issuance of an order in this case, there was no rule, law, or other legal authority requiring that MOUs maintain the transmission function's proportional allocation from their most recently approved comprehensive TCOS filing in subsequent interim TCOS filings.

Over nearly thirty years, the Commission has had numerous opportunities to investigate any suspected over-earning by College Station. Like other utilities, College Station has consistently filed annual Earnings Monitoring Reports (EMRs) since 2000, in addition to filing its three interim TCOS filings in 2007, 2008, and 2017.[16] In each of its EMR filings, College Station

---

[13] Order on Rehearing at FOF No. 54.

[14] *Id.* at FOF No. 53.

[15] *Id.* at 2-3.

[16] For College Station's most recent EMRs, *see Year-End 2020 Electric Utility Earnings Reports in Accordance with 16 TAC § 25.73*, Project No. 51718 (Jan. 14, 2021); *Year-End 2019 Electric Utility Earnings Reports in Accordance with 16 TAC § 25.73*, Project No. 50655 (Mar. 11, 2020); *Year-End 2018 Electric Utility Earnings Reports Pursuant to 16 TAC § 25.73*, Project No. 49355 (Mar. 19, 2019); *Year End 2017 Electric Utility Earnings*

5

complied with the instructions and provided the required materials. At no time did the Commission express to College Station any concerns of over-earning based on a GFT inclusion.[17] The Commission's decision to penalize College Station for failing to apply a principle that is based on mere coincidence in prior TCOS proceedings is not grounded in the law and is a clearly unwarranted exercise of discretion.

Even if a proportional allocation requirement had existed at the time of the three interim TCOS filings, College Station only increased the Commission's approved allocation at the direction of Commission Staff[18] and with the Commission's approval.[19] If the policy was in place at the time of College Station's first interim TCOS filing in 2007, it begs the question why Commission Staff specifically instructed College Station to include a GFT. Moreover, if this policy had been in place, there is simply no reasonable explanation for why the Commission would not have previously identified an increased proportional allocation—adding *anything* to the $0 allocation from Docket No. 15762 is an increase above College Station's effective rate. Furthermore, the increase was easily observable in each of College Station's interim TCOS filings. The "Taxes Other Than Income Taxes" schedule would have included a single line-item for the GFT, and the inclusion was specifically identified in testimony.[20] College Station had no reason to know that maintaining a proportional allocation was the Commission's policy. Commission Staff memoranda recommending approval of College Station's interim TCOS filings provided that the appropriate rate of return from Docket No. 15762 was applied to College Station's approved rate base.[21] The Commission's findings based on the "proportional allocation" principle are not based on any legal requirement established prior to this docket. As such, this principle cannot justifiably be imposed on College Station for an inclusion it only made at the specific direction of Commission Staff and with the approval of three Commission orders.

---

*Reports Pursuant to 16 TAC 25.73*, Project No. 48158 (Mar. 13, 2018).

[17] Ex. CS-10 at 14-15.

[18] Ex. CS-10 at 16.

[19] *Id.* at 53-57, 68-72, 74-77.

[20] *Id.* at 73, TRC-11.

[21] *Id.* at 79, TRC-13.

## 4. The Commission's punitive decision to order a refund is contrary to the facts in evidence.

In the Proposal for Decision on Second Remand, the ALJs reduced the recommended refund amount to $900,000 based on the evidence.[22] The Commission's decision inexplicably abandons this reasoned judgment. Even if College Station had violated a Commission rule or order, significant weight should be given to the unique factual history and numerous mitigating factors. Ordering a maximum refund and requiring carrying charges, as the Commission has done in Findings of Fact Nos. 71 and 73, ignores the evidence.[23] For example, the only evidence directly supporting the Commission's decision to order a full refund is Commission Staff witness Stark's direct testimony. Notably, Ms. Stark *no longer endorses this testimony*. Ms. Stark originally proposed a full refund but subsequently reviewed the history, facts, and circumstances, and modified her recommendation.[24] The Commission's decision fails to acknowledge this important factual development. In addition, the evidence shows that College Station conferred with Commission Staff on the inclusion of a GFT, explicitly referenced the inclusion in testimony, multiple Commission Staff experts reviewed it, and the Commission issued orders approving the inclusion on three occasions.[25] The Order on Rehearing does not align with the undisputed evidence.

The Order on Rehearing similarly fails to recognize that ordering a refund is not in the public interest.[26] As Commission Staff raised in briefing, the maximum refund is over 500% of College Station's annual revenue requirement, whereas the impact of the annual amount on the 2022 total ERCOT TCOS revenue requirement would have been three one-hundredths of one percent. These numerical facts illustrate how punitive the Commission's decision is—the Order on Rehearing irreparably damages College Station's financial stability in favor of saving a negligible amount for TCOS ratepayers across ERCOT. Such a drastic decision is not in the public interest. Throughout the proceeding, College Station *and* Commission Staff demonstrated that,

---

[22] SOAH Proposal for Decision at 2 (Dec. 21, 2023) (PFD).

[23] Order on Rehearing at FOF Nos. 71, 73.

[24] Supplemental Direct Testimony of Ruth Stark, Staff Ex. 3A at Bates 4-5, wherein Ms. Stark modifies her original recommendation based on the information provided in College Station's rebuttal testimony.

[25] Ex. CS-10 at 16-17; 20; 47-52; 53-63; 68-72, 74-81.

[26] *See* Commission Staff's Initial Brief at 20 (May 16, 2023), citing *Complaint of Toby Smith Water Co.,* Docket No. 3173, 6 P.U.C. BULL. 413 (Jan. 8, 1981).

even if inclusion of a GFT was somehow unlawful, the evidence overwhelmingly supports mitigation. The Commission's decision shows an arbitrary and capricious disregard for the facts and history of the case.

**B. The Order on Rehearing ignores longstanding precedent of approving GFTs within "other associated taxes" under the TCOS rule and instead retroactively disallows an entire expense category permitted under the rule. [FOF 52A, COL 9]**

The Order on Rehearing contradicts the longstanding precedent of allowing inclusion of a GFT as "other associated taxes" under the TCOS rule. The Commission has the authority to review the rates approved in an interim TCOS proceeding, but the Commission does not have the authority to disallow an entire category of costs expressly permitted under the TCOS rule and historically approved by the Commission. In its findings and conclusions, the Order on Rehearing establishes that College Station's interim transmission rates are subject to reconciliation,[27] but reconciliation does not equate to reconsideration of a well-established Commission policy. If the Commission recognizes a precedent of maintaining the effective rate from a previous comprehensive TCOS proceeding, then the Commission must also recognize the longstanding practice and permissibility of including GFT as "other associated taxes." In fact, in Finding of Fact No. 47, the Order on Rehearing itself provides that GFTs have most often appeared as an "other taxes" line item.[28] Ordering College Station to issue a refund for its GFT inclusions is not aligned with the Commission's well-established interpretation of the TCOS rule.

During the hearing on remand, Commission Staff's witness Stark confirmed that GFTs have been traditionally included in interim TCOS filings as "other associated taxes,"[29] a category explicitly permitted in interims under the TCOS rule. Notably, new rates established in an interim TCOS filing *shall* include "other associated taxes," signifying that the category must be included in an interim filing.[30] Ms. Stark also confirmed that the practice has been to allow MOUs to include a GFT as part of the return calculation if it is not included in "Taxes Other Than Income Taxes."[31]

---

[27] Order on Rehearing at FOF No. 52A; COL No. 9.

[28] *Id.* at FOF No. 47.

[29] Tr. at 62:10-23 (Stark Cross), at which point Ms. Stark confirms that MOUs have included GFT within the "other associated taxes" category of 16 TAC § 25.192(h)(1), and that the Commission issued orders authorizing that treatment.

[30] 16 TAC § 25.192(h)(1).

[31] Tr. at 40:10-23 (Stark Cross).

By Ms. Stark's own characterization of "other associated taxes" and the Commission's approval of College Station's three interim filings, there is no dispute that the Commission has repeatedly approved inclusion of a GFT within the "other associated taxes" category. Despite this, Conclusion of Law No. 10B erroneously finds that College Station was not authorized to include a GFT under the very subsection permitting updates to "other associated taxes."[32] The Order on Rehearing is a sudden prohibition of an inclusion and categorization the Commission has historically approved and one that Commission Staff's own witness acknowledged as correct.

Per the language of the TCOS rule, the interim orders, and the Order on Rehearing itself, College Station expects that its rates will be subject to reconciliation in a comprehensive TCOS filing.[33] For example, if College Station includes the costs of a new transformer in an interim TCOS filing, it is logical to expect, under the plain language of the TCOS rule, that the costs, interest, and other expense components of that transformer will be subject to a prudence review in a subsequent comprehensive filing. Under the rule, however, there is absolutely no reason to expect that the entire category of invested capital will be wholly excluded—the addition and retirement of transmission facilities is expressly listed as a category that may be reflected in an interim TCOS filing.[34] Similarly, the Commission rationalizes its decision in part by stating that general transfer payments are not expressly authorized for inclusion in interim TCOS updates under the Commission's rules.[35] The TCOS rule lists *categories* that may be updated in an interim TCOS filing. The TCOS rule is not so granular that it contemplates each and every type of expense that may fall within a given category. At the direction of Commission Staff, College Station updated its GFT within "other associated taxes" consistent with a practice the Commission has approved for decades. If the Commission intends to renege on this practice, as it has done in the Order on Rehearing, it must be done on a prospective basis and not in a manner that arbitrarily imposes a punitive decision on one party.

---

[32] Order on Rehearing at COL No. 10B.

[33] 16 TAC § 25.192(h)(2) provides that interim *rates* are subject to reconciliation at the next complete review of the TSP's transmission cost of service. In addition, each of the three interim orders provided that the "updated rate" would be subject to reconciliation (*see* Ex. CS-10 at 56; 71; 76).

[34] 16 TAC § 25.192(h)(1).

[35] Order on Rehearing at 3, FOF No. 46A.

9

The recommendations of Commission Staff in College Station's interim filings note that the *costs* will be subject to review and analysis.[36] Each interim order provided only that the "updated rate" is subject to reconciliation.[37] College Station recognizes that if it was determined in a comprehensive TCOS case that the *amount* of GFT included in its interim filings was inaccurate, then it could be subject to correction. But that is not the Commission's decision in this case. The Order on Rehearing asserts that a MOU can no longer include a GFT in interim TCOS filings under the rule—a position that is undeniably contrary to longstanding practice and unsupported by the law. College Station relied on three orders issued by the Commission and had no reason to know, under the plain language of the rule and the Commission's history of approving GFTs in interim TCOS filings, that the inclusion of the entire "other associated taxes" category would later be disallowed. Furthermore, "costs of interim plant additions" is the only category expressly subject to reconciliation under the TCOS rule. During a reconciliation, the Commission is required to review the costs of interim plant additions.[38] The rule specifically enumerates what *shall* be reviewed and if the Commission had intended any other required review beyond plant additions, it would have made such categories similarly explicit. The plain language of the rule limits reconciliation to interim transmission plant additions. The rule also refers to refunding the "corresponding return and taxes" on amounts found to be unreasonable or unnecessary.[39] Invested capital has "corresponding return and taxes" but expense items like a GFT do not. The Order on Rehearing itself provides that, under the TCOS rule, reconciliation will entail the review of interim plant additions.[40] Likewise, each of the Commission's past orders approving College Station's

---

[36] *Application of City of College Station for Interim Update for Wholesale Transmission Rates*, Docket No. 34230, Commission Staff's Final Recommendation at 1 (Jun. 7, 2007); *Application of the City of College Station for Interim Update of its Wholesale Transmission Rate Pursuant to P.U.C. Subst. R. §25.192(g)(1)*, Docket No. 35837, Commission Staff's Final Recommendation at 1 (Aug. 12, 2008); *see also* Ex. CS-10 at 78. Ms. Spence's memo in the 2008 interim filing provides that the "cost of transmission plant additions" will be reviewed at the next complete review and concludes that the "associated tax effects" were appropriately represented in the interim filing.

[37] Ex. CS-10 at 56 (Ordering Paragraph No. 4); Ex. CS-10 at 71 (Ordering Paragraph No. 4); Ex. CS-10 at 76 (Ordering Paragraph No. 3).

[38] 16 TAC § 25.192(h)(2).

[39] *Id.*

[40] Order on Rehearing at COL No. 9.

inclusion of a GFT provided that transmission plant additions would be reviewed at the next complete review and listed no other components that must be reviewed.[41]

## C. The Order on Rehearing arbitrarily disclaims three of the Commission's own prior orders. [FOFs 52, 57]

Finding of Fact No. 52 from the PFD stated, "[t]he Commission issued orders approving inclusion of a GFT in College Station's interim TCOS filings in Docket Nos. 34230, 35837, and 46847."[42] Even though this is a true statement, the Commission revised the ALJs' Finding of Fact No. 52 because it "incorrectly describes the Commission's orders in [the three interim TCOS proceedings]."[43] As a result of the Commission's change, the Order on Rehearing fails to consider that the Commission consciously allowed College Station to include a GFT in three different proceedings over a decade. Inherent in each of the Commission's three interim orders is the Commission's allowance of a GFT inclusion within the approved rates. Also inherent is the acknowledgement that College Station indisputably could have included a GFT in its original comprehensive TCOS filing, did not do so, and was harmed by that exclusion. College Station was unable to collect GFT revenues from the time Docket No. 15762 rates went into effect until College Station's first interim TCOS filing in 2007. The Commission now finds that College Station should be punished for not doing something the utility *could* have done that cost only the utility money. The interim orders signify that the Commission realized this. Finding of Fact No. 57 states that inclusion of College Station's GFT amounts in the interim filings was "inconsistent with the Commission's precedent," but the Commission itself approved these inclusions and made no findings that such inclusions were in violation of its own precedent.

From 1996 through 2017, not a single order issued in a College Station TCOS case reflected that inclusion of a GFT was impermissible, or that it could be reviewed and disallowed in a subsequent comprehensive filing. In the interim orders, the Commission was saying, "we are allowing this utility to include a GFT in its TCOS rates." Orders issued in interim TCOS cases have meaning, and College Station reasonably relied on the Commission's approval of a GFT on three different occasions over ten years. College Station's witness even provided that had Commission Staff notified College Station that the inclusion was inappropriate or could only be

---

[41] Ex. CS-10 at 56, 71, 76-77.

[42] PFD at 62.

[43] Order on Rehearing at 5.

incorporated through a comprehensive case first, College Station would have either filed the 2007 interim application without the GFT, as was originally done in the draft submitted to Commission Staff, or re-evaluated the filing and filed a full TCOS case.[44] The Commission erroneously deleted the ALJs' proposed Finding of Fact No. 62[45] addressing this fact even though it is supported by witness testimony. The Commission revised and deleted key findings from the PFD that are factually correct and crucial to a decision supported by the evidence. As such, the Order on Rehearing arbitrarily and capriciously fails to acknowledge the import of the Commission's own past orders.

## III. CONCLUSION

College Station respectfully requests that the Commission grant this Third Motion and revise its Order on Rehearing issued on July 11, 2024, in accordance with the points of error detailed above. In addition, College Station requests any other relief to which it is entitled.

Respectfully submitted,

**LLOYD GOSSELINK ROCHELLE
& TOWNSEND, P.C.**
816 Congress Avenue, Suite 1900
Austin, Texas 78701
(512) 322-5800

THOMAS L. BROCATO
State Bar No. 03039030
tbrocato@lglawfirm.com

ROSLYN M. DUBBERSTEIN
State Bar No. 24117520
rdubberstein@lglawfirm.com

**ATTORNEYS FOR THE CITY OF COLLEGE
STATION**

---

[44] Ex. CS-10 at 14.

[45] Order on Rehearing at 5.

12

## CERTIFICATE OF SERVICE

I certify that, unless otherwise ordered by the presiding officer, notice of the filing of this document was provided to all parties of record via electronic mail on July 26, 2024, in accordance with the Order Suspending Rules, issued in Project No. 50664.

THOMAS L. BROCATO

# APPENDIX D



## Filing Receipt

**Filing Date - 2023-12-21 12:09:58 PM**

**Control Number - 52728**

**Item Number - 178**

# State Office of Administrative Hearings

Kristofer S. Monson
Chief Administrative Law Judge

December 21, 2023

Shelah Cisneros, Commission Counsel          <u>**VIA EFILE TEXAS**</u>
Commission Advising and Docketing Management
William B. Travis State Office Building
1701 N. Congress, 7th Floor
Austin, Texas 78701

**RE: SOAH Docket No. 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; PUC Docket No. 52728;** *Application of the City of College Station to Change Rates for Wholesale Transmission Service*

Dear Ms. Cisneros:

Please find attached a Proposal for Decision (PFD) in this case. By copy of this letter, the parties to this proceeding are being served with the PFD.

Please place this case on an open meeting agenda for the Commissioners' consideration. Please notify the Administrative Law Judges and the parties of the open meeting date, as well as the deadlines for filing exceptions to the PFD, replies to the exceptions, and requests for oral argument.

Enclosure

CC: Service List

SOAH Docket No. 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    **Suffix: PUC**

PUC Docket No. 52728

# Before the
# State Office of Administrative
# Hearings

---

## APPLICATION OF THE CITY OF COLLEGE STATION TO CHANGE RATES FOR WHOLESALE TRANSMISSION SERVICE

---

## TABLE OF CONTENTS

List of Acronyms and Abbreviations ..................................................................... 1

I. Jurisdiction, Notice, and Procedural History ..................................................... 3

II. Applicable Law ................................................................................................. 7

III. Discussion ........................................................................................................ 9

    A.  Background ................................................................................................. 9

    B.  Recoverability of General Fund Transfers .............................................. 15

        1.  College Station's Position ................................................................. 15

        2.  Staff's Position ................................................................................. 20

        3.  TIEC's and OPUC's Positions ......................................................... 24

        4.  ALJs' Analysis ................................................................................. 26

    C.  Calculation of Refund Amount ............................................................... 28

        1.  TIEC's and OPUC's Positions ......................................................... 30

        2.  Staff's Position ................................................................................. 31

3. College Station's Position ............................................................... 37

4. ALJs' Analysis ................................................................................ 41

D. Uncontested Issues ................................................................................ 48

1. Extent of Issues Raised in this Case ............................................... 48

2. Parties' Settlement ......................................................................... 51

3. Rate-Case Expenses ....................................................................... 54

IV. Conclusion ............................................................................................. 56

V. Findings of Fact ...................................................................................... 57

VI. Conclusions of Law ............................................................................... 66

VII. Proposed Ordering Paragraphs ............................................................ 68

## LIST OF ACRONYMS AND ABBREVIATIONS

| TERM | DEFINITION |
|---|---|
| 4CP | 4 Coincident Peak |
| Application | College Station's application filed on November 3, 2021 |
| ALJ | Administrative Law Judge |
| City or College Station | City of College Station |
| COL | Conclusion of Law |
| Commission | Public Utility Commission of Texas |
| EMR | Earnings Monitoring Report |
| ERCOT | Electric Reliability Council of Texas |
| FERC | Federal Energy Regulatory Commission |
| First Remand Order | Commission's Order Remanding Proceeding dated January 26, 2023 |
| FOF | Finding of Fact |
| GFT | General Fund Transfer |
| Initial PFD | Proposal for Decision issued on July 27, 2023 |
| MOU | Municipally Owned Utility |
| MW | Megawatt |
| OP | Ordering Paragraph |
| OPUC | Office of Public Utility Counsel |
| PFD | Proposal for Decision |
| PILOT | Payment In Lieu of Taxes |
| PURA | Public Utility Regulatory Act |
| RCEs | Rate-Case Expenses |
| ROI | Return on Investment |
| Rule | 16 Texas Administrative Code § |
| Second Remand Order | Commission's Order Remanding Proceeding dated September 14, 2023 |
| Settlement | Uncontested Stipulation and Settlement Agreement dated |

| TERM | DEFINITION |
|------|------------|
|  | August 16, 2022 |
| SOAH | State Office of Administrative Hearings |
| Staff | Staff of the Public Utility Commission of Texas |
| TAC | Texas Administrative Code |
| TCOS | Transmission Cost of Service |
| TIEC | Texas Industrial Energy Consumers |
| TSP | Transmission Service Provider |

List of Acronyms
SOAH Docket No. 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, PUC Docket No. 52728

SOAH Docket No. 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          Suffix: PUC
PUC Docket No. 52728

# BEFORE THE
# STATE OFFICE OF ADMINISTRATIVE
# HEARINGS

---

## APPLICATION OF THE CITY OF COLLEGE STATION
## TO CHANGE RATES FOR WHOLESALE
## TRANSMISSION SERVICE

---

### PROPOSAL FOR DECISION ON SECOND REMAND

The City of College Station (College Station or City) filed an application (Application) with the Public Utility Commission of Texas (Commission) for authority to change its transmission cost of service (TCOS) and wholesale transmission rates. College Station requests an annual TCOS of $6,006,601 and an annual wholesale transmission rate of $84.67 per megawatt (MW).[1] The Commission last set College Station's transmission rates in a comprehensive TCOS

---

[1] College Station Ex. 1 (Application) at 3. Citations to College Station's exhibits are to the Bates page numbers.

proceeding in Docket No. 15762.[2] College Station also seeks to recover its reasonable rate-case expenses (RCEs) for this proceeding.

As discussed further below, the Commission has remanded this case to the State Office of Administrative Hearings (SOAH) for a second time to address all issues identified in the Commission's Preliminary Order.[3] On second remand, the sole contested issue was whether College Station could recover general fund transfers (GFTs) in interim rates, and if not, the amount of any refund due to customers and the period over which it should be provided by College Station. The parties reached an agreement that would resolve all other remaining issues in this proceeding.

For the reasons discussed below, the Administrative Law Judges (ALJs) find that Commission policy and precedent does not support the recoverability of the GFTs included in College Station's interim rates and therefore a refund is due. However, based on the unique circumstances of this case, the ALJs recommend that the Commission exercise its discretion to order a *partial* refund of the over-collected amounts. Specifically, the ALJs find good cause to require a refund of approximately $900,000, to be returned through a temporary rate rider over 24 months. Further, the ALJs recommend that the Commission adopt the parties' settlement agreement on the remaining issues in this case and authorize College Station to recover its reasonable RCEs incurred for this proceeding.

---

[2] *See City of College Station Filing Pursuant to Subst. R. 23.67*, Docket No. 15762, Order (July 8, 1997).

[3] Order Remanding Proceeding (Sept. 14, 2023) (Second Remand Order); *see also* Preliminary Order (Apr. 21, 2022).

# I.   JURISDICTION, NOTICE, AND PROCEDURAL HISTORY

The Commission has jurisdiction and authority over the Application under Public Utility Regulatory Act (PURA)[4] §§ 35.004, 35.006, and 40.004(1), and 16 Texas Administrative Code § (Rule) 25.192. SOAH has jurisdiction over all matters relating to the conduct of a hearing in this matter under Texas Government Code § 2003.049 and PURA § 14.053.

College Station filed its Application on November 3, 2021,[5] and its proof of notice attesting to the method and recipients of notice on November 12, 2021.[6] The Commission ALJ found the Application sufficient but required College Station to submit additional proof of notice.[7] College Station filed its proof of notice by publication on December 17, 2021.[8] The Commission ALJ thereafter found the notice sufficient.[9] The Office of Public Utility Counsel (OPUC) was granted intervenor status on November 17, 2021.[10] OPUC filed a request for hearing on February 22, 2022. The Commission referred this case to SOAH on April 19, 2022.[11] The Commission issued a Preliminary Order on April 21, 2022, identifying 29 issues

---

[4] Tex. Util. Code §§ 11.001-66.016.

[5] College Station Ex. 1 (Application).

[6] College Station Ex. 2 (Proof of Notice).

[7] Commission Order No. 3 (Nov. 30, 2021).

[8] College Station Ex. 3 (Proof of Notice by Publication).

[9] Commission Order No. 4 (Jan. 12, 2022).

[10] Commission Order No. 2 (Nov. 17, 2021).

[11] Order of Referral (Apr. 19, 2022).

to be addressed in this proceeding.[12] On July 22, 2022, Texas Industrial Energy Consumers (TIEC) was granted intervenor status.[13]

College Station, OPUC, and Commission staff (Staff) filed a Joint Motion to Admit Evidence and an Uncontested Stipulation and Settlement Agreement (Settlement) on August 16, 2022. College Station filed a Supplement to the Joint Motion to Admit Evidence the following day. TIEC was unopposed to the Settlement. On August 18, 2022, the ALJs issued SOAH Order No. 7 admitting evidence, remanding the case to the Commission, and dismissing the case from SOAH's docket.

On January 26, 2023, after considering the Settlement at its open meeting, the Commission issued an Order Remanding Proceeding (First Remand Order),[14] declining to accept the Settlement. The First Remand Order stated that College Station had improperly included GFTs in its interim TCOS proceedings and remanded this case to SOAH "for further processing in accordance with this Order."[15] Following the First Remand Order, the parties to the Settlement agreed that its terms would remain in place for all issues except the recoverability of GFTs

---

[12] Preliminary Order (Apr. 21, 2022).

[13] SOAH Order No. 4 (July 22, 2022).

[14] Order Remanding Proceeding (Jan. 26, 2023) (First Remand Order). While this order was later rescinded, the ALJs refer to it as the First Remand Order to distinguish it from the Commission's subsequent order with the same title.

[15] First Remand Order at 2.

in College Station's interim rates.[16] TIEC remained unopposed to the remaining terms of the Settlement.[17]

A hearing on remand was held on May 2, 2023, by videoconference before ALJs Cassandra Quinn and Daniel Wiseman. College Station, OPUC, TIEC, and Staff participated in the hearing. The record closed on May 31, 2023, with the filing of the parties' post-hearing briefs. The ALJs issued a Proposal for Decision (PFD) on July 27, 2023 (Initial PFD),[18] finding that the Commission had already determined that the GFTs were not recoverable in its First Remand Order and recommending a refund amount.

On September 14, 2023, the Commission rejected the Initial PFD because the ALJs "failed to provide their own findings of fact and conclusions of law on all contested issues that the Commission remanded to SOAH."[19] The Commission also rescinded its First Remand Order and issued a new Order Remanding Proceeding (Second Remand Order). The Second Remand Order provided that:

> The Commission remands this proceeding to SOAH to address all issues, including whether or not it was permissible for College Station to include general fund transfer payments in the interim TCOS filings, and if not, how to address any over or under-recovered amounts. Also, because the Commission declined to accept the entirety of the parties'

---

[16] Remand Hearing Transcript (R. Tr.) at 27-29.

[17] TIEC First Initial Brief at 1 n.3. This PFD refers to the parties' post-hearing briefs from the first remand as their "First Initial Brief" and "First Reply Brief" to distinguish them from the subsequent briefs on second remand, which are referred to as their "Second Initial Brief" and "Second Reply Brief." This PFD cites to both sets of briefing because the parties incorporate arguments from their first round of briefing in this second remand.

[18] Proposal for Decision (July 27, 2023) (Initial PFD).

[19] Order Remanding Proceeding at 1 (Sept. 14, 2023) (Second Remand Order).

unopposed agreement filed on August 16, 2022 and the proposed order based on the agreement, all issues in the Commission's preliminary order, in addition to the general transfer issue, must be addressed.[20]

On second remand, a prehearing conference convened on October 16, 2023, by videoconference before ALJs Quinn and Wiseman. The parties agreed that an additional evidentiary hearing was unnecessary; the sole remaining contested issue to be decided related to the recoverability of the GFTs; and the Settlement should be resubmitted to the Commission, but with the PFD making specific findings regarding its reasonableness.[21] The parties also agreed to a briefing schedule. They filed their second initial briefs on October 30, 2023, and second reply briefs and proposed findings of fact (FOFs), conclusions of law (COLs), and ordering paragraphs (OPs) on November 6, 2023, on which date the record closed.

College Station subsequently filed uncontested updates to its RCEs incurred in this proceeding. On December 1, 2023, two additional College Station exhibits regarding RCEs were admitted.[22] On December 8, 2023, College Station filed a motion to admit an additional uncontested exhibit related to RCEs. The motion is granted, and the evidentiary record is reopened for the limited purpose of admitting the exhibit.[23]

---

[20] Second Remand Order at 1.

[21] Second Remand Prehearing Conference Transcript at 4-8, 13.

[22] SOAH Order No. 14 (Dec. 1, 2023).

[23] The specific exhibit is College Station's Response to SOAH Order No. 14 and all corresponding attachments. This exhibit is designated as College Station Exhibit 21. To ensure that the record is complete, the ALJs also admit the Fourth Supplemental Direct Testimony of Ruth Stark filed on December 18, 2023, even though no party offered it as an exhibit. The ALJs designate this exhibit as Staff Exhibit 13.

## II.   APPLICABLE LAW

College Station is a municipally owned utility (MOU) providing electric transmission service within the Electric Reliability Council of Texas (ERCOT) region and a transmission service provider (TSP) as defined in the Commission's rules.[24] Under Rule 25.192 (the TCOS rule), "[e]ach TSP in the ERCOT region shall periodically revise its transmission service rates to reflect changes in the cost of providing such services."[25] In between these cases considering the TSP's full cost of service, the TCOS rule authorizes a TSP to update its transmission rates on an interim basis to reflect changes in invested capital, as provided below:

**(h)   Interim Updates of Transmission rates.**

**(1)   Frequency.** Each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than once per calendar year to reflect changes in its invested capital. Upon the effective date of an amendment to §25.193 pursuant to an order in Project Number 37909, *Rulemaking Proceeding to Amend P.U.C. Subst. R. 25.193, Relating to Distribution Service Provider Transmission Cost Recovery factors (TCRF)*, that allows a distribution service provider to recover, through its transmission cost recovery factor, all transmission costs charged to the distribution service provider by TSPs, each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than twice per calendar year to reflect changes in its invested capital. If the TSP elects to update its transmission rates, the new rates shall reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the commission-authorized rate of return on such facilities as well as changes in loads. If the TSP does not have a

---

[24] 16 Tex. Admin. Code § 25.5(141).

[25] 16 Tex. Admin. Code § 25.192(g).

7

commission-authorized rate of return, an appropriate rate of return shall be used.

Subsection (h) of the rule also provides for a reconciliation of rates established in the interim proceedings:

> **(2)** **Reconciliation.** An update of transmission rates under paragraph (1) of this subsection shall be subject to reconciliation at the next complete review of the TSP's transmission cost of service, at which time the commission shall review the costs of the interim transmission plant additions to determine if they were reasonable and necessary. Any amounts resulting from an update that are found to have been unreasonable or unnecessary, plus the corresponding return and taxes, shall be refunded with carrying costs determined as follows: for the time period beginning with the date on which over-recovery is determined to have begun to the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying costs shall be calculated using the same rate of return that was applied to the transmission investments included in the update. For the time period beginning with the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying charges shall be calculated using the TSP's rate of return authorized in that complete review.

Section 1502.059 of the Texas Government Code provides the authority for MOUs like College Station to make transfers to the city's general fund:

> Notwithstanding Section 1502.058(a) [setting limits on a municipality's use of revenue] or a similar law or municipal charter provision, a municipality and its officers and utility trustees may transfer to the municipality's general fund and may use for general or special purposes revenue of any municipally owned utility system in the amount and to the extent authorized in the indenture, deed of trust, or ordinance providing for and securing payment of public securities issued under this chapter or similar law.

College Station is governed by a set of approved financial policies entitled "Fiscal and Budgetary Policy Statements."[26] The policies related to utility transfers to the City's general fund are found in section 3.9, which provides as follows:

### 3.9. Utility Transfer to General Fund

The intent of this transfer is to provide a benefit to the citizens for their ownership of the various utility operations.

An in-lieu-of-franchise fee is included as part of the rate computation of the transfer and is consistent with the franchise rates charged to investor owned utilities franchised to operate within the City.

1.  Electric Fund In-Lieu-of-Franchise Fee – The in-lieu-of-franchise fee will be calculated based on kWh [kilowatt-hour] usage at a rate of that [sic] would equate to an approximate 9.0% franchise fee. The final total transfer amount will not exceed 9.0% of total estimated operating revenues.[27]

## III.  DISCUSSION

### A.  BACKGROUND

College Station, like most cities that own utilities, makes annual fund transfers from its municipal utility into the City's general fund to be used for general purposes.[28] These payments, which provide compensation to a city for its ownership of the utility, are referred to by many names, including GFTs, Payment in Lieu of

---

[26] College Station Ex. 12 (Dreyfus Rebuttal Testimony (Reb.)) at 7.

[27] College Station Ex. 12 (Dreyfus Reb.) at 55 (MKD-2 at 6).

[28] Staff Ex. 3 (Stark Direct Testimony (Dir.)) at 6-7; College Station Ex. 12 (Dreyfus Reb.) at 7-8. Citations to Staff's exhibits are to the Bates page numbers.

Taxes (PILOT), Return on Investment (ROI), Payment in Lieu of Franchise Fees, and Taxes Other Than Income Taxes.[29] This PFD will refer to these transfers as GFTs, except where quoting from exhibits or testimony that include a different reference. GFTs historically have been included in an MOU's comprehensive TCOS cases either as part of the return calculation or as Taxes Other Than Income Taxes.[30]

On May 2, 1996, College Station filed its first comprehensive TCOS application in Docket No. 15762.[31] The application included a request for $1.44 million categorized as "taxes other than income tax," but the case was resolved by a settlement that provided for $0 in tax expense allocated to the transmission function.[32] Thus, no GFT was included in the approved rates.

Since that time, College Station has filed three interim TCOS updates in 2007, 2008, and 2017.[33] In each of those updates, College Station included GFTs, relying on the advice of Staff. Before the City's first interim TCOS filing in 2007, Timothy Crabb, the Director of College Station's Electric Utility Department,

---

[29] R. Tr. at 39-40; Staff Ex. 3 (Stark Dir.) at 7; College Station Ex. 12 (Dreyfus Reb.) at 8.

[30] Staff Ex. 3 (Stark Dir.) at 14.

[31] *City of College Station Filing Pursuant to Subst. R. 23.67*, Docket No. 15762 (May 2, 1996).

[32] College Station Ex. 12 (Dreyfus Reb.) at 16-17; Docket No. 15762, PUC Order No. 15 (Dec. 30, 1996) (adopting rates on an interim basis); Docket No. 15762, Order (July 7, 1997) (adopting rates set in Order No. 15 as final rates).

[33] *Application of the City of College Station for Interim Update of Wholesale Transmission* Rates, Docket No. 46847, Notice of Approval (Mar. 17, 2017); *Application of the City of College Station for Interim Update of Wholesale Transmission Rates Pursuant to P.U.C. Subst. R. 25.192(g)(1)*, Docket No. 35837, Order (Sept. 12, 2008); *Application of the City of College Station for Interim Update of Wholesale Transmission Rates Pursuant to P.U.C. Subst. R. 25.192(g)(1)*, Docket No. 34230, Order (July 23, 2007).

contacted Staff member Glenda Spence[34] to ensure he was compiling the correct information for the filing. In his contemporaneous notes of the communications, Mr. Crabb wrote:

> When talking to Glenda on 3/15/07, she said that I needed to remember to include PILOT (Payment in Lieu of Taxes). I could not find any PILOT amount in the original filing, so I talked to [then-Director of Electric Utilities] David Massey and he said for College Station the amount is called ROI. Glenda said to include this amount, even if it was not in the original filing, and they would make the call as to whether it would be allowed.[35]

Mr. Crabb spoke with Ms. Spence regarding GFTs (which he refers to as PILOT) again before filing the interim TCOS update the following month and shared annotated schedules that included GFT numbers. Because a GFT was not included in the 1996 TCOS application, Mr. Crabb used numbers from February 2007 for the schedules, and the annotation for those numbers states that Ms. Spence agreed that using the most recent numbers was the best, most conservative approach.[36]

In his testimony accompanying the first interim TCOS update, Docket No. 34230, which was filed on May 1, 2007, Mr. Crabb stated that "the filing includes payments in lieu of taxes [PILOT] that are transfers by the Electric Department to the general revenues of the City of College Station" and that the

---

[34] Ms. Spence was an Accountant in the Rate Regulation Division, who at that time, had over 15 years' experience at the Commission. College Station Ex. 10 (Crabb Reb.) at 7; R. Tr. at 48.

[35] College Station Ex. 10 (Crabb Reb.), Attachment TRC-1.

[36] College Station Ex. 10 (Crabb Reb.), Attachment TRC-2.

adjustment was "based on total transmission revenue requirements since Docket No. 15762 did not include a payment in lieu of taxes [PILOT] amount."[37]

The Commission approved College Station's first interim TCOS update, including the GFT, on July 23, 2007.[38]

College Station filed its second interim TCOS update, Docket No. 35837, on July 1, 2008. Before filing, on June 4, 2008, Mr. Crabb emailed Ms. Spence to ask about including a GFT, here referred to as ROI or PILOT:

> In our submission last year (Docket 34230) I included a Schedule F-1 to calculate the distribution of the ROI (or PILOT) between the Transmission and Distribution areas. Because this was not included in the original TCOS filing, I used the Transmission and Distribution assets as of 2/28/07 as the basis for the distribution . . . . For this year's filing, should I also make this information as up-to-date as possible by using the current (05/31/08) Transmission and Distribution assets as the basis for the distribution, or should I use the percentages calculated last year?[39]

The following day, Ms. Spence responded: "I got your message but I'm going to forward your question to my boss, Darryl Tietjen. He'd have the definitive word on this so rather than go through me I'll let him answer you directly."[40] Mr. Tietjen, the Director of the Rate Regulation Division at the Commission, replied: "I would

---

[37] College Station Ex. 10 (Crabb Reb.), Attachment TRC-3.

[38] College Station Ex. 10 (Crabb Reb.), Attachment TRC-6.

[39] College Station Ex. 10 (Crabb Reb.), Attachment TRC-7.

[40] College Station Ex. 10 (Crabb Reb.), Attachment TRC-7.

say go ahead with your inclination to use current numbers. I would suggest, however, that you be sure and fully explain the issue in any testimony you include with your filing."[41] Mr. Crabb did discuss the inclusion of the GFT in his testimony.[42]

The Commission approved College Station's second interim TCOS update, including the GFT, on September 12, 2008.[43]

College Station filed its third interim TCOS update, Docket No. 46847, in 2017. Mr. Crabb explained that "[g]iven that our practice in the two previous interim filings had been based on instructions and guidance from Staff, we included PILOT in the same manner we had done in Docket Nos. 34230 and 35837."[44] Mr. Crabb again included testimony regarding PILOT, and again the Commission approved the interim TCOS update, including the GFT.[45]

In total, College Station recovered approximately $19.2 million in GFTs through its Commission-approved interim rates.[46]

---

[41] College Station Ex. 10 (Crabb Reb.), Attachment TRC-7.

[42] College Station Ex. 10 (Crabb Reb.), Attachment TRC-8.

[43] College Station Ex. 10 (Crabb Reb.), Attachment TRC-10.

[44] College Station Ex. 10 (Crabb Reb.) at 12.

[45] College Station Ex. 10 (Crabb Reb.), Attachments TRC-11, 12.

[46] Staff Ex. 3 (Stark Dir.) at 20. This amount is calculated through June 30, 2022, the end of the month that Ms. Stark's direct testimony was filed in this docket.

13

The instant proceeding is the next comprehensive review of College Station's TCOS and therefore is the proceeding in which the City's interim TCOS rates will be reconciled pursuant to Rule 25.192(h). Staff's witness in this proceeding, Ruth Stark, testified that College Station was not authorized to include a GFT in its interim TCOS cases because it had not included a GFT in its comprehensive TCOS case in 1996.[47] Ms. Stark initially recommended that the Commission require College Station to refund all amounts recovered through the interim TCOS cases associated with GFTs. The proposed refund amount with carrying costs was $31.5 million as of June 30, 2022, when she filed her testimony.[48] However, after College Station filed rebuttal testimony describing the procedural history set forth above regarding why it included GFTs in its interim updates, Ms. Stark filed supplemental direct testimony recommending that the Commission find good cause to require a lesser refund of $6.6 million.[49]

Until Ms. Stark's direct testimony in this proceeding, according to Mr. Crabb, College Station had never received or heard any indication from the Commission that it had been overearning, despite filing annual Earnings Monitoring Reports (EMRs).[50]

In the instant case, College Station proposes a change to how it recovers its GFT by moving it from "Taxes Other Than Income Taxes" to the calculation of

---

[47] Staff Ex. 3 (Stark Dir.) at 10-21.

[48] Staff Ex. 3 (Stark Dir.) at 20.

[49] Staff Ex. 3A (Stark Supplemental Direct Testimony (Supp. Dir.)) at 4-5.

[50] College Station Ex. 10 (Crabb Reb.) at 14.

return.[51] The GFT included in the proposed return calculation is based on 9% of operating revenues, consistent with the requirements for an in-lieu-of-franchise fee in Section 3.9 of the City's financial policies.[52]

As noted above, the sole contested issue on remand is the recoverability of the GFTs included in the interim TCOS proceedings. This PFD begins by addressing that issue, followed by a discussion of the uncontested issues, including the City's requested RCEs.

## B.   RECOVERABILITY OF GENERAL FUND TRANSFERS

### 1.   College Station's Position

College Station argues that, for several reasons, it would be unlawful and inequitable to order College Station to make a refund. First, according to College Station, there is no authority requiring that GFTs must first be included in an MOU's comprehensive TCOS filing before they can be included in an interim TCOS proceeding. Indeed, College Station was expressly advised to do just that by Staff. Second, it is the Commission's precedent to approve the inclusion of a GFT as "Other Associated Taxes" under the TCOS rule, which College Station did in its interim TCOS cases. Additionally, College Station argues that requiring a refund would constitute retroactive ratemaking and, ultimately, be unjust.

---

[51] College Station Ex. 1 (Application) at 42 (Rabon Dir.).

[52] College Station Ex. 1 (Application) at 44 (Rabon Dir.).

College Station contends that no basis exists under Texas law, the Commission's TCOS rule, or any relevant order to allege that its inclusion of a GFT in the 2007, 2008, and 2017 interim TCOS filings violated the final order in Docket No. 15762.[53] This contention was first raised in Staff witness Stark's testimony in this case,[54] but she acknowledged that it is not supported by any specific authority.[55] College Station emphasizes that it conferred with Staff before including a GFT in its interim filings, referenced the inclusion of a GFT in its testimonies, and received Commission orders approving it. None of the Commission's orders reflected that including a GFT was impermissible or could be disallowed in a subsequent comprehensive TCOS filing.

Moreover, College Station contends that it did not violate any Commission rule because the Commission's longstanding practice has been to include GFTs in interim TCOS filings as "other associated taxes," as demonstrated by the approval of College Station's interim TCOS applications.[56] Ms. Stark confirmed this practice, explaining that MOUs may include a GFT in TCOS filings in one of two ways— (1) as Taxes Other Than Income Taxes, or (2) as part of the return calculation.[57] She also acknowledged that a GFT may be referred to as "other associated taxes" or

---

[53] College Station First Initial Brief at 7-8.

[54] Staff Ex. 3 (Stark Dir.) at 10-21.

[55] College Station Ex. 9 (Staff Response to College Station RFI 1-5(b) at 9 ("There is no rule, statute, precedent, or other authority that specifically requires that a municipal utility must include PILOT in its initial comprehensive rate case in order to include it in subsequent interim filings.")); R. Tr. at 43, 72 (Ms. Stark testifying that there is nothing specifically in the Commission's rules, orders, rate-filing package, or elsewhere that says a utility can only update if it had a GFT in its initial TCOS case).

[56] College Station First Initial Brief at 8-11.

[57] R. Tr. at 40, 62.

"Taxes Other Than Income Taxes" even though it is not a tax.[58] No legal or logical basis exists, according to College Station, to distinguish the City from other MOUs simply because it did not include a GFT in its initial TCOS case. College Station warns that, if the Commission's new interpretation is adopted, the many prior approvals of GFTs in interim filings for MOUs as "other associated taxes" would suddenly be in violation of the Commission's rules and potentially subject to refunds.

College Station argues that, per the language of the TCOS rule and the Commission's orders resulting from the interim update proceedings, it can reasonably expect that its approved *rates* will be subject to a later reconciliation, but not the exclusion of an entire category of costs. For example, if College Station includes the costs of a new transformer in an interim TCOS filing, the costs, interest, and other expense components of that transformer will be subject to a later prudence review. However, the entire category of invested capital would not be excluded since it is expressly listed as a category that may be included in an interim TCOS filing.

College Station recognizes that if the *amount* of GFTs in its interim filings was inaccurate, it could be subject to a later refund. However, College Station relied on three Commission orders over the span of 10 years and had no reason to know that the inclusion of a GFT as an entire category would later be disallowed. College Station witness Crabb testified that, if College Station had known the

---

[58] R. Tr. at 40.

inclusion was inappropriate or could only be incorporated through a comprehensive case first, the City would have either excluded the GFTs or filed a full TCOS case.[59]

Further, College Station contends that requiring it to make a refund would constitute retroactive ratemaking. Under the concept of retroactive ratemaking, utility regulators are prohibited from "making a retrospective inquiry to determine whether a prior rate was reasonable and imposing a . . . refund when rates were too high."[60] PURA also prohibits retroactive ratemaking, providing that "[t]he rates established in the order shall be observed thereafter until changed as provided by this title."[61] Because, as College Station argues above, there is no rule, statute, or authority prohibiting College Station from including GFTs in its interim TCOS filings, applying a new rule to invalidate those rates would be impermissibly retroactive.

Nor, College Station contends, did the inclusion of GFTs in its interim filings increase the rate of return beyond the 6.71% that was authorized in its initial TCOS proceeding. Because College Station used the weighted average cost of capital in its initial TCOS filing, any GFT in that filing would have been included within "Taxes Other Than Income Taxes." Not until the instant proceeding did College Station begin to use the cash flow method. Calculation of the authorized 6.71% in its interim TCOS filings did not include any transfers, and the GFT was an expense item classified under "Taxes Other Than Income Taxes." If College Station had used a

---

[59] College Station Ex. 10 (Crabb Reb.) at 12.

[60] *State v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 190, 199 (Tex. 1994).

[61] PURA § 36.111(b).

cash flow approach in Docket No. 15762, any transfers would have been included as a component of return, but that was not the case.[62] According to College Station witness Grant Rabon, "[B]ased on the method of developing the return in Docket No. 15762, the inclusion of the transfer to the general fund [via College Station's three interim updates] cannot increase the City's rate of return beyond what the Commission authorized in the City's last comprehensive rate case."[63]

Finally, College Station argues that ordering a refund under these circumstances would be unjust. College Station maintains it acted transparently on three separate occasions when seeking guidance about the inclusion of GFTs in its filings and consistently followed Staff's directives. College Station asserts that, in relying on the advice of Staff, it took the steps any reasonable MOU would take. Moreover, on each occasion the Commission approved College Station's treatment of GFTs, and thus, according to College Station, it reasonably expected that the *rates* approved in its interim filings would be subject to later review, not the exclusion of an entire category of expenses. College Station asserts that, as Staff witness Stark herself acknowledged, the citizens of College Station should not have to pay for this abrupt reversal of Commission policy.[64]

---

[62] College Station First Initial Brief at 12.

[63] College Station Ex. 11 (Rabon Reb.) at 9.

[64] R. Tr. at 64.

## 2. Staff's Position

Staff explains that, when it recommended in its direct testimony that College Station make a substantial refund of amounts collected through interim TCOS rates, it was unaware of certain facts that College Station subsequently provided in its rebuttal testimony.[65] While Staff continues to argue College Station was not authorized to recover the GFTs in its interim TCOS proceedings, its objective has veered away from requiring a substantial refund and toward ensuring that SOAH and the Commission have all pertinent information when making important precedential decisions that will impact all MOUs.[66]

Initially, Staff agrees with College Station that no rule explicitly requires a GFT to be included in a comprehensive TCOS case before it can be included in an interim TCOS case; however, Staff argues it is equally true that no rule permits *any* update of a GFT in an interim case.[67]

Staff argues that an MOU must apply the same proportional allocation, or "effective rate," attributed to its GFTs in its last comprehensive TCOS proceeding to its GFTs in any subsequent interim TCOS filings. In other words, Staff contends that because none of College Station's GFT was allocated to the transmission

---

[65] Staff First Reply Brief at 1. Staff's First Reply Brief does not contain page numbers. Citations in this PFD presume that the page numbering begins after the title page, with the Introduction being on page 1.

[66] Staff First Reply Brief at 1; *see also* Staff First Reply Brief at 15 ("Staff's position changed from recommending a correct course of action (as in the technically correct application of 16 TAC § 25.192(h)(2) which would result in a significant refund by College Station) to recommending the right course of action (as in a fair outcome based on all of the facts and circumstances) when it became aware of how its informal communications with College Station may have played a role in the erroneous updates to College Station's general fund transfers in the interim TCOS proceedings.").

[67] Staff First Reply Brief at 4.

function in its previous comprehensive TCOS case (Docket No. 15762), none should have been allocated in College Station's interim TCOS filings.[68] To illustrate this point, Staff highlights the four interim TCOS cases that College Station witness Dr. Mark Dreyfus cited as examples where the Commission authorized MOUs to recover GFTs in interim TCOS proceedings.[69] In each example, the MOU maintained the proportionate relationship between the GFT and the revenue requirement from the MOU's last comprehensive TCOS proceeding.[70] College Station rejects this argument, noting there is no rule that imposes such a requirement and the only authority that does require allocation percentage—the Commission's Rate Filing Package—does not address GFTs.[71]

However, maintaining this proportional relationship, Staff argues, avoids introducing a potentially contentious calculation into the expedited process of setting interim rates.[72] Staff notes that the Commission has consistently rejected proposed changes to the interim TCOS process that would "complicate and undermine the purpose of and process for interim TCOS filings" or "substantially alter the nature of interim TCOS filings and significantly complicate and lengthen

---

[68] *See* College Station First Reply Brief at 12.

[69] Staff First Initial Brief at 8-9; *see* College Station Ex. 12 (Dreyfus Reb.) at 21-22 (citing *Application of the City of Garland for Interim Update of Wholesale Transmission Rates*, Docket No. 51798, Application (Feb. 5, 2021); *Application of Bryan Texas Utilities for Interim Update of Wholesale Transmission Rates*, Docket No. 51623, Application (Dec. 15, 2020); *Application of CPS Energy for Interim Update of Wholesale Transmission Rates*, Docket No. 51550, Application (Nov. 23, 2020); *Application of CPS Energy for Interim Update of Wholesale Transmission Rates Pursuant to PUC Subst. R. §25.192(h)(1)*, Docket No. 42579, Application (June 3, 2014)).

[70] R. Tr. at 106-07.

[71] College Station Second Reply Brief at 4-5.

[72] Staff First Reply Brief at 4.

their processing."[73] Staff concedes there is no rule that explicitly requires maintaining the proportional relationship between the GFT and the revenue requirement, but argues the lack of such a rule is unsurprising because the rule is silent on updating GFTs.[74]

Staff also concedes that it has previously interpreted the TCOS rule more favorably toward MOUs by not opposing interim updates to GFTs included in "other associated taxes" or as a separate expense item.[75] Staff explains that its position was based on a broad and liberal interpretation of the rule that treated GFTs as if they were akin to taxes that were allowed to be updated because they were based on a specified percentage of either plant or revenues, both of which change in an interim TCOS update. Yet, Staff notes that the Commission had not previously considered Staff's interpretation for formal approval and is not bound to follow it.[76]

Further, Staff disagrees with the City's contention that requiring a refund would constitute retroactive ratemaking, noting that refunds resulting from a review and reconciliation of the interim rates are permissible under PURA and Rule 25.192(h).[77] The determination of whether a GFT is permitted to be updated in an interim TCOS proceeding is well within the Commission's authority. The rule

---

[73] Staff First Initial Brief at 8 (citing *Rulemaking Proceeding to Amend PUC Subst. R. §25.192(g) Related to Transmission Service Rates*, Project No. 37519, Order Adopting Amendment to §25.192 as Approved at the July 30, 2010 Open Meeting at 17, 19 (Aug. 4, 2010)).

[74] *See* Staff First Reply Brief at 4.

[75] Staff First Reply Brief at 6.

[76] Staff First Reply Brief at 7.

[77] Staff First Reply Brief at 3.

expressly states that an "update of transmission rates . . . shall be subject to reconciliation" and "any amounts from an update that are found to be unreasonable or unnecessary . . . shall be refunded with carrying costs." Thus, the application of this long-standing rule is not retroactive ratemaking, given that the interim rates were always subject to review and reconciliation.

Regarding College Station's claim that it could not have increased its rate of return through its interim TCOS updates, Staff responds that the City is arguing form over substance.[78] The mere presentation of GFT in the category of "other associated taxes" does not make it an actual tax. Staff argues that College Station itself has deemed the payment as "return on investment" regardless of which component it was included in for the interim TCOS cases.[79] Staff also notes that the City's financial policies state that the intent of the GFT is to provide a benefit to the citizens for the ownership of the various utility operations. Staff contends that the combination in the interim TCOS cases of the 6.71% return on plant additions with the amounts included for GFT, resulted in an *effective* rate of return of well over the 6.71% authorized in Docket No. 15762. While no over-earning was found in College Station's annual EMRs, Staff witness Stark testified that the inclusion of the GFTs as an expense item coupled with College Station's misunderstanding of the appropriate functionalization of certain expenses in those reports precluded Staff's identification of this issue.[80]

---

[78] Staff First Reply Brief at 9.

[79] Staff First Reply Brief at 10 (citing College Station Ex. 10 (Crabb Reb.) at 5, 6, 7, 9, & Attachment TRC-1 at 2).

[80] Staff Ex. 3A (Stark Supp. Dir.) at 2.

For these reasons, Staff recommends that the Commission find that College Station should not have included the GFTs in its interim TCOS rates. However, Staff agrees with College Station that ordering a full refund may be unjust in this proceeding, given College Station's reliance on Staff guidance. Accordingly, as discussed below, Staff argues that good cause exists for an exception to the full refund provisions of Rule 25.192(h) that allows the Commission to approve a refund less than the total amount authorized under the rule.

Alternatively, if the Commission determines that GFTs are categorically prohibited, Staff asks that the Commission only preclude updates to GFTs in *future* interim TCOS updates, as there are other MOUs that have included updates in their GFTs in interim TCOS proceedings consistent with the effective rate methodology.[81] According to Staff, "[a] ruling that is applicable to past interim TCOS updates that are still in effect and subject to reconciliation and refund because the MOU has not yet come in for a comprehensive base rate case could place them in the position of facing significant refunds of over-collected interim TCOS rates even though they were following a long-standing practice."[82]

### 3.    TIEC's and OPUC's Positions

TIEC and OPUC contend that College Station's GFTs were unauthorized and must be refunded.[83] Rule 25.192(h) only provides for interim updates to TCOS

---

[81] Staff First Reply Brief at 15.

[82] Staff First Reply Brief at 15.

[83] TIEC First Initial Brief at 1-3; OPUC First Initial Brief at 5-7.

rates to reflect changes in invested capital and appropriate changes to depreciation expense, income taxes, and other taxes that are associated with change to invested capital. College Station acknowledges that $0 of GFT was included in its initial TCOS filing, and the Commission approved a 0% proportional allocation of GFTs to College Station's transmission function. TIEC and OPUC assert that by including GFTs in its interim TCOS filings College Station deviated from the Commission-approved allocation of 0%, thereby violating the Commission's order and Rule 25.192(h).

Interim TCOS proceedings are designed to be formulaic to allow a utility to quickly update its rates "to reflect changes in invested capital."[84] TIEC asserts that to allow utilities to deviate from the approved rate structure, as College Station did, would "be contrary to the intention of the rule and make the expedited TCOS updates ripe for abuse because the process involves strict time limitations that preclude a full review of each interim application."[85]

Additionally, TIEC notes that, in each interim order at issue, the Commission stated the rate "was subject to reconciliation at the next complete review of [College Station's] TCOS," and that "[a]ny over recovery of costs, as a result of update, is subject to refund."[86] Accordingly, OPUC and TIEC argue, the full amount of $31.5 million should be refunded to ratepayers. While noting that this is a large figure, OPUC relies on Staff witness Stark's testimony that "it is important to

---

[84] Staff First Initial Brief at 8-9; *see also* R. Tr. at 106-07.

[85] TIEC Second Initial Brief at 4-5.

[86] TIEC Second Initial Brief at 5.

recognize that College Station opted to forego comprehensive rate cases since 1997 [and] [t]his is what can happen to a utility when it chooses not to apply for a comprehensive rate case for many years."[87]

### 4. ALJs' Analysis

The ALJs conclude that College Station improperly included GFTs in its interim TCOS filings and that those amounts, plus carrying costs, may be subject to refund. However, as discussed in the next section below, the ALJs recommend that the Commission exercise its discretion to find good cause to reduce the refund amount.

As an initial matter, although the TCOS rule is silent regarding the recoverability of GFTs, the parties do not dispute that College Station could have included a GFT in its initial comprehensive TCOS case or that it can include one in the instant case. Nevertheless, College Station appears to be in the unique position of not including a GFT in its comprehensive TCOS case, but subsequently including GFTs in its interim TCOS cases. The rule is likewise silent on this issue, and the recoverability of a GFT in this circumstance appears to be an issue of first impression for the Commission.

Notably, Rule 25.192(h)(1) provides only for interim updates to TCOS rates to reflect changes in invested capital; appropriate changes to depreciation expense, income taxes, and other taxes associated with the change to invested capital; and the

---

[87] OPUC Second Initial Brief at 7 (citing Staff Ex. 3 (Stark Dir.) at 18).

Commission-authorized rate of return on such facilities. Here, College Station did not "update" any of these items but included a new category of expense—GFTs—that had not been approved in its initial TCOS. It is appropriate for the Commission to review these expenses in this proceeding, as the interim proceedings in which the GFTs were allowed are expressly subject to reconciliation. Therefore, reviewing College Station's expenses recovered in its interim proceedings does not constitute retroactive ratemaking. Nor is the Commission bound, as College Station argues, by the interim TCOS orders in which recovery of GFTs was allowed. If that were the case, the review of any expenses in a subsequent comprehensive TCOS proceeding would be meaningless, as the Commission would be bound by its approvals of the interim TCOS.

Moreover, the purpose of the Commission's interim TCOS rule is to provide an expedited process to reflect changes in invested capital, not to set a new rate structure. Although College Station argues that recovery of GFTs in interim TCOS proceedings is commonplace, the orders it relies on reflect that the MOUs in those cases first incorporated a GFT in their comprehensive TCOS case and maintained the transmission function's proportional allocation in the subsequent interim TCOS cases.[88] Although this standard practice is not captured in a Commission rule or policy document, Staff showed that it has been applied consistently in other cases. Additionally, allowing deviations from this approach would undermine

---

[88] *See* College Station Ex. 12 (Dreyfus Reb.) at 21-22 (citing *Application of the City of Garland for Interim Update of Wholesale Transmission Rates*, Docket No. 51798, Application (Feb. 12, 2021); *Application of Bryan Texas Utilities for Interim Update of Wholesale Transmission Rates*, Docket No. 51623, Application (Dec. 15, 2020); *Application of CPS Energy for Interim Update of Wholesale Transmission Rates*, Docket No. 51550, Application (Nov. 23, 2020); *Application of CPS Energy for Interim Update of Wholesale Transmission Rates Pursuant to PUC Subst. R. §25.192(h)(1)*, Docket No. 42579, Application (June 3, 2014)).

Rule 25.192's purpose to allow for a formulaic and expedited update to reflect only changes to invested capital. The fact that the introduction of a new category of expenses like GFTs and a new effective rate in interim proceedings would be contentious is demonstrated by this proceeding, and is incompatible with the expedited review for interim proceedings intended by Rule 25.192.

For those reasons, the ALJs conclude that, for a GFT to be included as an expense item in an interim TCOS case, the MOU must have first included a GFT as an expense item in its prior comprehensive TCOS case and must maintain the transmission function's proportional allocation approved in that case. Because College Station did not do so, the GFTs it recovered through its three interim TCOS cases are subject to reconciliation and refund in this case. Therefore, the only remaining issues are the calculation of any refund and the period over which it should be made.

## C.   CALCULATION OF REFUND AMOUNT

In direct testimony, Ms. Stark calculated that, as of June 30, 2022, when her testimony was filed, the total amount of the GFTs included in College Station's rates over the 15 years that interim rates were in effect was $19.2 million.[89] With the addition of carrying costs calculated using College Station's approved rate of return, the total over-recovery would be $31.5 million.[90] Ms. Stark initially recommended a

---

[89] Staff Ex. 3 (Stark Dir.) at 18.

[90] Staff Ex. 3 (Stark Dir.) at 18. This amount is also as of June 30, 2022.

refund in that amount over 15 years.[91] Alternatively, if the Commission found that College Station was authorized to include the GFTs in its interim TCOS rates, Ms. Stark recommended a refund of $6.6 million.[92] This amount reflects Ms. Stark's view that, because the interim TCOS rule only permits increases in the revenue requirement resulting from additions of new plant, it was inappropriate for College Station to include GFTs associated with transmission plant that was included in Docket No. 15762, where the Commission had assigned a value of $0 to the plant as of the end of the test year in that case.[93] Under this alternative, the over-collected amount would be $3.9 million through June 30, 2022, and would be $6.6 million with carrying costs calculated using College Station's approved rate of return.

After College Station filed rebuttal testimony explaining the circumstances behind why it included the GFTs in the interim proceedings, Ms. Stark filed supplemental direct testimony recommending that the Commission adopt her alternative refund amount of $6.6 million.[94] Staff ultimately presented six various refund proposals, which are discussed below.

---

[91] Staff Ex. 3 (Stark Dir.) at 19.

[92] Staff Ex. 3 (Stark Dir.) at 20-21.

[93] Staff Ex. 3 (Stark Dir.) at 20-21.

[94] Staff Ex. 3A (Stark Supp. Dir.) at 4-5.

### 1. TIEC's and OPUC's Positions

Based on their contentions discussed above that it was improper for College Station to include the GFTs in its interim TCOS cases, TIEC and OPUC seek a refund of the total amount College Station recovered for the GFTs, plus carrying costs, which as of June 30, 2022, totaled $31.5 million.[95] They contend that the size of the refund is controlled by Rule 25.192(h)(2), which requires College Station to refund all of the over-recovery, plus carrying costs calculated using the authorized rate of return. TIEC and OPUC acknowledge that the refund amount is large compared to College Station's revenue requirement.[96] In their view, however, that was a risk the City took by failing to come in for a full rate review since 1997, and a utility should not be allowed to avoid refunding inappropriately recovered amounts just because the refund amount is comparatively large. TIEC supports refunding the amount over 15 years as Ms. Stark initially proposed, but acknowledges that the Commission may find a longer period is necessary given the amount.[97] OPUC leaves the refund period to the Commission's discretion.[98]

---

[95] TIEC Second Initial Brief at 3, 9; OPUC Second Initial Brief at 7-8; *see also* TIEC First Initial Brief at 3-4; OPUC First Initial Brief at 7-8.

[96] TIEC First Initial Brief at 2, 4; OPUC Second Initial Brief at 7.

[97] TIEC First Initial Brief at 4; *see also* TIEC Second Initial Brief at 9 (requesting that the refund be made "over a reasonable amount of time.").

[98] OPUC Second Initial Brief at 6.

## 2. Staff's Position

Staff contends that mitigating factors support a refund of less than $31.5 million.[99] Staff offers six potential methods of calculating a refund based on three factors.[100]

For the first factor, Staff agrees with College Station that the depreciation expense included in each of the interim TCOS cases was calculated incorrectly, resulting in the City collecting less than it should have when those rates were in effect.[101] The undercollected depreciation expense is approximately $3.0 million.[102] While the TCOS rule does not permit a surcharge for under-recovered interim TCOS rates, Staff believes the rule does not preclude netting over- and under-recoveries. In this case, Staff supports reducing the over-recovery resulting from the inclusion of the GFTs by the under-collected depreciation expense.

---

[99] Staff Second Initial Brief at 2; Staff First Initial Brief at 17-21.

[100] Staff First Initial Brief at 16-17.

[101] Staff First Initial Brief at 16. College Station witness Rabon testified that:

> [T]he City relied on the Commission provided template for the determination of depreciation expense in each interim filing. However, despite the formula provided in the header of Schedule E-1 of the template that indicates the depreciation rates should be multiplied by net plant, depreciation rates should always be multiplied by gross plant in service, rather than net plant in service. Thus, the City understated its depreciation expense in each of its interim filings based on the erroneous formula in the provided template.

College Station Ex. 11 (Rabon Reb.) at 10.

[102] College Station Ex. 11 (Rabon Reb.), Attachment GSR-2.

31

The second factor relates to the appropriate method for calculating carrying costs.[103] Ms. Stark's direct testimony calculated the carrying costs using College Station's approved rate of return, which is consistent with the current version of the TCOS rule.[104] However, Staff explains that this version of the rule was only in effect at the time of the City's third interim TCOS filing. Prior to 2010, when the first and second interim TCOS filings were made, the TCOS rule did not provide for carry charges at that rate, or any rate.[105] As a result, Staff contends that the Commission could conclude that carrying costs at College Station's rate of return during that time period is not appropriate because it was not provided for in the rule.[106]

Finally, as a third factor, Staff notes that the Commission has "complete discretion to forego any carrying charges if it finds it in the public interest to do so."[107]

---

[103] Staff First Initial Brief at 14-15.

[104] *See* 16 TAC § 25.192(h)(2).

[105] *See Rulemaking Proceeding to Revise PUC Transmission Rules Consistent with the New ERCOT Market Design*, Project No. 23157, Order Adopting New and Amended Transmission Rules and Repealing Certain Rules Consistent with the New ERCOT Market Design as Approved at the May 24, 2001 Open Meeting (May 25, 2001). At the time of College Station's first and second interim TCOS filings, the reconciliation language was contained in Rule 25.192(g)(2), which provided:

> An update of transmission rates under paragraph (1) of this subsection shall be subject to reconciliation at the next complete review of the TSP's transmission cost of service. The commission shall review whether the cost of transmission plant additions are reasonable and necessary at the next complete review of the TSP's transmission cost of service. Any over-recovery of costs, as a result of the update, is subject to refund.

[106] Staff First Initial Brief at 14.

[107] Staff First Initial Brief at 15-16.

Together, these three factors result in the following six options, listed from largest to smallest potential refund:[108]

1.    The total over-collection, *without* reduction for the under-recovery of depreciation expense, and with carrying charges calculated at College Station's approved rate of return of 6.71% (i.e., the full $31.5 million);

2.    The total over-collection, *with* reduction for the under-recovery of depreciation expense, and with carrying charges on the net amount calculated at College Station's approved rate of return of 6.71%;

3.    The total over-collection, *without* reduction for the under-recovery of depreciation expense, and with carrying charges calculated: (i) at the Commission's interest rate for over- and under-billings applicable for each year from when the first interim TCOS (Docket No. 34230) went into effect until the third interim TCOS (Docket No. 46847) went into effect, and (ii) at College Station's approved rate of return of 6.71% for the period thereafter;

4.    The total over-collection, *with* reduction for the under-recovery of depreciation expense, and with carrying charges on the net amount calculated: (i) at the Commission's interest rate for over- and under-billings applicable for each year from when the first interim TCOS (Docket No. 34230) went into effect until the third interim TCOS (Docket No. 46847) went into effect, and (ii) at College Station's approved rate of return of 6.71% for the period thereafter;

5.    The total over-collection, *without* reduction for the under-recovery of depreciation expense, and with no carrying charges; or

6.    The total over-collection, *with* reduction for the under-recovery of depreciation expense, and with no carrying charges.

---

[108] Staff has not calculated the refund amount under these various scenarios, but states that it can do so as requested by the ALJs or Commissioners.

Staff does not recommend a particular approach, but explains that Commission precedent supports a refund of less than the total over-recovered amount.[109] In support, Staff cites past cases where the Commission has declined to order refunds of "unlawful" rates for various reasons. In those cases, the Commission found that:

- The Commission has absolute discretion to order the refund or surcharge of any difference between the final rate and interim rate.[110]

- The Commission has discretion to order no refund, partial refund, or complete refund of unlawful rates.[111]

- In considering whether to require refunds, the Commission may consider: (1) the intent of the utility in assessing the unlawful charge; (2) the character of unlawful charge; (3) the utility's difficulty in making the refund of unlawfully collected amounts; (4) the realization of any excess profits due to the unlawful charge; and (5) the genesis of the proceeding in which the refund issue arose, i.e., whether it arose as a result of a customer complaint.[112]

- With regard to cooperatives, adverse effects on financial condition are more detrimental to the public interest than a failure to pay a portion, or even all, of a refund. Adverse effects to financial condition increase the utility's cost of capital, which can cause its rates to increase. The net effect is that investors, who are not members of the cooperative, benefit at the expense of ratepayers, who are members.[113] A refund amount was determined by estimating the amount of money the cooperative could

---

[109] Staff First Initial Brief at 19-21.

[110] *Application of Southwestern Bell Telephone Company for Approval of Call Control Options and Selective Call Forwarding Pursuant to P.U.C. Subst. R. 23.26*, Docket No. 9695, 18 Tex. P.U.C. Bull. 1591, 1992 WL 528504 (Aug. 27, 1992).

[111] *Application of Guadalupe Valley Electric Cooperative, Inc. to Revise G-3, G-4, and G-5 Service Tariffs*, Docket No. 13168, 20 Tex. P.U.C. Bull. 970, 1994 WL 932806 (Nov. 4, 1994).

[112] *Id.*

[113] *Inquiry into the Legality of Certain Rates Charged by Pedernales Electric Cooperative, Inc.*, Docket No. 5411, 15 Tex. P.U.C. Bull. 1867, 1989 WL 610290 (Nov. 30, 1989).

refund without exceeding the limits of its debt service coverage and impairing its financial condition.[114]

- Refunds will not be ordered if it is not in the public interest to do so.[115]

Considering the factors in the third bullet point above, Staff first concludes that College Station's actions were not the result of a willful disregard for the Commission's rules nor a covert attempt to recover the GFTs through an interim, rather than comprehensive, TCOS proceeding.[116] Staff points out that the initial GFT was not included in College Station's draft interim TCOS request and was only added at the suggestion and with the agreement of Staff.[117] Staff also recognizes the potential for adverse effects on the cost of capital for the City and similar TSPs and "does not believe it would be in the public interest to subject College Station to what could be misconstrued as a regulatory 'gotcha' by some (including rating agencies)."[118] Given these factors, Staff also believes the Commission should weigh the potential financial onus to College Station of making a refund against the minimal impact the overcollection had on any particular ERCOT TSP or customer. Staff notes that a full refund would be over 500% of College Station's annual transmission revenue requirement, while the annual over-collected amount was only 0.03% of ERCOT's total TCOS revenue requirement for 2022. The per-customer impact would be even less considering College Station's *under*-collection of depreciation

---

[114] *Id.*

[115] *Complaint of Toby Smith Water Co.*, Docket No. 3173, 6 Tex. P.U.C. Bull. 413, 1981 WL 178980 (Jan. 8, 1981).

[116] Staff First Initial Brief at 10.

[117] College Station Ex. 10 (Crabb Reb.) at 10.

[118] Staff First Initial Brief at 20.

expense discussed above. Finally, Staff notes that the over-collection was identified as part of the review in this case, not through a customer complaint.

For these reasons, Staff asks that the Commission find good cause, under these particular facts and circumstances, for an exception to the full refund provision of Rule 25.192(h)(2).[119] Additionally, Staff continues to support the recommendation of Ms. Stark in her supplemental direct testimony,[120] which provided that good cause supported a refund of $6.6 million through June of 2022.[121] In its reply brief, Staff clarifies that it recommends this refund amount without further reductions for waiving carrying charges or offsetting the over-collection of depreciation.[122]

Finally, Staff addresses the mechanism for implementing the refund.[123] After issuance of the Initial PFD, Staff conducted a number run presenting three potential refund options.[124] First, the refund could be made consistent with the Settlement, which anticipated a refund "over a 24-month period via a credit (similar to the

---

[119] Staff First Initial Brief at 21.

[120] *See* Commission Staff's Exceptions to the Proposal for Decision at 4 (Aug. 14, 2023) ("Although not explicitly stated in its post-hearing briefings, Staff's position remains as described in the supplemental direct testimony of Ms. Stark. The amount of the general fund transfer included in College Station's interim TCOS rates that is associated with the plant in service as of the test year end in Docket No. 15762 should be the amount refunded"); *see also* Commission Staff's Proposed Findings of Fact at FOF No. 19 (May 31, 2023) (proposing the following FOF: "The Commission orders College Station to refund $3.9 million based on the alternative recommendation of Commission Staff, plus carrying charges at the 10% rate of return adopted in this order over a period of one year.").

[121] Staff Ex. 3A (Stark Supp. Dir.) at 4-5.

[122] Staff Second Reply Brief at 5-6.

[123] Staff Second Initial Brief at 3.

[124] Commission Staff's Exceptions to the Proposal for Decision at 6-8 (Aug. 14, 2023)

mechanics of a rate case expense surcharge)."[125] However, Staff notes that this mechanism was based on a refund amount of $3.9 million and may not be best for a larger refund.[126] Staff therefore presented two alternative mechanisms: (1) using the refund to reduce College Station's agreed-upon TCOS to be reflected in the wholesale transmission rate; or (2) applying the refund in one-month refunds of the annual refund amount based on the newly approved 4 Coincident Peak (4CP) applicable to wholesale transmission billings that year to be provided annually. Staff contends that the second alternative mechanism for annual one-month refunds would be administratively simple and allow for the precise amount of refund to be credited to wholesale transmission customers. However, Staff acknowledges that there is no testimony in the evidentiary record for these mechanisms, and thus, Staff defers to the ALJs on whether to address the refund mechanism.

### 3.    College Station's Position

College Station disagrees that a refund should be ordered, as it would be an inequitable penalty.[127] The City emphasizes the procedural history described in the Background section above that led to the inclusion of the GFTs in its interim TCOS filings. In particular, the initial inclusion of the GFT was prompted by an experienced Staff member, who advised Mr. Crabb that the GFT should be included even if it was not in the original filing and the Commission would make the call as to

---

[125] Joint Ex. 1 (Settlement) at 2, para. 3.

[126] Staff Second Initial Brief at 3.

[127] College Station Second Initial Brief at 11-13; *see also* College Station First Initial Brief at 13-16.

whether it would be allowed.[128] College Station did as directed and explained the inclusion of the GFT in its testimony, and the Commission approved it. For the second interim TCOS filing, the City again conferred with Staff, including the Director of Rate Regulation, Mr. Tietjen, who would have the "definitive" word on the question, according to Staff. Mr. Tietjen directed Mr. Crabb to use current numbers and "be sure and fully explain the issue in any testimony you include with your filing."[129] College Station again followed Staff's instruction and explained the inclusion of the GFT in its testimony, and the Commission approved it. For the third interim TCOS filing, College Station again explained the GFT in its testimony, and the Commission again approved it. Accordingly, College Station maintains that it acted innocently and transparently on three separate occasions at the direction of Staff, and on each occasion, the Commission approved College Station's request. In addition, but for the specific direction of Staff, College Station may not have even included a GFT in its first interim filing.[130]

As discussed above, College Station also argues that a refund would constitute retroactive ratemaking as there is no rule, statute, or other authority that prohibited the inclusion of the GFTS in its interim TCOS filings.[131] College Station maintains that regulated entities must have some degree of certainty from their regulator. In College Station's view, ordering a refund here would effectively mean the

---

[128] College Station Ex. 10 (Crabb Reb.) at 16, 22.

[129] College Station Ex. 10 (Crabb Reb.), Attachment TRC-7 (email from Darryl Tietjen to Timothy Crabb dated June 6, 2008).

[130] College Station Ex. 10 (Crabb Reb.) at 12.

[131] College Station Second Initial Brief at 13-14.

Commission is retroactively applying a new regulatory standard to invalidate the rates set by the Commission's prior orders.

Alternatively, if the Commission orders a refund, College Station argues that the evidence does not support a refund greater than $900,000, and, in fact, mitigating factors support a lesser amount.[132] As an initial matter, College Station notes that, although Staff's original $31.5 million recommendation remains in evidence, the witness who initially made that recommendation, Ms. Stark, no longer supports it. Thus, according to the City, the evidence supports a maximum refund of $6.6 million, the amount supported by Ms. Stark in her supplemental direct testimony.

Nevertheless, College Station argues that mitigating factors support a lesser amount. These factors include the following:

- College Station had no malicious intent in including a GFT in its interim TCOS filings and was specifically instructed to do so by Staff.

- College Station acted in good faith and transparently throughout all of its TCOS filings.

- Inclusion of a GFT in TCOS rates as "other associated taxes" is routine and consistent with Commission precedent and practice.

- Three Commission orders approved inclusion of a GFT in College Station's TCOS rates.

- Ordering a refund would have a significant financial impact on College Station. If College Station is ordered to refund $31.5 million over 15 years, the annual refund would represent over 63% of the City's annual requested revenue requirement.

---

[132] College Station Second Initial Brief at 14-17.

- College Station's inclusion of a GFT did not increase College Station's rate of return because GFT was never included as a component of return.
- The refund issue did not arise as the result of a customer complaint.

College Station notes that the Initial PFD found that mitigating factors weigh in favor of lowering the refund amount and that waiving carrying costs is reasonable.[133] College Station states that the facts underlying that analysis have not changed. Removal of carrying charges would reduce Staff's recommended $6.6 million disallowance to $3.9 million.[134] In addition, College Station argues that the record supports an additional $3.0 million reduction to offset a depreciation expense error in College Station's interim TCOS filings. As Mr. Rabon explained in rebuttal testimony, College Station understated its depreciation expense in each of its interim TCOS filings based on an incorrect formula provided in a Commission template, resulting in a total under-recovery of roughly $3 million.[135] College Station concludes that, based on Staff's testimony, the reduction for carrying charges, and the reduction for the depreciation expense error, the maximum refund amount supported by the record is $900,000, but due to mitigating circumstances, a significantly lower amount is in the public interest.

Finally, regarding the mechanism for implementing any refund, College Station recommends using the method the parties agreed to in the Settlement—a temporary rate rider that would be reflected as a separate line-item

---

[133] Initial PFD at 40.

[134] Staff Ex. 3 (Stark Dir.) at 22.

[135] College Station Ex. 11 (Rabon Reb.) at 12 & Attachment GSR-2.

credit.[136] College Station maintains that this approach would provide full transparency and allow College Station to eliminate the line-item credit once the prescribed amount has been refunded.

### 4. ALJs' Analysis

Under the TCOS rule, any amounts resulting from an interim TCOS update that are found to have been unreasonable or unnecessary must be refunded with carrying costs.[137] As stated in the previous section, the ALJs find that College Station's interim TCOS proceedings resulted in an over-recovery of costs because College Station did not maintain the transmission function's proportional allocation in its initial comprehensive TCOS case. Therefore, a refund is due under the rule. However, the Commission has discretion on whether to require a full, partial, or no refund.[138] As discussed below, the ALJs agree with Staff that mitigating circumstances support a refund of less than $31.5 million in this case. The issue then is what refund amount, if any, is appropriate.

As an initial matter, the ALJs disagree with College Station's contention that no refund amount should be ordered. While the City makes compelling arguments as to why it included the GFTs and that it acted in good faith, that does not change the fact that its interim TCOS rates recovered amounts that are inconsistent with Commission policy and precedent. Staff does not speak for the Commission, and its

---

[136] College Station Second Initial Brief at 12.

[137] 16 TAC § 25.192(h)(2).

[138] 16 TAC § 22.5(b); *Application of Guadalupe Valley Electric Cooperative, Inc. to Revise G-3, G-4, and G-5 Service Tariffs*, Docket No. 13168, 20 Tex. P.U.C. Bull. 970, 1994 WL 932806 (Nov. 4, 1994).

interpretation of the law may be fallible. Complying with Staff advice does not excuse non-compliance with the law. Under the TCOS rule and the orders issued in each of College Station's interim TCOS cases, the interim rates were subject to later review and reconciliation.[139] As discussed above, because the reconciliation of interim rates is expressly authorized by the TCOS rule and the Commission's orders in College Station's interim TCOS proceedings, ordering a refund in this case is not prohibited as retroactive ratemaking.

In recommending a refund amount, the ALJs consider the five factors identified in the precedent cited by Staff.[140] First, regarding College Station's intent, the ALJs find that the City did not willfully or intentionally violate the Commission's rules. In fact, the evidence overwhelmingly shows that College Station acted in good faith. College Station witness Crabb's documentation of his conversations with Staff demonstrates that the GFT in the initial interim TCOS filing was included at the prompting of an experienced Staff member.[141] Each time College Station sought to include the GFT in an interim TCOS case, it was transparent in its testimony, underwent a review by Staff, and received Commission approval. Mr. Crabb also testified persuasively that if the City had known the GFT was not recoverable in an

---

[139] 16 TAC § 25.192(h)(2).

[140] *See* Docket No. 13168, 20 Tex. P.U.C. Bull. 970, 1994 WL 932806 (Nov. 4, 1994) ("In each case considering refunds, the Commission provides a case-specific listing of factors evaluated in the Commission's decision. Throughout these cases five broad considerations emerge: (1) the intent of the utility; (2) the character of the illegal charge; (3) the difficulty to make a refund; (4) whether the utility (or shareholders) received excess profits due to the illegal charge; and (5) whether the case arose as a result of a customer complaint.")

[141] College Station Ex. 10 (Crabb Reb.) at 5 & Attachment TRC-1.

interim TCOS case, it either would have excluded it or would have filed a comprehensive TCOS case.[142]

Second, regarding the character of the charge, the Commission has previously looked at whether a rate was reasonable to the customer and whether a valid business reason existed for the charge.[143] Here, the parties do not dispute that College Station could have included a GFT in its initial comprehensive TCOS case or that it can include one in the instant case. Additionally, as Ms. Stark testified, the Commission's longstanding practice has been to allow MOUs to recover GFTs in interim TCOS proceedings as either part of the return or as "Taxes Other Than Income Taxes" (even though it is not technically a tax).[144] Thus, the ALJs find that the recovery of a GFT in general is not unreasonable, nor was it unreasonable for College Station to believe it could be included in an interim TCOS filing. College Station also has statutory authority authorizing GFTs and has adopted a financial policy identifying that "[t]he intent of this transfer is to provide a benefit to the citizens for their ownership of the various utility operations."[145] Therefore, a valid business purpose was also shown.

The third factor considers the utility's difficulty in making the refund. In this case, College Station requested a revenue requirement of $6.0 million. As Staff

---

[142] College Station Ex. 10 (Crabb Reb.) at 12.

[143] Docket No. 13168, 20 Tex. P.U.C. Bull. 970, 1994 WL 932806.

[144] Staff Ex. 3 (Stark Dir.) at 5.

[145] Tex. Gov't Code § 1502.059; College Station Ex. 12 (Dreyfus Reb.), Attachment MKD-2 at 6.

points out, a refund of $31.5 million would be many multiples of that.[146] Likewise, College Station witness Dreyfus testified that recovering this amount over 15 years, as Ms. Stark initially recommended, would be $3.8 million annually, representing over 63% of the City's requested annual revenue requirement.[147] Thus, a refund of that magnitude would have a significant impact on the City.

The fourth factor addresses whether the utility realized any excess profits due to the charge. Although College Station maintains that it could not have earned a rate of return greater than the 6.71% authorized in Docket No. 15762 because it included that same rate in each of the interim updates, the ALJs agree with Staff that this argument is a matter of form over substance. As Ms. Stark testified, College Station's *effective* rate of return was higher in each of the interim updates because it included both the 6.71% return on rate base, plus the GFTs as an expense item. Including the GFTs, which as discussed above is not consistent with Commission precedent, resulted in College Station collecting rates that were higher than they otherwise would have been, which effectively increased its return.

The final factor looks at whether the refund issue arose incidentally or as a result of a customer complaint. Here, no customer initially complained about the GFTs included in rates, though OPUC and TIEC on remand take positions opposing the GFTs.

---

[146] Staff First Initial Brief at 20-21.

[147] College Station Ex. 14 (Dreyfus Reb.) at 19.

The ALJs find that, with the exception of the "excess profits" factor, these factors weigh in favor of mitigating the refund amount. Staff was the only party that presented options on how the Commission might calculate a mitigated refund amount. However, the Commission has considerable discretion on this issue and is not bound by these options.

In determining a refund amount, the ALJs recommend starting with Staff witness Stark's recommended refund amount of $6.6 million.[148] Ms. Stark testified that this amount reflects that the Commission adopted an order in Docket No. 15762 that assigned $0 of the GFT to the plant in service as of the end of the test year based on a stipulation between College Station and the other parties.[149] She explained that the TCOS rule allows interim updates to transmission rates that reflect changes associated with additions and retirements of transmission facilities, but that changing the allocation of the GFT to the Docket No. 15762 plant from $0 to another amount was not related to the addition or retirement of transmission facilities. Therefore, she believed a refund in this amount would be reasonable given the unique circumstances in this case.

However, the ALJs find that other factors in this case weigh in favor of an even lower refund amount. Most notably, College Station reasonably relied on repeated advice of Staff, the Commission's three prior orders in its interim TCOS cases approving interim rates that included the GFTs, and the Commission's precedent

---

[148] *See* Staff Ex. 3A (Stark Supp. Dir.) at 4-5.

[149] Staff Ex. 3A (Stark Supp. Dir.) at 5.

in other MOU interim TCOS cases authorizing recovery of GFTs. Furthermore, although Commission precedent in other MOU TCOS cases indicates that the Commission's standard practice has been to maintain the transmission function's proportional allocation in interim TCOS proceedings, the instant case appears to be the first opportunity for the Commission to expressly articulate that policy. The ALJs conclude that it would be inequitable to require a significant refund due to a policy that had not previously been memorialized in an applicable statute or Commission rule, order, or policy document.

The ALJs therefore recommend two further reductions. First, given the unique circumstances of this case, the ALJs conclude that waiving carrying costs is reasonable. This adjustment reduces the $6.6 million to $3.9 million.[150] Second, as Staff points out, the TCOS rule does not preclude the Commission from netting an over-recovery against an under-recovery, such as the under-recovered depreciation expense here. Notably, College Station's under-recovery of depreciation expense stemmed from an error in a Commission form. Thus, it would be one-sided to recognize an *over-recovery* resulting from incorrect advice from Commission Staff, but not to recognize an *under-recovery* resulting from incorrect instructions in a Commission form. This adjustment further reduces the refund amount by approximately $3.0 million.[151] Thus, in total, the ALJs recommend a refund of approximately $900,000. However, this amount will need to be updated because the over- and under-recoveries were calculated as of mid-2022.

---

[150] Staff Ex. 3 (Stark Dir.) at 22.

[151] College Station Ex. 11 (Rahon Reb.) at 12 & Attachment GSR-2.

To implement the refund, the ALJs recommend using a temporary rate rider over a 24-month period, as contemplated by the parties' Settlement. With the refund amount that the ALJs recommend, the alternative refund mechanisms proposed by Staff are unnecessary. Additionally, a rider has the benefit of being transparent and simple to apply.

In sum, the ALJs recommend that the Commission grant a good-cause exception to the TCOS rule's requirement that over-recovered amounts be refunded with carrying costs,[152] and instead require a total refund of approximately $900,000 (to be updated with current numbers) over a 24-month period through a rate rider. The ALJs further recommend that Staff submit number running consistent with the above recommendation to be available for the Commission open meeting to consider this matter.[153]

---

[152] *See* 16 TAC § 22.5(b).

[153] During the first remand, College Station identified an error in Staff's calculation of the $6.6 million where interest expense was counted twice for September 2008 and March 2017. *See* Initial PFD at 36. Staff agreed that interest was double counted and calculated that correcting the error would reduce the refund amount by $46,059. Staff First Reply Brief at 13-14. The parties did not address this issue in their briefing on second remand, but because it is an acknowledged error, the number running should make the necessary correction.

## D.   UNCONTESTED ISSUES

### 1.   Extent of Issues Raised in this Case

No party contested College Station's position on any of the following issues identified in the Commission's Preliminary Order, and therefore these issues are addressed exclusively in the FOFs and COLs below:

Issue Nos. 1-3:    Sufficiency of the Application and notice

Issue No. 10:    Invested capital

Issue No. 11:    Cash working capital

Issue No. 12:    Cost-free capital

Issue Nos. 13-14:    Regulatory assets and liabilities

Issue No. 24:    Export power from the ERCOT region

Issue No. 25:    Tariff revisions

Issue Nos. 26-27:    Existing rate riders

Issue No. 28:    Waivers

The remaining Preliminary Order issues were addressed in testimonies filed by OPUC and Staff before they entered into the Settlement. Specifically, OPUC and Staff witnesses recommended the following adjustments to College Station's proposed revenue requirement:

- OPUC: Federal Energy Regulatory Commission (FERC) Account 570, Maintenance of Station Equipment: Disallow $154,112 attributable to a contractor maintenance schedule that appears non-recurring.[154]

---

[154] OPUC Ex. 1 (Nalepa Dir.) at 8-10.

- <u>OPUC: FERC Account 935, Maintenance of General Plant</u>: Disallow $1,936 to make the test-year expense consistent with the three-year average.[155]

- <u>Staff: GFT Included in Return</u>: Disallow $263,701 to reflect that the franchise rate charged to other utilities operating within the City is 5%, rather than the 9% identified in the City's financial policies.[156]

- <u>Staff: Prepayments</u>: Exclude $6,130 from the transmission prepayments balance to reflect that it was recorded in the last month of fiscal year 2020 and then immediately reversed in the next month.[157]

- <u>Staff: Depreciation</u>: Use the depreciation rates for transmission plant included in the City's last interim TCOS, resulting in an increase in depreciation expense of $166,588 and an increase in accumulated depreciation of $1,602,999.[158] Staff also recommended that College Station perform a depreciation study and a salvage and cost of removal study before filing its next comprehensive rate case.[159]

- <u>Staff: Debt Service</u>: Reduce debt service allocated to transmission by $203,180 to remove a known and measurable change for the debt service for a new Series 2021 debt issuance.[160]

---

[155] OPUC Ex. 1 (Nalepa Dir.) at 10-11.

[156] Staff Ex. 3 (Stark Dir.) at 6-10.

[157] Staff Ex. 3 (Stark Dir.) at 23.

[158] Staff Ex. 2 (Graham Dir.) at 10-11.

[159] Staff Ex. 2 (Graham Dir.) at 6.

[160] Staff Ex. 1 (Sears Dir.) at 11-12.

- <u>Staff: Return</u>: After flowing through Staff's proposed adjustments to debt service, the GFT, depreciation expense, and rate base, the fallout return would be 8.9%,[161] rather than the 10.7% return requested by the City.[162]

- <u>Staff: Rate-Case Expenses</u>: Disallow College Station's recovery of its RCEs for its interim TCOS proceedings in Docket Nos. 34230 and 46847 in the amounts of $11,229 and $10,637, respectively.[163]

Staff calculated that its proposed adjustments would result in a reduction to College Station's revenue requirement of $466,880,[164] which when combined with OPUC's proposed adjustments totals $622,928.[165] OPUC also recommended that College Station's RCEs be recovered over 12 months rather than the six months requested by the City.[166]

In rebuttal testimony, College Station explained why it disagreed with each of OPUC's and Staff's recommendations listed above.[167] However, College Station

---

[161] Staff Ex. 1 (Sears Dir.) at 13-14 & Attachment ES-3. Staff witness Emily Sears recommended that the Commission approve College Station's use of the cash flow methodology to calculate its return. She explained that "[u]nlike a typical overall ROR [rate of return] calculated in a base rate case proceeding that is determined by market analysis and then applied to rate base, the overall ROR in this proceeding is calculated by taking the Cash Flow Return in dollars divided by the rate base. This means that if there are any changes to the dollar amounts of the inputs in the Cash Flow method or the rate base, the fallout ROR could change." *Id.* at 13-14.

[162] College Station Ex. 1 (Application) at 43 (Rabon Dir.).

[163] Staff Ex. 3 (Stark Dir.) at 23-25.

[164] Staff Ex. 3 (Stark Dir.), Attachment RS-1.

[165] This amount does not include Staff's proposed disallowances for rate-case expenses, which would be recovered through a rider.

[166] OPUC Ex. 1 (Nalepa Dir.) at 11-12.

[167] College Station Ex. 11 (Rabon Reb.) at 4-23.

proposed two adjustments to its revenue requirement to address the two expense issues raised by OPUC witness Karl Nalepa.[168]

College Station, OPUC, and Staff ultimately entered into the Settlement, which resolved all issues in this case, and TIEC was unopposed, as discussed below.[169]

## 2. Parties' Settlement

After the Commission rejected the GFT portion of the Settlement in the First Remand Order, College Station, Staff, and OPUC did not withdraw from the Settlement and agreed to limit the hearing on remand to that single issue.[170] TIEC, while not a party to the Settlement, remained unopposed to this approach.[171] The parties continue to take these positions in this second remand.[172]

The key components of the Settlement are as follows:

- College Station's TCOS shall be $5,875,259 and its wholesale transmission rate shall be $82.82 per MW.[173]
- College Station's transmission rate base shall be $26,864,373 and does not include prepayments.

---

[168] College Station Ex. 11 (Rabon Reb.) at 18-23.

[169] Joint Ex. 1 (Settlement).

[170] R. Tr. at 27-29.

[171] Id.

[172] Second Remand Prehearing Conference Transcript at 4-8, 13; College Station Second Initial Brief at 17-18; Staff Second Initial Brief at 2; OPUC Second Initial Brief at 4; TIEC Second Initial Brief at 1.

[173] The revenue requirement is a reduction of $131,342 from the amount requested in College Station's Application.

- College Station's rate of return shall be 10.00%.

- College Station's depreciation rates and expense shall be as originally filed in the Application.

- College Station agrees to include a depreciation study in its next application for a complete TCOS review.

- College Station will update its financial policies to minimize confusion about the authorization of transfers to the city's general fund.

- College Station withdraws its request for RCEs from two of its previous interim TCOS filings, Docket Nos. 34230 and 46847.

- College Station will recover the reasonable and necessary RCEs incurred through a 24-month surcharge.[174]

- The rate-case expense rider shall be calculated based on 70,938 MW (ERCOT's 4CP for calendar year 2020).[175]

Although the Settlement is a black-box agreement, College Station explains how the parties arrived at the agreement's terms.[176] College Station represents that the revenue requirement reduction is based on the adjustments to FERC Accounts 570 and 935 recommended by OPUC witness Nalepa and evaluated further by College Station witness Rabon in rebuttal testimony. Additionally, according to College Station, the change from the requested 10.7% return is a result of adding $166,587.84 in depreciation expense, as recommended by Staff witness Heidi Graham. College Station states that, when this adjustment is made, the fallout

---

[174] College Station has incurred additional rate-case expenses since executing the Settlement, as discussed below.

[175] *See* Joint Ex. 3 (Testimony of Ruth Stark in Support of Stipulation) at 4-5.

[176] College Station Second Initial Brief at 19; Joint Ex. 2 (Testimony of Mark K. Dreyfus in Support of Stipulation) at 2-3. However, the Settlement states that: "The Agreement is the result of compromise and was arrived at only for the purposes of settling this case. The Agreement is not intended to be precedential. A Signatory's agreement to entry of a final order of the Commission consistent with this Agreement should not be regarded as an agreement to the appropriateness or correctness of any assumptions, methodology, or legal or regulatory principle that may have been employed in reaching this Agreement." Joint Ex. 1 (Settlement) at 3, para. B.2.

rate of return is 10.08%, and "[a]s a compromise, the signatories agreed to an even 10.0% rate of return."[177]

Staff witness Stark and College Station witness Dreyfus filed testimony in support of the Settlement.[178] Mr. Dreyfus opined that the Settlement is reasonable, in the public interest, and incorporates compromise because no party receives its comprehensive preferred outcome.[179] Ms. Stark testified that, based on her review and analysis of the Application, testimony, discovery, PURA, and the TCOS rule, the Settlement represents a fair and equitable resolution and is in the public interest.[180] Both witnesses maintained that the Settlement was within the reasonable range of likely results from continued litigation.[181]

The ALJs find that the parties demonstrated that the Settlement is a reasonable resolution of the contested issues in this case. The Settlement is a reasonable compromise of the parties' positions on those issues, without any single party's position dominating the others' positions. Notably, the parties in this case represent diverse interests, yet no party is opposed to the outcome. Additionally, Ms. Stark and Mr. Dreyfus testified that the Settlement is in the public interest and the outcome is within the range of expected results if this case were to be fully

---

[177] College Station Second Initial Brief at 19.

[178] Joint Exs. 2 (Testimony of Mark K. Dreyfus in Support of Stipulation) and 3 (Testimony of Ruth Stark in Support of Stipulation).

[179] Joint Ex. 2 (Testimony of Mark K. Dreyfus in Support of Stipulation) at 6.

[180] Joint Ex. 3 (Testimony of Ruth Stark in Support of Stipulation) at 6-7.

[181] Joint Ex. 2 (Testimony of Mark K. Dreyfus in Support of Stipulation) at 6; Joint Ex. 3 (Testimony of Ruth Stark in Support of Stipulation) at 6.

litigated. Adopting the Settlement would also be consistent with public policy, which favors the peaceable resolution of disputes.[182] Accordingly, the ALJs recommend that the Commission adopt the Settlement on all issues except (1) the recoverability of the GFTs in the interim TCOS cases, which is addressed above, and (2) the amount of recoverable RCEs, which should be updated, as discussed in the next section, to address College Station's incurrence of additional RCEs after execution of the Settlement.

### 3.     Rate-Case Expenses

The Settlement provides for the recovery of RCEs incurred in this proceeding through August 31, 2022, through a 24-month surcharge.[183] The signatories also agreed that the August cutoff date would be extended if additional RCEs were incurred beyond that date due to the Commission's decision on the Settlement.[184] Because the Commission rejected the Settlement and twice remanded the case to SOAH, College Station incurred additional RCEs for this proceeding after that date.

College Station provided the following updates to its RCEs, which were each reviewed by Staff:

---

[182] *See* Tex. Civ. Prac. & Rem. Code § 154.002 ("It is the policy of this state to encourage the peaceable resolution of disputes[.]"); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178 (Tex. 1997) ("Texas law favors and encourages voluntary settlements and orderly dispute resolution."); *Transport Ins. v. Faircloth*, 898 S.W.2d 269, 280 (Tex. 1995) (noting that "[p]ublic policy favors the amicable settlement of controversies" because settlement "avoid[s] the uncertainties regarding the outcome of litigation, and the often exorbitant amounts of time and money to prosecute or defend claims at trial").

[183] Joint Ex. 1 (Settlement) at 2, paras. A.9-A.10.

[184] *Id.*

- On April 18, 2023, College Station filed an update of RCEs incurred in this proceeding totaling $320,154.85,[185] and on April 27, 2023, an affidavit supporting the updated expenses.[186] The following day, Staff filed supplemental testimony finding this amount to be reasonable and recoverable.[187]

- On July 14, 2023, College Station filed an additional update of RCEs incurred through June 30, 2023, totaling $429,151.82, along with a supporting affidavit.[188] On July 21, 2023, Staff filed supplemental testimony finding this amount to be reasonable and recoverable.[189]

- On December 8, 2023, College Station filed an additional update of RCEs incurred through November 30, 2023, totaling $487,904.95, along with a supporting affidavit.[190] On December 18, 2023, Staff filed supplemental testimony finding this amount to be reasonable and recoverable.[191]

College Station requests that it be authorized to recover its RCEs incurred through the conclusion of this proceeding.[192] Similarly, Staff recommends that, consistent with the Settlement, College Station be authorized to recover its

---

[185] College Station Ex. 15 (College Station Fifth Supplemental Response to Staff Second Request for Information).

[186] College Station Ex. 16 (College Station Sixth Supplemental Response to Staff Second Request for Information).

[187] Staff Ex. 3B (Stark Second Supp. Dir.) at 3.

[188] College Station Exs. 17, 18. In SOAH Order No. 10, the ALJs allowed post-hearing filings updating College Station's rate-case expenses through June 30, 2023. College Station also requests that it be allowed to recover in this proceeding rate-case expenses incurred after that date. College Station's Response to Third Supplemental Direct Testimony of Ruth Stark (July 26, 2023).

[189] Staff Ex. 12 (Stark Third Supp. Dir.).

[190] College Station Ex. 21 (College Station Response to SOAH Order No. 14).

[191] Staff Ex. 13 (Stark Fourth Supp. Dir.).

[192] College Station Second Initial Brief at 20.

reasonable RCEs incurred in this proceeding.[193] Staff further recommends that the Commission authorize College Station to establish a regulatory asset to record its trailing RCEs from this proceeding.[194]

Given that no party opposes College Station's recovery of the RCEs incurred through November 30, 2023, and Staff specifically finds such expenses are reasonable and recoverable, the ALJs recommend that the Commission authorize College Station to recover those RCEs in the amount of $487,904.95. Consistent with the Settlement, the ALJs recommend that this amount be recovered through a 24-month surcharge.[195] The ALJs also recommend that the Commission authorize College Station to establish a regulatory asset to record its trailing RCEs for this case.

## IV.  CONCLUSION

For the reasons discussed above, the ALJs recommend that the Commission approve College Station's Application as modified to (1) require a partial refund of approximately $900,000 over a 24-month period for the over-recovery of GFTs in College Station's interim TCOS proceedings; (2) incorporate the terms of the parties' Settlement; and (3) authorize College Station to recover $487,904.95 in

---

[193] Staff Second Initial Brief at 3-4. To limit the amount of trailing rate-case expenses that could be subject to review and recovery in a future proceeding, Staff requested that College Station be authorized to update its rate-case expenses through November 30, 2023. In SOAH Order No. 14, the ALJs established a procedure for such an update, which resulted in College Station's most recent rate-case-expense total listed above.

[194] Staff Second Initial Brief at 4. Staff also notes that "because it is likely that the Commission will require a compliance filing to effectuate any refund amount that it orders as a result of this proceeding, it is possible that the trailing rate-case expense regulatory asset could be reviewed in that compliance filing and used as an offset to any potential regulatory liability that College Station establishes as a result of any refund ordered."

[195] *See also* Staff Ex. 13 (Stark Fourth Supp. Dir.) at 3 (recommending recovery over a 24-month period).

RCEs incurred through November 30, 2023, through a 24-month surcharge, with any additional RCEs recorded in a regulatory asset for recovery in a future proceeding. In support of these recommendations, the ALJs provide the following FOFs, COLs, and proposed OPs.

## V. FINDINGS OF FACT

### *Applicant*

1. The City of College Station (College Station) is a municipally owned utility (MOU) providing electric transmission service within the Electric Reliability Council of Texas (ERCOT) region under certificate of convenience and necessity number 30035.

### *Application*

2. On November 3, 2021, College Station filed an application with the Public Utility Commission of Texas (Commission) to change its Transmission Cost of Service (TCOS) and wholesale transmission service rates.

3. In its application, College Station requested the Commission approve an annual wholesale transmission rate of $84.67 per megawatt (MW) based on an annual TCOS of $6,006,601 using a test year ending September 30, 2020, the end of College Station's fiscal year.

4. College Station also requested recovery of its reasonable and necessary rate-case expenses (RCEs) through a six-month surcharge.

5. In Commission Order No. 3 issued on November 30, 2021, the Commission Administrative Law Judge (ALJ) found College Station's application administratively complete.

6. College Station's last comprehensive TCOS review was approved on July 8, 1997 in Docket No. 15762.

## *Notice*

7.  On November 12, 2021, College Station filed the affidavit of Thomas L. Brocato, attorney for College Station, attesting that notice of the application was mailed on November 3, 2021, to (1) all transmission and distribution providers listed on the Commission's transmission charge matrix; (2) Commission staff (Staff); (3) the parties still operating in Texas that participated in Docket No. 15762; and (4) the Office of Public Utility Counsel (OPUC).

8.  On November 23, 2021, Staff recommended College Station be required to provide notice by publication for two consecutive weeks in newspapers of general circulation in the areas served by College Station. Staff asserted notice by publication should be required because College Station's last comprehensive TCOS proceeding concluded in 1997 and because College Station requested a more-than-50% increase to its wholesale transmission rates.

9.  On December 17, 2021, College Station filed proof of notice of publication, providing that notice of the application was published in a newspaper of general circulation for two consecutive weeks on December 3, 2021, and December 10, 2021, and in an online publication of general circulation from December 3, 2021, to December 16, 2021.

10. On January 12, 2022, the Commission ALJ issued Order No. 4 finding notice sufficient.

## *Intervenors*

11. On November 17, 2021, the Commission ALJ issued Commission Order No. 2 granting OPUC's motion to intervene.

12. On July 22, 2022, the State Office of Administrative Hearings (SOAH) ALJs issued SOAH Order No. 4 granting Texas Industrial Energy Consumers' (TIEC) motion to intervene.

## *Initial Referral to SOAH*

13. On February 22, 2022, OPUC filed a request for hearing.

14.     On April 19, 2022, the Commission referred this case to SOAH for assignment of an ALJ to conduct a hearing.

15.     On April 21, 2022, the Commission issued its Preliminary Order identifying the issues to be addressed in this proceeding.

16.     On May 13, 2022, the SOAH ALJs convened a prehearing conference via Zoom videoconference.

17.     In SOAH Order No. 2, issued on May 16, 2022, the SOAH ALJs adopted a procedural schedule.

### *Uncontested Stipulation and Settlement Agreement*

18.     On August 16, 2022, College Station, OPUC, and Staff filed a Joint Motion to Admit Evidence and an Uncontested Stipulation and Settlement Agreement (Settlement). TIEC was unopposed to the Settlement.

19.     On August 16, 2022, College Station filed the testimony of Mark K. Dreyfus in support of the Settlement.

20.     On August 17, 2022, Staff filed the testimony of Ruth Stark in support of the Settlement.

21.     On August 17, 2022, College Station filed a Supplement to the Joint Motion to Admit Evidence.

22.     On August 18, 2022, the SOAH ALJs issued SOAH Order No. 7 admitting 34 joint exhibits into evidence, remanding the case to the Commission, and dismissing the case from SOAH's docket.

23.     On September 8, 2022, College Station filed a Second Supplement to the Joint Motion to Admit Evidence.

24.     On November 9, 2022, Commission Counsel issued a memo requesting clarification regarding the Settlement.

25.     On November 15, 2022, College Station filed the supplemental testimony of Grant Rabon in response to the Commission Counsel's memo.

26. On November 15, 2022, the Commission ALJ issued Order No. 5 admitting two joint exhibits into evidence.

27. During the Open Meeting on January 26, 2023, the Commission considered the Settlement.

28. On January 26, 2023, the Commission issued an Order Remanding Proceeding (First Remand Order), declining to accept the Settlement and remanding the case to SOAH for further processing in accordance with its order.

29. The First Remand Order addressed whether College Station was permitted to include a General Fund Transfer (GFT) in its interim TCOS filings.

## *First Remand*

30. On March 21, 2023, the SOAH ALJs convened a prehearing conference via Zoom videoconference.

31. On May 2, 2023, the SOAH ALJs convened a hearing on remand via Zoom videoconference. The hearing concluded the same day.

32. The following parties appeared through legal counsel and participated in the hearing on remand: College Station, Staff, OPUC, and TIEC.

33. The scope of the hearing on remand was limited to the issue of whether College Station was permitted to include a GFT in its interim TCOS proceedings. No other terms of the Settlement were contested.

34. On May 16, 2023, the parties filed initial briefs.

35. On May 31, 2023, the parties filed reply briefs and proposed findings of fact, conclusions of law, and ordering paragraphs.

36. The record closed on May 31, 2023, except that College Station was authorized to, and did, file a supplemental update concerning its requested RCEs through June 30, 2023.

37. The SOAH ALJs admitted into evidence at the hearing three joint exhibits, 17 exhibits offered by College Station, one exhibit offered by OPUC, and 11 exhibits offered by Staff.

38. On July 27, 2023, the SOAH ALJs issued a Proposal for Decision (Initial PFD).

39. In the Initial PFD, the SOAH ALJs admitted three additional exhibits regarding RCEs.

## *Second Remand*

40. On September 14, 2023, the Commission rejected the Initial PFD, rescinded its First Remand Order, and issued a new Order Remanding Proceeding (Second Remand Order) remanding the proceeding to SOAH a second time and instructing the ALJs to issue findings of fact and conclusions of law on all contested issues.

41. On October 16, 2023, the SOAH ALJs convened a prehearing conference via Zoom videoconference, and the parties agreed that an additional evidentiary hearing was unnecessary; the sole remaining contested issue to be decided related to the recoverability of the GFTs; and the Settlement should be resubmitted to the Commission, but with the PFD making specific findings regarding its reasonableness.

42. On October 30, 2023, parties filed additional initial briefs.

43. On November 6, 2023, parties filed additional reply briefs and proposed findings of fact, conclusions of law, and ordering paragraphs.

44. The record closed on November 6, 2023, except that College Station was authorized to, and did, file a supplemental update concerning its requested RCEs through November 30, 2023.

45. In SOAH Order No. 14, issued on December 4, 2023, the SOAH ALJs admitted two additional exhibits regarding RCEs.

46. In the Proposal for Decision on Second Remand, the SOAH ALJs admitted two additional exhibits regarding RCEs.

### *College Station's GFTs in Interim TCOS Filings*

47. GFTs may be reflected in the revenue requirement as a component of an MOU's cash needs when using the cash flow method to determine the return component of rates or included in the revenue requirement as a separate expense item, most often appearing in the "other taxes" line item.

48. College Station's first comprehensive TCOS application in Docket No. 15762 was resolved by a settlement that provided for $0 in tax expense allocated to the transmission function and did not use the cash flow method to determine return. Thus, no GFT was included in the approved rates.

49. College Station included a GFT in its interim TCOS filings in 2007, 2008, and 2017 in Docket Nos. 34230, 35837, and 46847, respectively, as an expense item under "other taxes."

50. College Station began including a GFT in its interim TCOS filings at the direction of Staff with their knowledge that it was not included in College Station's last comprehensive TCOS filing.

51. In each of the interim TCOS cases, College Station filed testimony explaining that it was requesting a GFT, and its filings were reviewed by Staff.

52. The Commission issued orders approving inclusion of a GFT in College Station's interim TCOS filings in Docket Nos. 34230, 35837, and 46847.

53. Using the effective rate for the separate expense item GFT from an MOU's last comprehensive rate case to update the MOU's GFT in a later interim TCOS filing is a reasonable method of determining the appropriate amount of the GFT associated with interim transmission plant additions and retirements.

54. The effective rate for the GFT from an MOU's last comprehensive rate case has been consistently used to update the MOU's GFTs in later interim TCOS proceedings.

55. The effective rate of College Station's GFT for its transmission function in Docket No. 15762 was 0%.

56. Despite having a GFT effective rate of 0%, $833,330 was included in College Station's interim TCOS rates resulting from Docket No. 34230, $1,228,955 was included in its interim TCOS rates resulting from Docket No. 35837, and $1,476,306 was included in the interim TCOS rates resulting from Docket No. 46847.

57. Inclusion of these amounts in College Station's interim TCOS rates is inconsistent with the Commission's precedent of using an MOU's effective rate for the GFT from its last comprehensive rate case to update the MOU's later interim TCOS proceedings.

58. The amount College Station recovered in its interim TCOS cases associated with the GFTs is $19.2 million as of June 30, 2022. With carrying costs calculated at College Station's authorized rate of return, the total over-recovery is $31.5 million as of June 30, 2022.

59. The over-recovered amount includes $3.9 million associated with the plant in service as of the test-year end in Docket No. 15762. With carrying costs, this portion of the over-recovered amount totals $6.6 million as of June 30, 2022.

60. The current proceeding is the next complete review of College Station's TCOS and the first opportunity for the Commission to review and reconcile College Station's interim TCOS rates.

61. In including the GFTs in its interim TCOS filings, College Station acted in good faith and did not willfully or intentionally violate the Commission's rules or policies.

62. If College Station had known the GFT was not recoverable in an interim TCOS case, it would have excluded it or would have filed a comprehensive TCOS case.

63. Recovery of a GFT in general is not unreasonable, nor was it unreasonable for College Station to believe it could be included in an interim TCOS filing.

64. College Station has statutory authority to adopt a GFT and has identified a valid business purpose for it.

65. Making a refund of the total over-recovered amount would have a significant impact on College Station because it is more than five times College Station's total revenue requirement.

66. College Station's effective rate of return was higher in each of the interim updates because it recovered both its authorized rate of return on rate base, plus the GFTs as an expense item.

67. The over-recovered amounts were discovered in this proceeding, not through a customer complaint.

68. A refund of the over-recovered amounts is appropriate, but based on the particular facts in this case, good cause exists to mitigate the refund amount due.

69. In determining a refund amount, it is reasonable to start with the over-recovered amount associated with the plant in service as of the test-year end in Docket No. 15762, with carrying costs, which was $6.6 million as of June 30, 2022.

70. College Station's under-collection of depreciation expense through the interim TCOS rates of approximately $3.0 million should be netted against the $6.6 million.

71. College Station should not be required to apply carrying costs to the refund amount.

72. The refund amount as of June 30, 2022, is approximately $900,000.

73. A refund amount of approximately $900,000 is reasonable due to the mitigating factors.

74. It is reasonable for College Station to make the refund over 24 months through a rider.

*Adoption of Settlement*

75. The terms of the Settlement should be adopted, except for the term requiring College Station to refund $3.9 million related to the GFTs in its interim TCOS

proceedings. The RCE term should be adopted with modification to account for recovery of RCEs incurred beyond August 31, 2022.

76. The adopted terms of the Settlement are reasonable, in the public interest, supported by evidence, and provide an equitable and fair resolution of the issues presented in this case.

77. The adopted terms of the Settlement represent a reasonable compromise that reflects adjustments from diverse parties.

### *Rate Base, Return, and Depreciation*

78. Under the Settlement, College Station's transmission rate base is $26,864,373, and the return on transmission rate base is $2,874,067, as shown in Schedule B of Exhibit 1 attached to the Settlement.

79. The parties agreed to a rate of return of 10.00%. In his testimony filed on November 15, 2022, Mr. Rabon testified that the parties agreed to use a 10.70% rate of return for purposes of determining the return on transmission rate base in this proceeding, as shown in Exhibit 1 attached to the Settlement. Mr. Rabon further testified that the parties agreed to use a 10.00% rate of return for purposes of future interim TCOS applications and annual earnings monitoring reports.

80. The agreed rate of return will allow College Station to recover its reasonable and necessary expenses while providing sufficient incentive for continued transmission investment.

81. College Station will use the depreciation rates as originally filed in the application and as shown in the rebuttal testimony of College Station witness Rabon at Table 3 in the far-right column labeled "Docket No. 52728."

82. College Station will include a depreciation study, prepared in accordance with Schedule E1: Depreciation Expenses of the Commission's Transmission Cost of Service Rate Filing Package for Non-Investor Owned Transmission Service Providers in the Electric Reliability Council of Texas, in its next application for a complete review of its transmission cost of service.

83. College Station's transmission-related invested capital is used and useful.

### *Financial Policy*

84.     College Station agrees to update its financial policies to minimize confusion about the authorization of transfers to the city's general fund.

### *TCOS and Wholesale Transmission Rate*

85.     Under the Settlement, College Station's TCOS revenue requirement is $5,875,259, and its annual wholesale transmission rate is $82.82 per MW.

### *Rate-Case Expenses*

86.     The wholesale transmission rate approved in this Order does not include RCEs.

87.     In the Settlement, the parties agreed to extend recovery of RCEs as necessary due to the Commission's processing of the case.

88.     College Station will continue to incur RCEs through the conclusion of the proceeding.

89.     College Station's RCEs for this proceeding incurred through November 30, 2023, in the amount of $487,904.95 are reasonable and necessary. This amount should be recovered through a 24-month surcharge. College Station should establish a regulatory asset to record any additional RCEs incurred for this case for recovery in a future proceeding.

## VI.  CONCLUSIONS OF LAW

1.     The Commission has jurisdiction over this proceeding under Public Utility Regulatory Act (PURA) §§ 35.004 and 40.004(1).

2.     College Station is a MOU as defined in PURA § 11.003(11) and an electric utility as defined in PURA § 35.001 for the purpose of wholesale transmission service.

3.     College Station is a transmission service provider (TSP) as defined in 16 Texas Administrative Code (Rule) § 25.5(141) that provides transmission service as defined in PURA § 31.002(20).

4. The Commission processed the application in accordance with the requirements of PURA, the Administrative Procedure Act, and Commission rules.

5. College Station provided notice of the application that complies with Rule 22.55.

6. College Station's application complies with the requirements of Rule 25.192.

7. A TSP in the ERCOT region may seek authority to change its transmission rates under Rule 25.192(g).

8. A TSP may apply to update its transmission rates on an interim basis to reflect changes in its invested capital. Rule 25.192(h)(1).

9. Interim updates of transmission rates are subject to reconciliation at the next complete review of the TSP's TCOS, at which time the Commission shall review the costs of the interim transmission plant additions to determine if they were reasonable and necessary. Rule 25.192(h)(2).

10. Any amounts resulting from an interim TCOS update that are found to have been unreasonable or unnecessary, plus the corresponding return and taxes, shall be refunded with carrying costs. Rule 25.192(h)(2).

11. The Commission may grant exceptions to any requirement in its rules for good cause. Rule 22.5(b).

12. The Commission has absolute discretion to order the refund or surcharge of any difference between the final rate and interim rate. *Application of Southwestern Bell Telephone Company for Approval of Call Control Options and Selective Call Forwarding Pursuant to P.U.C. Subst. R. 23.26*, Docket No. 9695, 18 Tex. P.U.C. Bull. 1591, 1992 WL 528504 (Aug. 27, 1992).

13. In considering whether to require refunds, the Commission may consider: (1) the intent of the utility in assessing the unlawful charge; (2) the character of unlawful charge; (3) the utility's difficulty in making the refund of unlawfully collected amounts; (4) the realization of any excess profits due to the unlawful charge; and (5) the genesis of the proceeding in which the refund issue arose, i.e., whether it arose as a result of a customer complaint.

*Application of Guadalupe Valley Electric Cooperative, Inc. to Revise G-3, G-4, and G-5 Service Tariffs*, Docket No. 13168, 20 Tex. P.U.C. Bull. 970, 1994 WL 932806 (Nov. 4, 1994).

14. Ordering College Station to issue a refund for its inclusion of a GFT in Docket Nos. 34230, 35837, and 46847 is appropriate.

15. Based on the particular facts and mitigating circumstances in this case, good cause exists for an exception to the full refund provision of Rule 25.192(h)(2).

16. College Station's annual TCOS revenue requirement in the amount of $5,875,259 is reasonable and necessary and calculated in accordance with Rule 25.192(c).

17. College Station's annual wholesale transmission rate of $82.82 per MW is properly calculated under Rule 25.192.

18. College Station's transmission-related investment is reasonable and necessary and is used and useful, consistent with the requirements of Rule 25.192.

19. The wholesale transmission rate base additions since College Station's last comprehensive TCOS proceeding that were included in the application have been reconciled in accordance with Rule 25.192 and were prudently incurred.

20. It is appropriate for College Station to recover its reasonable and necessary RCEs incurred through November 30, 2023, in this proceeding. Rule 25.245.

21. College Station should recover any trailing RCEs through a regulatory asset for review and recovery in a separate docket.

## VII. PROPOSED ORDERING PARAGRAPHS

1. The Commission adopts the Proposal for Decision on Second Remand, including findings of fact and conclusions of law, to the extent provided in this Order.

2. The Commission approves College Station's TCOS and wholesale transmission rates to the extent provided by this Order.

3.    The Commission establishes College Station's annual TCOS revenue requirement as $5,875,259, effective the date of this Order.

4.    The Commission establishes College Station's annual wholesale transmission rate as $82.82 per MW, effective the date of this Order.

5.    College Station must refund a total of $900,000 over a 24-month period via a credit.

6.    College Station may recover its reasonable and necessary RCEs incurred in this proceeding through November 30, 2023, in the amount of $487,904.95.

7.    College Station must recover its RCEs through a separate surcharge over a period not to exceed 24 months, and such surcharge should be calculated based on 70,938 MW (ERCOT's 4 Coincident Peak for calendar year 2020).

8.    College Station must record any additional RCEs incurred in this docket in a regulatory asset. College Station may seek recovery of those additional amounts in a future proceeding.

9.    The Commission approves the depreciation rates described in Finding of Fact No. 81.

10.    College Station must include a depreciation study, prepared in accordance with Schedule E-1: Depreciation Expense of the Commission's Transmission Cost of Service Rate Filing Package for Non-Investor Owned Transmission Service Providers in the Electric Reliability Council of Texas, in its next application for a complete review of its transmission cost of service as referenced in Rule 25.192(h)(2).

11.    Within 10 days of the date of this Order, College Station must file with the Commission a clean copy of the approved wholesale transmission service tariff to be stamped *Approved* and retained by Central Records.

12.    The Commission denies all other motions and any other requests for general or specific relief that the Commission has not expressly granted.

**SIGNED December 21, 2023.**

Daniel Wiseman,

Administrative Law Judge

Cassandra Quinn,

Administrative Law Judge

# APPENDIX E



Control Number: 15762

Item Number: 95

Addendum StartPage: 3

**PUC DOCKET NO. 15762**

| | | |
|---|---|---|
| CITY OF COLLEGE STATION FILING | § | PUBLIC UTILITY COMMISSION |
| IN COMPLIANCE WITH SUBST. R. | § | OF TEXAS |
| 23.67 | § | |
| | § | |

**ORDER**

Separate proceedings have been initiated by the utilities that own transmission facilities within the Electric Reliability Council of Texas (ERCOT) to develop information relating to the costs of each utility in providing transmission service. The information developed in these proceedings has been used by the Commission in fixing transmission rates in ERCOT. A companion proceeding, Docket No. 15840, *Regional Transmission Proceeding to Establish Postage Stamp Rate and Statewide Loadflow Pursuant to Subst. Rule 23.67*, has been established to develop information and resolve issues that affect a number of transmission-owning utilities and transmission customers and to fix the regional transmission rates required in P.U.C. SUBST. R. 23.67.

The instant case is the transmission cost-of-service case filed by the City of College Station (College Station). The issues in this docket were resolved pursuant to a stipulation of the parties, and the resolution was reflected in Order No. 15 adopted by the Commission on December 30, 1996. Accordingly, the Commission adopts by reference the findings and conclusions that are set out in the order. A copy of Order No. 15 is attached to this Order. The entry of this Order will finally resolve the issues in this proceeding, and, subject to motions for rehearing, the proceeding will be closed. All motions, applications, or requests for relief that are not addressed in the orders issued in this case are denied for want of merit.

College Station shall file, in a separate compliance docket, compliance tariffs for transmission service, based on (1) the cost of service adopted in Docket No. 15762, (2) the service issues resolved in Docket Nos. 15762 and 15840, and (3) the loads and megawatt-mile impacts shown in the matrices adopted by the Commission in Docket No. 15840. The compliance tariff, any objections to it, and responses to objections shall be filed in accordance with a schedule

95

**PUC DOCKET NO. 15762** **ORDER** **Page 2 of 2**

to be prescribed by the Commission. To facilitate the review of the compliance tariffs, the compliance tariffs shall be accompanied by red-lined versions of the tariff that show any changes that have been made to the interim tariffs approved by the Commission. A red-lined version of a tariff need not be filed if the tariff is identical to the interim tariff approved by the Commission.

SIGNED AT AUSTIN, TEXAS the _7th_ day of ~~June~~ July 1997.

PUBLIC UTILITY COMMISSION OF TEXAS

_____
PAT WOOD, III, CHAIRMAN

_____
ROBERT W. GEE , COMMISSIONER

_____
JUDY WALSH, COMMISSIONER



**DOCKET NO. 15762**

| | | |
|---|---|---|
| CITY OF COLLEGE STATION | § | PUBLIC UTILITY COMMISSION |
| FILING IN COMPLIANCE | § | |
| WITH SUBST. R. 23.67 | § | OF TEXAS |

## ORDER NO. 15
### APPROVING COSTS ON AN INTERIM BASIS

The Administrative Law Judge finds that the following costs for the City of College Station (College Station) are approved on an interim basis:

- College Station's reasonable and necessary transmission function revenue requirement and its total transmission cost of service is $495.211.

- The amount of $217.593 is required for return for the transmission function. This amount corresponds to a 6.71 percent rate of return for the transmission function facilities.

- College Station's original cost less depreciation of the used and useful invested capital for College Station's transmission function facilities is $3.244.667.

- College Station's depreciation for the transmission function is $175.023.

- College Station's reasonable operation and maintenance expense for the transmission function is $102.595.

- College Station's tax expense for the transmission function is $0.

SIGNED AT AUSTIN, TEXAS the 30th day of December, 1996.

PUBLIC UTILITY COMMISSION OF TEXAS

DEANN T. WALKER
ADMINISTRATIVE LAW JUDGE

# APPENDIX F



## Control Number: 34230



## Item Number: 12

## Addendum StartPage: 0

**DOCKET NO. 34230**

| | | |
|---|---|---|
| APPLICATION OF THE CITY OF | § | PUBLIC UTILITY COMMISSION |
| COLLEGE STATION FOR INTERIM | § | |
| UPDATE OF WHOLESALE | § | OF TEXAS |
| TRANSMISSION RATES PURSUANT TO | § | |
| P.U.C. SUBST. R. 25.192(g)(1) | § | |

**ORDER**

This Order addresses the application of the City of College Station (COCS) for Interim Update of Wholesale-Transmission Rates Pursuant to P.U.C. SUBST. R. 25.192(g)(1).

## I.  Background

COCS filed its application with the Public Utility Commission of Texas (Commission) on May 1, 2007, for an interim update of wholesale-transmission rates pursuant to, and consistent with, the requirements of P.U.C. SUBST. R. 25.192(g)(1). P.U.C. SUBST. R. 25.192(g) provides that "[e]ach TSP in the Electric Reliability Council of Texas (ERCOT) region may on an annual basis update its transmission rates to reflect changes in its invested capital," and further provides that the "Commission shall review whether the costs of transmission plant additions are reasonable and necessary at the next complete review of the TSP's transmission cost of service."

The Applicant and Commission Staff are the only parties to this proceeding. Commission Staff has reviewed the application and recommends approval. The application of COCS is approved.

The Commission adopts the following findings of fact and conclusions of law:

## II.  Findings of Fact

1.  On May 1, 2007, COCS filed its application for Interim Update of Wholesale-Transmission Rates Pursuant to P.U.C. SUBST. R. 25.192(g)(1).

DOCKET NO. 34230            ORDER            PAGE 2 OF 5

2.     COCS requested an interim revision to its previously approved TCOS and wholesale-transmission rate pursuant to, and consistent with, the requirements of P.U.C. SUBST. R. 25.192(g)(1).

3.     COCS's application compares the actual February 28, 2007, transmission-net-plant balances with the net-plant balances established in Docket No. 15762,[1] COCS's last interim TCOS filing. The $5,160,727 difference between these two balances provides the increase in rate base requested.

4.     In the application, COCS stated that the requested increase in invested capital in this filing results in a revenue requirement increase of $1,276,298 for a total revenue requirement of $1,771,509. COCS requested that the Commission approve an interim wholesale transmission rate of $0.02972 per 4CP kilowatt.

5.     Pursuant to P.U.C. SUBST. R. 22.55, on May 1, 2007, written notice was mailed via first class mail to every distribution service provider listed in the matrix established by the Commission in Docket No. 33550,[2] which established wholesale transmission charges for the calendar year 2007. On May 4, 2007, COCS filed an affidavit attesting to the provision of notice.

6.     On May 14, 2007, the notice and application were deemed sufficient and a procedural schedule was adopted.

---

[1] *City of College Station Filing in Compliance with P.U.C. SUBST. R. 23.67,* Docket No. 15762 (Jul. 8, 1997).

[2] *Commission Staff's Application to Set 2007 Wholesale Transmission Services Charges for the Electric Reliability Council of Texas (ERCOT),* Docket No. 33550 (Mar. 30, 2007).

7. On June 7, 2007, Staff filed its final recommendation on COCS's application. Staff recommended that it be approved as filed on May 1, 2007, with the updated transmission rate and underlying facility additions being subject to a comprehensive analysis and reconciliation at the next complete review of COCS's transmission cost of service.

## III. Conclusions of Law

1. COCS is an electric utility as defined in § 35.001 of the Public Utility Regulatory Act TEX. UTIL. CODE ANN. §§ 11.001-66.017 (Vernon 2007) (PURA).

2. The Commission has jurisdiction over this matter pursuant to § 35.004 of PURA.

3. P.U.C. SUBST. R. 25.192(g)(1) provides that a TSP in the ERCOT region may update its transmission rates to reflect changes in its invested capital on an annual basis.

4. Notice of the application was provided by COCS in compliance with P.U.C. PROC. R. 22.54 and 22.55.

5. COCS is entitled to the relief requested in its application pursuant to P.U.C. SUBST. R. 25.192(g)(1).

6. P.U.C. SUBST. R. 25.192(g)(2) provides that the Commission shall review whether the costs of transmission plant additions are reasonable and necessary at the next complete review of a TSP's TCOS.

7. COCS's application was filed pursuant to and complies with the requirements of P.U.C. SUBST. R 25.192(g)(1).

## IV. Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following order:

1. Pursuant to P.U.C. SUBST. R. 25.192(g)(1) COCS's revenue requirement is adjusted on an interim basis to $1,771,509 and its wholesale-transmission rate is adjusted on an interim basis to $0.02972 per 4CP kilowatt.

2. COCS's Rate Schedule Transmission Service-T1, modified consistent with this Order, is effective July 20, 2007.

3. COCS may begin billing the updated wholesale-transmission rate on and after such effective date for services rendered on or after the updated wholesale-transmission rate is approved. Such updated wholesale-transmission rate supersedes any other inconsistent rate.

4. The updated rate is subject to reconciliation at the next complete review of COCS's TCOS. The Commission shall review whether the cost of the transmission plant additions included in COCS's application are reasonable and necessary at the next complete review of COCS's TCOS. Any over-recovery of costs, as a result of update, is subject to refund.

5. Within 10 days of the date of this Order, COCS shall file a "clean" record copy of the new Wholesale-Transmission Rate Schedule (Rate WTS – Network Transmission Service), with the appropriate effective date, to be stamped "Approved" and retained by the Commission.

**DOCKET NO. 34230**                                **ORDER**                                **PAGE 5 OF 5**

6.      All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted herein, are hereby denied.

SIGNED AT AUSTIN, TEXAS the $20 \underline{th}$ day of July 2007.

**PUBLIC UTILITY COMMISSION OF TEXAS**

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
**PAUL HUDSON, CHAIRMAN**

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
**JULIE PARSLEY, COMMISSIONER**

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
**BARRY T. SMITHERMAN, COMMISSIONER**

q:\cadm\docket management\electric\transmission-tcos rate\34000\34230fo.doc

# APPENDIX G



Control Number: 35837



Item Number: 11

Addendum StartPage: 0

DOCKET NO. 35837

| | | |
|---|---|---|
| APPLICATION OF THE CITY OF | § | PUBLIC UTILITY COMMISSION |
| COLLEGE STATION FOR INTERIM | § | |
| UPDATE OF WHOLESALE | § | OF TEXAS |
| TRANSMISSION RATES PURSUANT | § | |
| TO P.U.C. SUBST. R. 25.192(g)(1) | § | |

ORDER

This Order addresses the application of the City of College Station (COCS or the Applicant) for Interim Update of Wholesale-Transmission Rates Pursuant to P.U.C. SUBST. R. 25.192(g)(1).

I. Background

COCS filed its application with the Public Utility Commission of Texas (Commission) on July 1, 2008, for an interim update of wholesale-transmission rates pursuant to, and consistent with, the requirements of P.U.C. SUBST. R. 25.192(g)(1). P.U.C. SUBST. R. 25.192(g) provides that "[e]ach transmission service provider (TSP) in the Electric Reliability Council of Texas (ERCOT) region may on an annual basis update its transmission rates to reflect changes in its invested capital," and further provides that the "Commission shall review whether the costs of transmission plant additions are reasonable and necessary at the next complete review of the TSP's transmission cost of service."

The Applicant and Commission Staff are the only parties to this proceeding. Commission Staff has reviewed the application and recommends approval. The application is approved.

The Commission adopts the following findings of fact and conclusions of law:

II. Findings of Fact

1. On July 1, 2008, COCS filed its application for Interim Update of Wholesale-Transmission Rates Pursuant to P.U.C. SUBST. R. 25.192(g)(1).

DOCKET NO. 35837            ORDER            PAGE 2 OF 5

2.     COCS requests an interim revision to its previously approved transmission cost of service (TCOS) and wholesale-transmission rate pursuant to, and consistent with, the requirements of P.U.C. SUBST. R. 25.192(g)(1).

3.     COCS' application compares the actual May 31, 2008, transmission-net-plant balances with the net-plant balances established in *City of College Station Filing in Compliance with SUBST. R. 23.67,* Docket No. 15762, as adjusted for interim additions in *Application of the City of College Station for Interim Update of Wholesale Transmission Rates Pursuant to P.U.C. SUBST. R. 25.192(g)(1),* Docket No. 34230 (Jul. 23, 2007). The $3,753,898 difference between these two balances provides the increase in rate base for this application.

4.     The additions to transmission plant included in this update cover costs for the following projects: the Switch Station to Brazos Tie Line; Spring Creek Substation; SCADA System Transmission; Post Oak to Switch Station Sub Transmission Line Rebuild; and the South Sub to Post Oak Sub Transmission Line Rebuild.[1]

5.     COCS stated that the requested increase in invested capital in this filing results in a revenue requirement increase of $750,696 for a total revenue requirement of $2,522,205. COCS requests that the Commission approve an interim wholesale transmission rate of $0.0437503 per 4CP kilowatt.

6.     On July 11, 2008, Commission Staff filed its response to Order No. 1, finding COCS' notice sufficient. Commission Staff could not recommend a procedural schedule until COCS provided proof of notice.

7.     On July 11, 2008, COCS filed its affidavit attesting to the provision of notice.

8.     On July 15, 2008, the Commission issued Order No. 2 deeming the application sufficient, and requiring a procedural schedule.

---

[1] Direct Testimony of Timothy Crabb at 4-5.

9. On July 21, 2008, Commission Staff filed comments regarding notice, deeming it to be reasonable, and a response to Order No. 2, proposing a procedural schedule.

10. On July 24, 2008, Order No. 3 deemed notice sufficient and adopted a procedural schedule.

11. On August 12, 2008, Commission Staff filed its final recommendation on COCS' application, recommending that it be approved as filed on July 1, 2008, with the updated transmission rate and underlying facility additions being subject to a comprehensive analysis and reconciliation at the next complete review of COCS' transmission cost of service.

### III. Conclusions of Law

1. COCS is an electric utility as defined in § 35.001 of the Public Utility Regulatory Act, TEX. UTIL. CODE ANN. §§ 11.001-66.016 (Vernon 2007 & Supp. 2008) (PURA).

2. The Commission has jurisdiction over this matter pursuant to § 35.004 of PURA.

3. P.U.C. SUBST. R. 25.192(g)(1) provides that a TSP in the ERCOT region may update its transmission rates to reflect changes in its invested capital on an annual basis.

4. Notice of the application was provided by COCS in compliance with P.U.C. PROC. R. 22.54 and 22.55.

5. COCS is entitled to the relief requested in its application pursuant to P.U.C. SUBST. R. 25.192(g)(1).

6. P.U.C. SUBST. R. 25.192(g)(2) provides that the Commission shall review whether the costs of transmission plant additions are reasonable and necessary at the next complete review of a TSP's TCOS.

7. COCS' application was filed pursuant to and complies with the requirements of P.U.C. SUBST. R 25.192(g)(1).

8. The requirements for informal disposition under P.U.C. PROC. R. 22.35 have been met in this proceeding.

## IV. Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following order:

1. Pursuant to P.U.C. SUBST. R. 25.192(g)(1), COCS' annual revenue requirement is adjusted on an interim basis by $750,696 and COCS' wholesale transmission rate is adjusted on an interim basis to $0.0437503 per 4CP kilowatt, effective September 11, 2008.

2. COCS' Rate Schedule Transmission Service-T1, modified consistent with this Order, is approved.

3. COCS may begin billing the updated wholesale-transmission rate on services rendered on or after the date the updated rate is approved. The updated rate supersedes any inconsistent rate.

4. The updated rate is subject to reconciliation at the next complete review of COCS' TCOS. The Commission shall review whether the cost of the transmission plant additions included in COCS' application is reasonable and necessary at the next complete review of COCS' TCOS. Any over-recovery of costs as a result of update is subject to refund.

5. Within 10 days of the date of this Order, COCS shall file a "clean" record copy of the new Rate Schedule Transmission Service – T1, with the appropriate effective date, to be stamped "Approved" and retained by the Commission.

6. All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted herein, are hereby denied.

DOCKET NO. 35837                    ORDER                    PAGE 5 OF 5

SIGNED AT AUSTIN, TEXAS the __12th__ day of September 2008.

PUBLIC UTILITY COMMISSION OF TEXAS

_____
BARRY T. SMITHERMAN, CHAIRMAN

_____
DONNA L. NELSON, COMMISSIONER

_____
KENNETH W. ANDERSON, JR., COMMISSIONER

Q:/share/orders/final/35000/35837fo

# APPENDIX H

*Tex. Gov't Code § 1502.059*

\*\*\* This document is current through the 2025 Regular Session of the 89th Legislature bills: sb14, sb2, sb503, sb365, sb569, sb262, sb1058, sb1409, sb1147, sb135, sb1145, 1038, sb1697, sb513, sb1499, sb1809, sb836, sb711, sb29, sb1426, sb897, sb384, sb1706, sb1930, sb1066, sb2065, sb1194, sb304, sb1215, sb599, sb1185, sb1468, sb1738, sb2314, sb1035, sb1062, sb1369, sb1268, sb1341, sb1151, sb1403, sb2066, sb1044, sb1806, sb1619, sb914, sb2034, sb522, sb1106, sb1366, sb1378, sb1415, sb1437, sb1532, sb1963, sb1577,sb2032, sb1197, sb1057, sb1583, sb870, sb879, sb2077, sb65, sb2964, sb765, sb610, sb2204, sb2629, sb412, sb922, sb767, sb372, sb1746, sb2196, sb305, sb783, sb326, sb530, sb769, hb912, sb1967, sb2312, sb463, sb1238, sb1169, sb856, sb855, sb906, sb2231, sb1364, sb929, sb1744, sb1877, sb1998, sb1932, hb1089, hb1244, hb166, hb1672, hb1706, hb2000, hb2018, hb22, hb1399, hb3248, hb3135, hb331, hb2763, hb3093, sb1172, sb1555, sb1464, sb1025, sb1490, sb1418, sb1729, sb1257, sb1557, sb1568, sb771, sb842, sb1841, sb499, sb888, sb616, sb2351, sb2419, sb266, sb2371, sb314, sb2929, sb1786, sb1271, sb1759, sb250, sb2306, hb517, sb1886, sb2004, hb554, sb1023, hb2051, hb3204, hb1109, sb1080, hb334, hb1327, hb2703, hb2884, hb2890, hb21, sb480, sb1921, hb1130, hb2027, hb1950, hb1041, hb1188, hb11, hb5061, hb303, hb431, hb2029, hb48, hb29, hb2663, sb1214, sb1020, sb529, sb207, sb1332, sb1901, sb1537, sb1646, sb2662, hb2692, sb1745, sb2349, sb985, sb2550, sb2774, sb688, sb2776, sb72, sb1267, sb2361, hb116, hb2809, hb1689, hb1238, hb1899, hb1151, sb2420, sb1316, sb703, sb241, sb455, sb2269, sb1245, sb1620, hb126, hb136, sb617, sb2122, sb1143, sb1273, sb1355, sb1422, hb630, sb1351, hb3229, hb142, hb3594, hb1465, hb5238, hb3809, sb901, sb746, hb3700,hb1729, hb3560, hb3611, hb2003, sb1173, hb1261, hb2742, hb3698, hb3307, hb1022, hb4739, sb2141, sb1227, sb1177, sb651, sb920, sb1321, sb1496, sb2112, sb687, hb1620, sb984, hb2768, hb2415, hb767, sb1349, sb1569, sb2284, hb2596, hb210, sb1018, sb992, hb198, sb434, sb1931, sb1895, sb1079, hb1778, sb3037, sb664, sb2124, sb958, sb745, sb927, sb1247, sb2938, sb402, sb1239, sb1759, sb761, sb1248, sb1662, sb2268, sb2303, sb9, hb640, hb1894, hb1105, hb1318, hb1024, hb102, hb5667, hb1106, hb109, hb108, hb1193, hb132, hb1562, hb1584, hb1592, hb1506, hb1445, hb1686, hb1443, hb1606, hb1458, hb148, hb1275, sb40, hb128, hb2513, hb1393, sb1184, hb685, hb3161, hb1403, hb3114, hb1828, hb1851, hb1612, hb1866, hb1734, hb1700, hb1871, hb1723, hb1661, hb2073, hb2025, hb1991, hb2014, hb2026, hb2061, hb1902, hb12, hb1481, hb1633, hb2253, hb2310, hb2254, hb2358, hb247, hb1893, hb2078, hb201, hb1922, hb2001, hb2971, hb1916, hb2306, hb2293, hb2273, hb2282, hb2213, hb2286, hb229, hb2560, hb2529, hb2440, hb2492, hb2564, hb2313, hb2348, hb2355, hb2468, hb2522, hb2434, hb2559, hb2508, hb2495, hb2563, hb4666, hb140, hb1422, hb2350, hb2510, hb2402, hb2467, hb2340, hb150, hb791, hb4076, hb3748, hb2970, sb1008, hb5699, hb3153, hb3159, hb3088, sb1388, hb3211, hb2530, hb2765, sb1493, sb670, hb3505,

hb2856, sb1371, hb4809, sb1762, hb4945, hb4643, hb5247, hb4506, hb4687, sb1733, hb3575, hb3803, hb2524. \*\*\*

*Texas Statutes & Codes Annotated by LexisNexis®* > *Government Code* > *Title 9 Public Securities (Subts. A — J)* > *Subtitle J Specific Authority for Municipalities to Issue Securities (Chs. 1501 — 1510)* > *Chapter 1502 Public Securities for Municipal Utilities, Parks, or Pools (Subchs. A — K)* > *Subchapter B Public Securities for Utility Systems, Parks, or Pools (§§ 1502.051 — 1502.077)*

## Sec. 1502.059. Transfer of Revenue to General Fund.

Notwithstanding Section 1502.058(a) or a similar law or municipal charter provision, a municipality and its officers and utility trustees may transfer to the municipality's general fund and may use for general or special purposes revenue of any municipally owned utility system in the amount and to the extent authorized in the indenture, deed of trust, or ordinance providing for and securing payment of public securities issued under this chapter or similar law.

## History

Enacted by *Acts 1999, 76th Leg., ch. 227 (H.B. 3157), § 1*, effective September 1, 1999; am. *Acts 1999, 76th Leg., ch. 1064 (H.B. 3224), § 22*, effective September 1, 1999 (renumbered from Sec. 1502.061).

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

# APPENDIX I

*Tex. Gov't Code § 2001.058*

*** This document is current through the 2025 Regular Session of the 89th Legislature bills: sb14, sb2, sb503, sb365, sb569, sb262, sb1058, sb1409, sb1147, sb135, sb1145, 1038, sb1697, sb513, sb1499, sb1809, sb836, sb711, sb29, sb1426, sb897, sb384, sb1706, sb1930, sb1066, sb2065, sb1194, sb304, sb1215, sb599, sb1185, sb1468, sb1738, sb2314, sb1035, sb1062, sb1369, sb1268, sb1341, sb1151, sb1403, sb2066, sb1044, sb1806, sb1619, sb914, sb2034, sb522, sb1106, sb1366, sb1378, sb1415, sb1437, sb1532, sb1963, sb1577,sb2032, sb1197, sb1057, sb1583, sb870, sb879, sb2077, sb65, sb2964, sb765, sb610, sb2204, sb2629, sb412, sb922, sb767, sb372, sb1746, sb2196, sb305, sb783, sb326, sb530, sb769, hb912, sb1967, sb2312, sb463, sb1238, sb1169, sb856, sb855, sb906, sb2231, sb1364, sb929, sb1744, sb1877, sb1998, sb1932, hb1089, hb1244, hb166, hb1672, hb1706, hb2000, hb2018, hb22, hb1399, hb3248, hb3135, hb331, hb2763, hb3093, sb1172, sb1555, sb1464, sb1025, sb1490, sb1418, sb1729, sb1257, sb1557, sb1568, sb771, sb842, sb1841, sb499, sb888, sb616, sb2351, sb2419, sb266, sb2371, sb314, sb2929, sb1786, sb1271, sb1759, sb250, sb2306, hb517, sb1886, sb2004, hb554, sb1023, hb2051, hb3204, hb1109, sb1080, hb334, hb1327, hb2703, hb2884, hb2890, hb21, sb480, sb1921, hb1130, hb2027, hb1950, hb1041, hb1188, hb11, hb5061, hb303, hb431, hb2029, hb48, hb29, hb2663, sb1214, sb1020, sb529, sb207, sb1332, sb1901, sb1537, sb1646, sb2662, hb2692, sb1745, sb2349, sb985, sb2550, sb2774, sb688, sb2776, sb72, sb1267, sb2361, hb116, hb2809, hb1689, hb1238, hb1899, hb1151, sb2420, sb1316, sb703, sb241, sb455, sb2269, sb1245, sb1620, hb126, hb136, sb617, sb2122, sb1143, sb1273, sb1355, sb1422, hb630, sb1351, hb3229, hb142, hb3594, hb1465, hb5238, hb3809, sb901, sb746, hb3700,hb1729, hb3560, hb3611, hb2003, sb1173, hb1261, hb2742, hb3698, hb3307, hb1022, hb4739, sb2141, sb1227, sb1177, sb651, sb920, sb1321, sb1496, sb2112, sb687, hb1620, sb984, hb2768, hb2415, hb767, sb1349, sb1569, sb2284, hb2596, hb210, sb1018, sb992, hb198, sb434, sb1931, sb1895, sb1079, hb1778, sb3037, sb664, sb2124, sb958, sb745, sb927, sb1247, sb2938, sb402, sb1239, sb1759, sb761, sb1248, sb1662, sb2268, sb2303, sb9, hb640, hb1894, hb1105, hb1318, hb1024, hb102, hb5667, hb1106, hb109, hb108, hb1193, hb132, hb1562, hb1584, hb1592, hb1506, hb1445, hb1686, hb1443, hb1606, hb1458, hb148, hb1275, sb40, hb128, hb2513, hb1393, sb1184, hb685, hb3161, hb1403, hb3114, hb1828, hb1851, hb1612, hb1866, hb1734, hb1700, hb1871, hb1723, hb1661, hb2073, hb2025, hb1991, hb2014, hb2026, hb2061, hb1902, hb12, hb1481, hb1633, hb2253, hb2310, hb2254, hb2358, hb247, hb1893, hb2078, hb201, hb1922, hb2001, hb2971, hb1916, hb2306, hb2293, hb2273, hb2282, hb2213, hb2286, hb229, hb2560, hb2529, hb2440, hb2492, hb2564, hb2313, hb2348, hb2355, hb2468, hb2522, hb2434, hb2559, hb2508, hb2495, hb2563, hb4666, hb140, hb1422, hb2350, hb2510, hb2402, hb2467, hb2340, hb150, hb791, hb4076, hb3748, hb2970, sb1008, hb5699, hb3153, hb3159, hb3088, sb1388, hb3211, hb2530, hb2765, sb1493, sb670, hb3505,

hb2856, sb1371, hb4809, sb1762, hb4945, hb4643, hb5247, hb4506, hb4687, sb1733, hb3575, hb3803, hb2524. \*\*\*

*Texas Statutes & Codes Annotated by LexisNexis®* > *Government Code* > *Title 10 General Government (Subts. A — Z)* > *Subtitle A Administrative Procedure and Practice (Chs. 2001 — 2050)* > *Chapter 2001 Administrative Procedure (Subchs. A — Z)* > *Subchapter C Contested Cases: General Rights and Procedures (§§ 2001.051 — 2001.062)*

## Sec. 2001.058. Hearing Conducted by State Office of Administrative Hearings.

**(a)** This section applies only to an administrative law judge employed by the State Office of Administrative Hearings.

**(b)** An administrative law judge who conducts a contested case hearing shall consider applicable agency rules or policies in conducting the hearing, but the state agency deciding the case may not supervise the administrative law judge.

**(c)** A state agency shall provide the administrative law judge with a written statement of applicable rules or policies.

**(d)** A state agency may not attempt to influence the finding of facts or the administrative law judge's application of the law in a contested case except by proper evidence and legal argument.

**(d-1)** On making a finding that a party to a contested case has defaulted under the rules of the State Office of Administrative Hearings, the administrative law judge may dismiss the case from the docket of the State Office of Administrative Hearings and remand it to the referring agency for informal disposition under Section 2001.056. After the case is dismissed and remanded, the agency may informally dispose of the case by applying its own rules or the procedural rules of the State Office of Administrative Hearings relating to default proceedings. This subsection does not apply to a contested case in which the administrative law judge is authorized to render a final decision.

**(e)** A state agency may change a finding of fact or conclusion of law made by the administrative law judge, or may vacate or modify an order issued by the administrative judge, only if the agency determines:

**(1)** that the administrative law judge did not properly apply or interpret applicable law, agency rules, written policies provided under Subsection (c), or prior administrative decisions;

**(2)** that a prior administrative decision on which the administrative law judge relied is incorrect or should be changed; or

**(3)** that a technical error in a finding of fact should be changed.

The agency shall state in writing the specific reason and legal basis for a change made under this subsection.

**(e-1)**Notwithstanding Subsection (e), a state agency may not vacate or modify an order of an administrative law judge that awards attorney's fees and costs under Section 2001.903.

**(f)** A state agency by rule may provide that, in a contested case before the agency that concerns licensing in relation to an occupational license and that is not disposed of by stipulation, agreed settlement, or consent order, the administrative law judge shall render the final decision in the contested case. If a state agency adopts such a rule, the following provisions apply to contested cases covered by the rule:

**(1)** the administrative law judge shall render the decision that may become final under Section 2001.144 not later than the 60th day after the latter of the date on which the hearing is finally closed or the date by which the judge has ordered all briefs, reply briefs, and other posthearing documents to be filed, and the 60-day period may be extended only with the consent of all parties, including the occupational licensing agency;

**(2)** the administrative law judge shall include in the findings of fact and conclusions of law a determination whether the license at issue is primarily a license to engage in an occupation;

**(3)** the State Office of Administrative Hearings is the state agency with which a motion for rehearing or a reply to a motion for rehearing is filed under Section 2001.146 and is the state agency that acts on the motion or extends a time period under Section 2001.146;

**(4)** the State Office of Administrative Hearings is the state agency responsible for sending a copy of the decision that may become final under Section 2001.144 or an order ruling on a motion for rehearing to the parties, including the occupational licensing agency, in accordance with Section 2001.142; and

**(5)** the occupational licensing agency and any other party to the contested case is entitled to obtain judicial review of the final decision in accordance with this chapter.

## History

Enacted by *Acts 1993, 73rd Leg., ch. 268 (S.B. 248), § 1*, effective September 1, 1993; am. *Acts 1997, 75th Leg., ch. 1167 (S.B. 332), § 1*, effective September 1, 1997; *Acts 2015,*

*84th Leg., ch. 228 (H.B. 2154), § 1*, effective September 1, 2015; *Acts 2019, 86th Leg., ch. 504 (S.B. 27), § 5*, effective September 1, 2019.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

# APPENDIX J

## *Tex. Gov't Code § 2001.174*

\*\*\* This document is current through the 2025 Regular Session of the 89th Legislature
bills: sb14, sb2, sb503, sb365, sb569, sb262, sb1058, sb1409, sb1147, sb135, sb1145,
1038, sb1697, sb513, sb1499, sb1809, sb836, sb711, sb29, sb1426, sb897, sb384, sb1706,
sb1930, sb1066, sb2065, sb1194, sb304, sb1215, sb599, sb1185, sb1468, sb1738, sb2314,
sb1035, sb1062, sb1369, sb1268, sb1341, sb1151, sb1403, sb2066, sb1044, sb1806,
sb1619, sb914, sb2034, sb522, sb1106, sb1366, sb1378, sb1415, sb1437, sb1532, sb1963,
sb1577,sb2032, sb1197, sb1057, sb1583, sb870, sb879, sb2077, sb65, sb2964, sb765,
sb610, sb2204, sb2629, sb412, sb922, sb767, sb372, sb1746, sb2196, sb305, sb783, sb326,
sb530, sb769, hb912, sb1967, sb2312, sb463, sb1238, sb1169, sb856, sb855, sb906,
sb2231, sb1364, sb929, sb1744, sb1877, sb1998, sb1932, hb1089, hb1244, hb166, hb1672,
hb1706, hb2000, hb2018, hb22, hb1399, hb3248, hb3135, hb331, hb2763, hb3093,
sb1172, sb1555, sb1464, sb1025, sb1490, sb1418, sb1729, sb1257, sb1557, sb1568, sb771,
sb842, sb1841, sb499, sb888, sb616, sb2351, sb2419, sb266, sb2371, sb314, sb2929,
sb1786, sb1271, sb1759, sb250, sb2306, hb517, sb1886, sb2004, hb554, sb1023, hb2051,
hb3204, hb1109, sb1080, hb334, hb1327, hb2703, hb2884, hb2890, hb21, sb480, sb1921,
hb1130, hb2027, hb1950, hb1041, hb1188, hb11, hb5061, hb303, hb431, hb2029, hb48,
hb29, hb2663, sb1214, sb1020, sb529, sb207, sb1332, sb1901, sb1537, sb1646, sb2662,
hb2692, sb1745, sb2349, sb985, sb2550, sb2774, sb688, sb2776, sb72, sb1267, sb2361,
hb116, hb2809, hb1689, hb1238, hb1899, hb1151, sb2420, sb1316, sb703, sb241, sb455,
sb2269, sb1245, sb1620, hb126, hb136, sb617, sb2122, sb1143, sb1273, sb1355, sb1422,
hb630, sb1351, hb3229, hb142, hb3594, hb1465, hb5238, hb3809, sb901, sb746,
hb3700,hb1729, hb3560, hb3611, hb2003, sb1173, hb1261, hb2742, hb3698, hb3307,
hb1022, hb4739, sb2141, sb1227, sb1177, sb651, sb920, sb1321, sb1496, sb2112, sb687,
hb1620, sb984, hb2768, hb2415, hb767, sb1349, sb1569, sb2284, hb2596, hb210, sb1018,
sb992, hb198, sb434, sb1931, sb1895, sb1079, hb1778, sb3037, sb664, sb2124, sb958,
sb745, sb927, sb1247, sb2938, sb402, sb1239, sb1759, sb761, sb1248, sb1662, sb2268,
sb2303, sb9, hb640, hb1894, hb1105, hb1318, hb1024, hb102, hb5667, hb1106, hb109,
hb108, hb1193, hb132, hb1562, hb1584, hb1592, hb1506, hb1445, hb1686, hb1443,
hb1606, hb1458, hb148, hb1275, sb40, hb128, hb2513, hb1393, sb1184, hb685, hb3161,
hb1403, hb3114, hb1828, hb1851, hb1612, hb1866, hb1734, hb1700, hb1871, hb1723,
hb1661, hb2073, hb2025, hb1991, hb2014, hb2026, hb2061, hb1902, hb12, hb1481,
hb1633, hb2253, hb2310, hb2254, hb2358, hb247, hb1893, hb2078, hb201, hb1922,
hb2001, hb2971, hb1916, hb2306, hb2293, hb2273, hb2282, hb2213, hb2286, hb229,
hb2560, hb2529, hb2440, hb2492, hb2564, hb2313, hb2348, hb2355, hb2468, hb2522,
hb2434, hb2559, hb2508, hb2495, hb2563, hb4666, hb140, hb1422, hb2350, hb2510,
hb2402, hb2467, hb2340, hb150, hb791, hb4076, hb3748, hb2970, sb1008, hb5699,
hb3153, hb3159, hb3088, sb1388, hb3211, hb2530, hb2765, sb1493, sb670, hb3505,

hb2856, sb1371, hb4809, sb1762, hb4945, hb4643, hb5247, hb4506, hb4687, sb1733, hb3575, hb3803, hb2524. ***

*Texas Statutes & Codes Annotated by LexisNexis®* > *Government Code* > *Title 10 General Government (Subts. A — Z)* > *Subtitle A Administrative Procedure and Practice (Chs. 2001 — 2050)* > *Chapter 2001 Administrative Procedure (Subchs. A — Z)* > *Subchapter G Contested Cases: Judicial Review (§§ 2001.171 — 2001.178)*

## Sec. 2001.174. Review Under Substantial Evidence Rule or Undefined Scope of Review.

If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

**(1)** may affirm the agency decision in whole or in part; and

**(2)** shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

**(A)** in violation of a constitutional or statutory provision;

**(B)** in excess of the agency's statutory authority;

**(C)** made through unlawful procedure;

**(D)** affected by other error of law;

**(E)** not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

**(F)** arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

## History

Enacted by *Acts 1993, 73rd Leg., ch. 268 (S.B. 248), § 1*, effective September 1, 1993.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

# APPENDIX K

*Tex. Utilities Code § 35.004*

\*\*\* This document is current through the 2025 Regular Session of the 89th Legislature bills: sb14, sb2, sb503, sb365, sb569, sb262, sb1058, sb1409, sb1147, sb135, sb1145, 1038, sb1697, sb513, sb1499, sb1809, sb836, sb711, sb29, sb1426, sb897, sb384, sb1706, sb1930, sb1066, sb2065, sb1194, sb304, sb1215, sb599, sb1185, sb1468, sb1738, sb2314, sb1035, sb1062, sb1369, sb1268, sb1341, sb1151, sb1403, sb2066, sb1044, sb1806, sb1619, sb914, sb2034, sb522, sb1106, sb1366, sb1378, sb1415, sb1437, sb1532, sb1963, sb1577,sb2032, sb1197, sb1057, sb1583, sb870, sb879, sb2077, sb65, sb2964, sb765, sb610, sb2204, sb2629, sb412, sb922, sb767, sb372, sb1746, sb2196, sb305, sb783, sb326, sb530, sb769, hb912, sb1967, sb2312, sb463, sb1238, sb1169, sb856, sb855, sb906, sb2231, sb1364, sb929, sb1744, sb1877, sb1998, sb1932, hb1089, hb1244, hb166, hb1672, hb1706, hb2000, hb2018, hb22, hb1399, hb3248, hb3135, hb331, hb2763, hb3093, sb1172, sb1555, sb1464, sb1025, sb1490, sb1418, sb1729, sb1257, sb1557, sb1568, sb771, sb842, sb1841, sb499, sb888, sb616, sb2351, sb2419, sb266, sb2371, sb314, sb2929, sb1786, sb1271, sb1759, sb250, sb2306, hb517, sb1886, sb2004, hb554, sb1023, hb2051, hb3204, hb1109, sb1080, hb334, hb1327, hb2703, hb2884, hb2890, hb21, sb480, sb1921, hb1130, hb2027, hb1950, hb1041, hb1188, hb11, hb5061, hb303, hb431, hb2029, hb48, hb29, hb2663, sb1214, sb1020, sb529, sb207, sb1332, sb1901, sb1537, sb1646, sb2662, hb2692, sb1745, sb2349, sb985, sb2550, sb2774, sb688, sb2776, sb72, sb1267, sb2361, hb116, hb2809, hb1689, hb1238, hb1899, hb1151, sb2420, sb1316, sb703, sb241, sb455, sb2269, sb1245, sb1620, hb126, hb136, sb617, sb2122, sb1143, sb1273, sb1355, sb1422, hb630, sb1351, hb3229, hb142, hb3594, hb1465, hb5238, hb3809, sb901, sb746, hb3700,hb1729, hb3560, hb3611, hb2003, sb1173, hb1261, hb2742, hb3698, hb3307, hb1022, hb4739, sb2141, sb1227, sb1177, sb651, sb920, sb1321, sb1496, sb2112, sb687, hb1620, sb984, hb2768, hb2415, hb767, sb1349, sb1569, sb2284, hb2596, hb210, sb1018, sb992, hb198, sb434, sb1931, sb1895, sb1079, hb1778, sb3037, sb664, sb2124, sb958, sb745, sb927, sb1247, sb2938, sb402, sb1239, sb1759, sb761, sb1248, sb1662, sb2268, sb2303, sb9, hb640, hb1894, hb1105, hb1318, hb1024, hb102, hb5667, hb1106, hb109, hb108, hb1193, hb132, hb1562, hb1584, hb1592, hb1506, hb1445, hb1686, hb1443, hb1606, hb1458, hb148, hb1275, sb40, hb128, hb2513, hb1393, sb1184, hb685, hb3161, hb1403, hb3114, hb1828, hb1851, hb1612, hb1866, hb1734, hb1700, hb1871, hb1723, hb1661, hb2073, hb2025, hb1991, hb2014, hb2026, hb2061, hb1902, hb12, hb1481, hb1633, hb2253, hb2310, hb2254, hb2358, hb247, hb1893, hb2078, hb201, hb1922, hb2001, hb2971, hb1916, hb2306, hb2293, hb2273, hb2282, hb2213, hb2286, hb229, hb2560, hb2529, hb2440, hb2492, hb2564, hb2313, hb2348, hb2355, hb2468, hb2522, hb2434, hb2559, hb2508, hb2495, hb2563, hb4666, hb140, hb1422, hb2350, hb2510, hb2402, hb2467, hb2340, hb150, hb791, hb4076, hb3748, hb2970, sb1008, hb5699, hb3153, hb3159, hb3088, sb1388, hb3211, hb2530, hb2765, sb1493, sb670, hb3505,

hb2856, sb1371, hb4809, sb1762, hb4945, hb4643, hb5247, hb4506, hb4687, sb1733, hb3575, hb3803, hb2524. \*\*\*

*Texas Statutes & Codes Annotated by LexisNexis®* > *Utilities Code* > *Title 2 Public Utility Regulatory Act (Subts. A — C)* > *Subtitle B Electric Utilities [Expires September 1, 2023] (Chs. 31 — 50)* > *Chapter 35 Energy Providers (Subchs. A — E)* > *Subchapter A Competition and Transmission Access In the Wholesale Market (§§ 35.001 — 35.010)*

## Notice

This section has more than one version with varying effective dates.

## Sec. 35.004. Provision of Transmission Service.

**(a)** An electric utility or transmission and distribution utility that owns or operates transmission facilities shall provide wholesale transmission service at rates and terms, including terms of access, that are comparable to the rates and terms of the utility's own use of its system.

**(b)** The commission shall ensure that an electric utility or transmission and distribution utility provides nondiscriminatory access to wholesale transmission service for qualifying facilities, exempt wholesale generators, power marketers, power generation companies, retail electric providers, and other electric utilities or transmission and distribution utilities.

**(c)** When an electric utility, electric cooperative, or transmission and distribution utility provides wholesale transmission service within ERCOT at the request of a third party, the commission shall ensure that the utility recovers the utility's reasonable costs in providing wholesale transmission services necessary for the transaction from the entity for which the transmission is provided so that the utility's other customers do not bear the costs of the service.

**(d)** The commission shall price wholesale transmission services within ERCOT based on the postage stamp method of pricing under which a transmission-owning utility's rate is based on the ERCOT utilities' combined annual costs of transmission, other than costs described by Subsections (d-2) and (d-3), divided by the total demand placed on the combined transmission systems of all such transmission-owning utilities within a power region. An electric utility subject to the freeze period imposed by Section 39.052 may treat transmission costs in excess of transmission revenues during the freeze period as an expense for purposes of

determining annual costs in the annual report filed under Section 39.257. Notwithstanding Section 36.201, the commission may approve wholesale rates that may be periodically adjusted to ensure timely recovery of transmission investment. Notwithstanding Section 36.054(a), if the commission determines that conditions warrant the action, the commission may authorize the inclusion of construction work in progress in the rate base for transmission investment required by the commission under Section 39.203(e).

**(d-1)**The commission by rule shall establish a reasonable allowance for transmission-owning utility costs incurred to interconnect generation resources directly with the ERCOT transmission system at transmission voltage. The allowance must take into account:

    **(1)**  the potential to reduce the costs to consumers of generation interconnection;

    **(2)**  historical generation interconnection costs; and

    **(3)**  any other factor that the commission considers reasonable to accomplish the goal of this subsection.

**(d-2)**Costs in excess of the transmission-owning utility allowance provided by Subsection (d-1) incurred to interconnect generation resources with the ERCOT transmission system must be directly assigned to and collected from the generation resource interconnecting through the facilities.

**(d-3)**Not later than September 1 of every fifth year, the commission shall review and may adjust the allowance provided by Subsection (d-1) to account for inflation or supply chain issues.

**(e)**  In this section, "ancillary services" means services necessary to facilitate the transmission of electric energy including load following, standby power, backup power, reactive power, and any other services as the commission may determine by rule.

**(f)**  The commission shall ensure that ancillary services necessary to facilitate the transmission of electric energy are available at reasonable prices with terms and conditions that are not unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive. On the introduction of customer choice in the ERCOT power region, acquisition of generation-related ancillary services on a nondiscriminatory basis by the independent organization in ERCOT on behalf of entities selling electricity at retail shall be deemed to meet the requirements of this subsection.

**(g)**  The commission shall:

**(1)**  review the type, volume, and cost of ancillary services to determine whether those services will continue to meet the needs of the electricity market in the ERCOT power region; and

**(2)**  evaluate whether additional services are needed for reliability in the ERCOT power region while providing adequate incentives for dispatchable generation.

**(h)**  The commission shall require the independent organization certified under Section 39.151 for the ERCOT power region to modify the design, procurement, and cost allocation of ancillary services for the region in a manner consistent with cost-causation principles and on a nondiscriminatory basis.

## History

Enacted by *Acts 1997, 75th Leg., ch. 166 (S.B. 1751), § 1*, effective September 1, 1997; am. *Acts 1999, 76th Leg., ch. 405 (S.B. 7), § 17*, effective September 1, 1999; am. *Acts 2003, 78th Leg., ch. 295 (H.B. 2548), § 1*, effective June 18, 2003; *Acts 2021, 87th Leg., ch. 426 (S.B. 3), § 14*, effective June 8, 2021; *Acts 2023, 88th Leg., ch. 410 (H.B. 1500), § 9*, effective September 1, 2023.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

# APPENDIX L

*Tex. Utilities Code § 40.004*

*** This document is current through the 2025 Regular Session of the 89th Legislature bills: sb14, sb2, sb503, sb365, sb569, sb262, sb1058, sb1409, sb1147, sb135, sb1145, 1038, sb1697, sb513, sb1499, sb1809, sb836, sb711, sb29, sb1426, sb897, sb384, sb1706, sb1930, sb1066, sb2065, sb1194, sb304, sb1215, sb599, sb1185, sb1468, sb1738, sb2314, sb1035, sb1062, sb1369, sb1268, sb1341, sb1151, sb1403, sb2066, sb1044, sb1806, sb1619, sb914, sb2034, sb522, sb1106, sb1366, sb1378, sb1415, sb1437, sb1532, sb1963, sb1577,sb2032, sb1197, sb1057, sb1583, sb870, sb879, sb2077, sb65, sb2964, sb765, sb610, sb2204, sb2629, sb412, sb922, sb767, sb372, sb1746, sb2196, sb305, sb783, sb326, sb530, sb769, hb912, sb1967, sb2312, sb463, sb1238, sb1169, sb856, sb855, sb906, sb2231, sb1364, sb929, sb1744, sb1877, sb1998, sb1932, hb1089, hb1244, hb166, hb1672, hb1706, hb2000, hb2018, hb22, hb1399, hb3248, hb3135, hb331, hb2763, hb3093, sb1172, sb1555, sb1464, sb1025, sb1490, sb1418, sb1729, sb1257, sb1557, sb1568, sb771, sb842, sb1841, sb499, sb888, sb616, sb2351, sb2419, sb266, sb2371, sb314, sb2929, sb1786, sb1271, sb1759, sb250, sb2306, hb517, sb1886, sb2004, hb554, sb1023, hb2051, hb3204, hb1109, sb1080, hb334, hb1327, hb2703, hb2884, hb2890, hb21, sb480, sb1921, hb1130, hb2027, hb1950, hb1041, hb1188, hb11, hb5061, hb303, hb431, hb2029, hb48, hb29, hb2663, sb1214, sb1020, sb529, sb207, sb1332, sb1901, sb1537, sb1646, sb2662, hb2692, sb1745, sb2349, sb985, sb2550, sb2774, sb688, sb2776, sb72, sb1267, sb2361, hb116, hb2809, hb1689, hb1238, hb1899, hb1151, sb2420, sb1316, sb703, sb241, sb455, sb2269, sb1245, sb1620, hb126, hb136, sb617, sb2122, sb1143, sb1273, sb1355, sb1422, hb630, sb1351, hb3229, hb142, hb3594, hb1465, hb5238, hb3809, sb901, sb746, hb3700,hb1729, hb3560, hb3611, hb2003, sb1173, hb1261, hb2742, hb3698, hb3307, hb1022, hb4739, sb2141, sb1227, sb1177, sb651, sb920, sb1321, sb1496, sb2112, sb687, hb1620, sb984, hb2768, hb2415, hb767, sb1349, sb1569, sb2284, hb2596, hb210, sb1018, sb992, hb198, sb434, sb1931, sb1895, sb1079, hb1778, sb3037, sb664, sb2124, sb958, sb745, sb927, sb1247, sb2938, sb402, sb1239, sb1759, sb761, sb1248, sb1662, sb2268, sb2303, sb9, hb640, hb1894, hb1105, hb1318, hb1024, hb102, hb5667, hb1106, hb109, hb108, hb1193, hb132, hb1562, hb1584, hb1592, hb1506, hb1445, hb1686, hb1443, hb1606, hb1458, hb148, hb1275, sb40, hb128, hb2513, hb1393, sb1184, hb685, hb3161, hb1403, hb3114, hb1828, hb1851, hb1612, hb1866, hb1734, hb1700, hb1871, hb1723, hb1661, hb2073, hb2025, hb1991, hb2014, hb2026, hb2061, hb1902, hb12, hb1481, hb1633, hb2253, hb2310, hb2254, hb2358, hb247, hb1893, hb2078, hb201, hb1922, hb2001, hb2971, hb1916, hb2306, hb2293, hb2273, hb2282, hb2213, hb2286, hb229, hb2560, hb2529, hb2440, hb2492, hb2564, hb2313, hb2348, hb2355, hb2468, hb2522, hb2434, hb2559, hb2508, hb2495, hb2563, hb4666, hb140, hb1422, hb2350, hb2510, hb2402, hb2467, hb2340, hb150, hb791, hb4076, hb3748, hb2970, sb1008, hb5699, hb3153, hb3159, hb3088, sb1388, hb3211, hb2530, hb2765, sb1493, sb670, hb3505,

hb2856, sb1371, hb4809, sb1762, hb4945, hb4643, hb5247, hb4506, hb4687, sb1733, hb3575, hb3803, hb2524. ***

*Texas Statutes & Codes Annotated by LexisNexis®* > *Utilities Code* > *Title 2 Public Utility Regulatory Act (Subts. A — C)* > *Subtitle B Electric Utilities [Expires September 1, 2023] (Chs. 31 — 50)* > *Chapter 40 Competition for Municipally Owned Utilities and River Authorities (Subchs. A — C)* > *Subchapter A General Provisions (§§ 40.001 — 40.004)*

## Sec. 40.004. Jurisdiction of Commission.

Except as specifically otherwise provided in this chapter, the commission has jurisdiction over municipally owned utilities only for the following purposes:

**(1)** to regulate wholesale transmission rates and service, including terms of access, to the extent provided by Subchapter A, Chapter 35;

**(2)** to regulate certification of retail service areas to the extent provided by Chapter 37;

**(3)** to regulate rates on appeal under Subchapters D and E, Chapter 33, subject to Section 40.051(c);

**(4)** to establish a code of conduct as provided by Section 39.157(e) applicable to anticompetitive activities and to affiliate activities limited to structurally unbundled affiliates of municipally owned utilities, subject to Section 40.054;

**(5)** to establish terms and conditions for open access to transmission and distribution facilities for municipally owned utilities providing customer choice, as provided by Section 39.203;

**(6)** to administer the natural gas energy credits program under Section 39.9044(b);

**(7)** to require reports of municipally owned utility operations only to the extent necessary to:

**(A)** enable the commission to determine the aggregate load and energy requirements of the state and the resources available to serve that load; or

**(B)** enable the commission to determine information relating to market power as provided by Section 39.155; and

**(8)** to evaluate and monitor the cybersecurity preparedness of a municipally owned utility described by Section 39.1516(a)(3) or (4).

## History

Enacted by *Acts 1999, 76th Leg., ch. 405 (S.B. 7), § 39*, effective September 1, 1999; *Acts 2019, 86th Leg., ch. 467 (H.B. 4170), § 16.005*, effective September 1, 2019; *Acts 2019, 86th Leg., ch. 610 (S.B. 936), § 9*, effective September 1, 2019; *Acts 2023, 88th Leg., ch. 410 (H.B. 1500), § 42*, effective September 1, 2023.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

# APPENDIX M

## 16 TAC § 25.192

This document reflects all regulations in effect as of June 30, 2025

*TX - Texas Administrative Code > TITLE 16. ECONOMIC REGULATION > PART 2. PUBLIC UTILITY COMMISSION OF TEXAS > CHAPTER 25. SUBSTANTIVE RULES APPLICABLE TO ELECTRIC SERVICE PROVIDERS > SUBCHAPTER I. TRANSMISSION AND DISTRIBUTION > DIVISION 1. OPEN-ACCESS COMPARABLE TRANSMISSION SERVICE FOR ELECTRIC UTILITIES IN THE ELECTRIC RELIABILITY COUNCIL OF TEXAS*

## § 25.192. Transmission Rates for Export from ERCOT

**(a)** Tariffs. Each transmission service provider (TSP) shall file a tariff for transmission service to establish its rates and other terms and conditions and shall apply its tariffs and rates on a non-discriminatory basis. The tariff shall apply to all distribution service providers (DSPs) and any entity scheduling the export of power from the Electric Reliability Council of Texas (ERCOT) region. The tariff shall not apply to any entity engaging in wholesale storage as described by § 25.501(m) of this title (relating to Wholesale Market Design for the Electric Reliability Council of Texas) (storage entity).

**(b)** Charges for transmission service delivered within ERCOT. DSPs, excluding storage entities, shall incur transmission service charges pursuant to the tariffs of the TSP.

**(1)** A TSP's transmission rate shall be calculated as its commission-approved transmission cost of service divided by the average of ERCOT coincident peak demand for the months of June, July, August and September (4CP), excluding the portion of coincident peak demand attributable to wholesale storage load. A TSP's transmission rate shall remain in effect until the commission approves a new rate. The TSP's annual rate shall be converted to a monthly rate. The monthly transmission service charge to be paid by each DSP is the product of each TSP's monthly rate as specified in its tariff and the DSP's previous year's average of the 4CP demand that is coincident with the ERCOT 4CP.

**(2)** Payments for transmission services shall be consistent with commission orders, approved tariffs, and § 25.202 of this title (relating to Commercial Terms for Transmission Service).

**(c)** Transmission cost of service. The transmission cost of service for each TSP shall be based on the expenses in Federal Energy Regulatory Commission (FERC) expense accounts 560-573 (or accounts with similar contents or amounts

functionalized to the transmission function) plus the depreciation, federal income tax, and other associated taxes, and the commission-allowed rate of return based on FERC plant accounts 350-359 (or accounts with similar contents or amounts functionalized to the transmission function), less accumulated depreciation and accumulated deferred federal income taxes, as applicable.

(1) The following facilities are deemed to be transmission facilities:

(A) power lines, substations, reactive devices, and associated facilities, operated at 60 kilovolts or above, including radial lines operated at or above 60 kilovolts, except the step-up transformers and a protective device associated with the interconnection from a generating station to the transmission network;

(B) substation facilities on the high side of the transformer, in a substation where power is transformed from a voltage higher than 60 kilovolts to a voltage lower than 60 kilovolts;

(C) the portion of the direct-current interconnections with areas outside of the ERCOT region (DC ties) that are owned by a TSP in the ERCOT region, including those portions of the DC tie that operate at a voltage lower than 60 kilovolts; and

(D) capacitors and other reactive devices that are operated at a voltage below 60 kilovolts, if they are located in a distribution substation, the load at the substation has a power factor in excess of 0.95 as measured or calculated at the distribution voltage level without the reactive devices, and the reactive devices are controlled by an operator or automatically switched in response to transmission voltage.

(E) As used in subparagraphs (A) - (D) of this paragraph, reactive devices do not include generating facilities.

(2) For municipally owned utilities, river authorities, and electric cooperatives, the commission may permit the use of the cash flow method or other reasonable alternative methods of determining the annual transmission revenue requirement, including the return element of the revenue requirement, consistent with the rate actions of the rate-setting authority for a municipally owned utility.

(3) For municipally owned utilities, river authorities, and electric cooperatives, the return may be determined based on the TSP's actual debt service and a reasonable coverage ratio. In determining a reasonable coverage ratio, the commission will consider the coverage ratios required in the TSP's bond indentures or ordinances and the most recent rate action of the rate setting authority for the TSP.

**(4)** A municipally owned utility that is required to apply for a certificate of public convenience and necessity to construct, install, or extend a transmission facility within ERCOT pursuant to § 25.101 of this title (relating to Certification Criteria) is entitled to recover, through the utility's wholesale transmission rate, reasonable payments made to a taxing entity in lieu of ad valorem taxes on that transmission facility, provided that:

> **(A)** The utility enters into a written agreement with the governing body of the taxing entity related to the payments;

> **(B)** The amount paid is the same as the amount the utility would have to pay to the taxing entity on that transmission facility if the facility were subject to ad valorem taxation;

> **(C)** The governing body of the taxing entity is not the governing body of the utility; and

> **(D)** The utility provides the commission with a copy of the written agreement and any other information that the commission considers necessary in relation to the agreement.

**(5)** The commission may adopt rate-filing requirements that provide additional details concerning the costs that may be included in the transmission costs and how such costs should be reported in a proceeding to establish transmission rates.

**(d)** Billing units. No later than December 1 of each year, ERCOT shall determine and file with the commission the current year's average 4CP demand for each DSP, or the DSP's agent for transmission service billing purposes, as appropriate, excluding the portion of coincident peak demand attributable to wholesale storage load. This demand shall be used to bill transmission service for the next year. The ERCOT average 4CP demand shall be the sum of the coincident peak of all of the ERCOT DSPs, excluding the portion of coincident peak demand attributable to wholesale storage load, for the four intervals coincident with ERCOT system peak for the months of June, July, August, and September, divided by four. As used in this section, a DSP's average 4CP demand is determined from the total demand, coincident with the ERCOT 4CP, of all customers connected to a DSP, including load served at transmission voltage, but excluding the load of wholesale storage entities. The measurement of the coincident peak shall be in accordance with commission-approved ERCOT protocols.

**(e)** Transmission rates for exports from ERCOT. A transmission service charge for exports of power from ERCOT must be assessed to transmission service customers for transmission service within the boundaries of the ERCOT region, in accordance with this section and the ERCOT protocols.

**(1)** A transmission service customer must be assessed a transmission service charge for the use of the ERCOT transmission system in exporting power from ERCOT based on scheduled exports and the rates established under subsections (c) and (d) of this section. The intervals must consist of one hour.

**(2)** The hourly transmission rate for exports from ERCOT will be the TSP's annual rate established under subsections (c) and (d) of this section divided by 8760.

**(3)** The entity scheduling the export of power over a DC tie is solely responsible to the TSP for payment of transmission service charges under this subsection.

**(4)** Beginning with the January 2023 reporting month, ERCOT must file a public report with the commission stating the total amount of energy imported and the total amount of energy exported over each DC tie for the calendar month. The report must also include the total amount of energy exported from the ERCOT region during the reporting month and each of the preceding 11 calendar months, reported by scheduling entity. Each report must be filed within 45 days of the end of the reporting month.

**(f)** Transmission revenue. Revenue from the transmission of electric energy out of the ERCOT region over the DC ties that is recovered under subsection (e) of this section shall be credited to all transmission service customers as a reduction in the transmission cost of service for TSPs that receive the revenue.

**(g)** Revision of transmission rates. Each TSP in the ERCOT region shall periodically revise its transmission service rates to reflect changes in the cost of providing such services. Any request for a change in transmission rates shall comply with the filing requirements established by the commission under this section.

**(h)** Interim Update of Transmission rates.

**(1)** Frequency. Each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than once per calendar year to reflect changes in its invested capital. Upon the effective date of an amendment to § 25.193 pursuant to an order in Project Number 37909, Rulemaking Proceeding to Amend P.U.C. Subst. R. 25.193, Relating to Distribution Service Provider Transmission Cost Recovery factors (TCRF), that allows a distribution service provider to recover, through its transmission cost recovery factor, all transmission costs charged to the distribution service provider by TSPs, each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than twice per calendar year to reflect changes in its invested capital. If the TSP elects to update its transmission rates, the new rates shall reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the

commission authorized rate of return on such facilities as well as changes in loads. If the TSP does not have a commission-authorized rate of return, an appropriate rate of return shall be used.

**(2)** Reconciliation. An update of transmission rates under paragraph (1) of this subsection shall be subject to reconciliation at the next complete review of the TSP's transmission cost of service, at which time the commission shall review the costs of the interim transmission plant additions to determine if they were reasonable and necessary. Any amounts resulting from an update that are found to have been unreasonable or unnecessary, plus the corresponding return and taxes, shall be refunded with carrying costs determined as follows: for the time period beginning with the date on which over-recovery is determined to have begun to the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying costs shall be calculated using the same rate of return that was applied to the transmission investments included in the update. For the time period beginning with the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying costs shall be calculated using the TSP's rate of return authorized in that complete review.

**(3)** Future consideration of effect on TSP's financial risk and rate of return. For a TSP that has increased its rates pursuant to paragraph (1) of this subsection, the commission may, in setting rates in the next complete review of the TSP's transmission cost of service, expressly consider the effects of reduced regulatory lag resulting from the interim updates to the TSP's rates and the concomitant impact on the TSP's financial risk and rate of return.

**(4)** Commission processing of application. The commission shall process an application filed pursuant to paragraph (1) of this subsection in the following manner.

**(A)** Notice and intervention deadline. The applicant shall provide notice of its application to all parties in the applicant's last complete review of the applicant's transmission cost of service and all of the distribution service providers listed in the last docket in which the commission set the annual transmission service charges for the Electric Reliability Council of Texas. The intervention deadline shall be 21 days from the date service of notice is completed.

**(B)** Sufficiency of application. A motion to find an application materially deficient shall be filed no later than 21 days after an application is filed. The motion shall be served on the applicant by hand delivery, facsimile transmission, or overnight courier delivery, or by e-mail if agreed to by the

applicant or ordered by the presiding officer. The motion shall specify the nature of the deficiency and the relevant portions of the application, and cite the particular requirement with which the application is alleged not to comply. The applicant's response to a motion to find an application materially deficient shall be filed no later than five working days after such motion is received. If within ten working days after the deadline for filing a motion to find an application materially deficient, the presiding officer has not filed a written order concluding that material deficiencies exist in the application, the application is deemed sufficient.

**(C)** Review of application. A proceeding initiated pursuant to paragraph (1) of this subsection is eligible for disposition pursuant to § 22.35(b)(1) of this title (relating to Informal Disposition). If the requirements of § 22.35 of this title are met, the presiding officer shall issue a notice of approval within 60 days of the date a materially sufficient application is filed unless good cause exists to extend this deadline or the presiding officer determines that the proceeding should be considered by the commission.

**(5)** Filing Schedule. The commission may prescribe a schedule for providers of transmission services to file proceedings to revise the rates for such services.

**(6)** DSP's right to pass through changes in wholesale rates. A DSP may expeditiously pass through to its customers changes in wholesale transmission rates approved by the commission, pursuant to § 25.193 of this title (relating to Distribution Service Provider Transmission Cost Recovery Factors (TCRF)).

**(7)** Reporting requirements. TSPs shall file reports that will permit the commission to monitor their transmission costs and revenues, in accordance with any filing requirements and schedules prescribed by the commission.

## History

### SOURCE:

The provisions of this § 25.192 adopted to be effective April 13, 1999, 24 TexReg 2874; amended to be effective September 30, 1999, 24 TexReg 8162; amended to be effective December 29, 1999, 24 TexReg 11722; amended to be effective June 20, 2001, 26 TexReg 4440; amended to be effective August 25, 2010, 35 TexReg 7195; amended to be effective April 18, 2012, 37 TexReg 2613; amended to be effective July 5, 2016, 41 TexReg 4805; amended to be effective December 20, 2022, 47 TexReg8267

Annotations

### Research References & Practice Aids

**CROSS-REFERENCES:**

This Section cited in *16 TAC § 25.193*, (relating to Procedures for Modifying Transmission Rates); *16 TAC § 25.198*, (relating to Initiating Transmission Service); *16 TAC § 25.200*, (relating to Load Shedding, Curtailments, and Redispatch); 16 TAC § 25.204, (relating to Summary of Required Filings); *16 TAC § 25.344*, (relating to Cost Separation Proceedings); *16 TAC § 25.247*, (relating to Rate Review Schedule).

This Chapter cited in *16 TAC § 25.2*, (relating to Cross-Reference Transition Provision); 16 TAC § 26.2, (relating to Cross-Reference Transition Provision).

This Subchapter cited in *16 TAC § 25.242*, (relating to Arrangements Between Qualifying Facilities and Electric Utilities).

TEXAS ADMINISTRATIVE CODETEXAS ADMINISTRATIVE CODE

**End of Document**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Michelle Felker on behalf of Thomas Brocato
Bar No. 03039030
mfelker@lglawfirm.com
Envelope ID: 103224431
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief for Appellant
Status as of 7/16/2025 4:22 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Thomas LBrocato | | tbrocato@lglawfirm.com | 7/16/2025 4:08:45 PM | SENT |
| John Hulme | 10258400 | John.Hulme@oag.texas.gov | 7/16/2025 4:08:45 PM | SENT |
| Jordan Pratt | 24140277 | jordan.pratt@oag.texas.gov | 7/16/2025 4:08:45 PM | SENT |
| Roslyn M.Warner | | rwarner@lglawfirm.com | 7/16/2025 4:08:45 PM | SENT |
| Justin Swearingen | | justin.swearingen@opuc.texas.gov | 7/16/2025 4:08:45 PM | SENT |
| Chris Ekoh | | chris.ekoh@opuc.texas.gov | 7/16/2025 4:08:45 PM | SENT |
| Benjamin Barkley | | benjamin.barkley@opuc.texas.gov | 7/16/2025 4:08:45 PM | SENT |
| Adam Falco | | afalco@cstx.gov | 7/16/2025 4:08:45 PM | SENT |
| OPUC  Eservice | | opuc_eservice@opuc.texas.gov | 7/16/2025 4:08:45 PM | SENT |
| David Laurent | | david.laurent@oag.texas.gov | 7/16/2025 4:08:45 PM | SENT |